UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KIMBERLY THEIDON,

                    Plaintiff,

          v.

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE, et. al.

                    Defendants.

CIVIL ACTION NO. 1:15-cv-10809-LTS

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A PROTECTIVE ORDER

### I.        INTRODUCTION.

Harvard's Motion for a Protective Order asks the Court to permit Harvard to take five limited steps to protect the confidentiality of the discovery materials it produces in this case. Plaintiff has agreed to only one of those steps: the standard requirement that discovery materials produced in this case be used for this case and for no other purpose. Four main issues remain in dispute:

- *First,* Harvard asks that the Court permit Harvard to redact from the discovery it produces names and other information identifying the sixteen scholars from other universities and thirteen of the members of Harvard's own Anthropology Department who provided confidential letters used in Professor Theidon's tenure process. Harvard proposes to produce the full text of these confidential letters, redacting only information that would identify their authors.

- *Second,* when Harvard asks scholars from other universities to write a confidential assessment of a tenure candidate (as it does in all cases, including Theidon's case), it requests that those scholars compare the Harvard tenure candidate's achievements and career promise to other scholars that Harvard identifies (or that the letter writer may identify as a leading scholar who should be included for comparison). Harvard asks the Court to permit Harvard to redact the names of

these scholars (in Harvard's parlance, "comparands") from the discovery it pro-
duces.

- *Third*, three scholars from other universities and two Harvard professors from
outside the Anthropology department participated in the *ad hoc* committee meet-
ing that considered Theidon's case. (The *ad hoc* committee process is described in
greater detail below).  Harvard does *not* ask the Court's permission to redact their
names, or to redact the names of five Harvard Anthropology Department mem-
bers—the faculty members who served on Theidon's Anthropology Department
tenure review committee, participated in the *ad hoc* committee meeting, or both.
However, Harvard asks that the Court order that these ten names be disclosed to
plaintiffs' counsel on an attorneys' eyes only basis.

- *Fourth,* at least through the summary judgment stage, Harvard asks the Court to
direct the parties not to reveal the identities of individuals whose names have been
disclosed on an attorney's eyes only basis when referring to those parties in public
filings or in open court.

These protections are warranted in this case because they are central to protecting the in-
tegrity of Harvard's tenure process—a process designed to ensure that Harvard confers lifetime
teaching appointments on only those scholars who are truly "in the first order of eminence" in
their disciplines. That tenure process is crucial to Harvard's ability to continue to be a leading
force in education and research in the United States and throughout the world. Confidentiality is
in turn a critical part of Harvard's tenure process; Harvard's ability to solicit candid assessments
of tenure candidates from other scholars—scholars at Harvard and scholars at other universi-
ties—depends on those scholars' expectation that their views will be treated confidentially. The
Protective Order Harvard asks the Court to enter would carefully balance Harvard's legitimate
need to protect the confidentiality of its tenure process and plaintiff's ability to *attempt* to prove
her discrimination and retaliation case, all in a manner consistent with Fed. R. Civ. P. 26(b)-(c).

## II.        PROCEDURAL AND FACTUAL BACKGROUND.

Plaintiff brought suit on March 12, 2015.  She alleges that when Harvard decided not to grant tenure to her in 2013, it did so because she is a woman and in retaliation against her for three actions she took that year and the year before: (1) posting comments in the Comments section of the Harvard Crimson's website in March 2013, in response to comments by others about an article concerning Harvard's sexual assault policy, Complaint ¶¶ 65-69; (2) permitting students to leaflet about sexual assault issues after one of her classes, Complaint ¶ 3, and (3) suggesting that a former student (and then-current Harvard employee) who raised concerns about sexual harassment by a professor talk to two *other* Anthropology Department faculty members about it, Complaint ¶ 76. Harvard has filed an Answer denying Plaintiffs' claims. Harvard's position in this case is simple: Harvard President Drew Faust—who made the ultimate decision not to grant tenure to Theidon—did so purely on the merits. Plaintiff's contentions that President Faust and Harvard did not award tenure to Theidon because she is a woman, or because she posted a comment in the Comments section of the Crimson, or for any of the other reasons she advanced—are baseless, reckless, and cannot survive a Motion for Summary Judgment at the completion of discovery.

Harvard's counsel sent the proposed Protective Order attached as Exhibit A to plaintiff's counsel on August 12, 2015.  Plaintiff's counsel sent Harvard counsel comments on September 9, 2015.  Plaintiffs' counsel agreed to the provision requiring that discovery be used solely for the prosecution and defense of this case and several other procedural provisions (concerning disclosure to potential experts and the like), but rejected the other provisions of Harvard's proposed Order described above.

B4462064.1

### III.     ARGUMENT.

A.     Confidentiality is Critical to Harvard's Tenure Process.

*Harvard's Tenure Process*. Harvard treats the *substance* of its tenure deliberations as highly confidential, but there is no mystery to the procedure Harvard follows.  Harvard's Faculty of Arts and Sciences ("FAS") publishes a summary, called the Tenure-Track Handbook, addressed specifically to FAS tenure-track faculty. Affidavit of Faculty of Arts and Sciences Dean Michael D. Smith, ¶ 5.  (A copy of that Handbook is attached to this Memorandum as Exhibit B.)[1] As the Handbook describes, the process calls for faculty members within a tenure candidate's department, and leading academics outside Harvard, to provide confidential, candid evaluations of a candidate's academic work. The process is careful, lengthy, and leads, ultimately, to Harvard's President, who in every case makes the final decision whether to award tenure to a candidate. Smith Aff. ¶ 10.

For candidates like Theidon, who come from FAS's own ranks rather than outside the university, the process typically begins with the scholar's appointment as an assistant professor in a Harvard FAS department (Anthropology in Theidon's case). An appointment as an assistant professor is ordinarily for a period of five years. *Id*. ¶ 6.  In the fourth year of that five-year appointment (assuming a regular schedule without appointment extensions for circumstances such as the birth of a child), an assistant professor may be considered for promotion to associate professor. *Id*. ¶ 7. At Harvard's FAS, an associate professorship is a tenure-track appointment held by individuals who have demonstrated sufficient promise and achievement such that they would

---

[1] FAS's tenure process for faculty members is described in even more detail in FAS's Appointment and Promotion Handbook, which is also available to all faculty members. For ease of reference, the Tenure Track Handbook is also attached to Dean Smith's Affidavit as Exhibit A.

be expected to qualify for tenure at a major research institution within three to five years. *Id.* ¶ 7. Unlike many other universities, an associate professor at Harvard is not a tenured position; the only tenured rank is that of Professor. *Id.* ¶ 7. Promotion to associate professor (in Theidon' case, a five-year appointment) is by no means an indication or promise that tenure will follow. *Id.* In fact, the letter informing Theidon that she has been promoted to Associate Professor specifically informed her that "promotion to Associate Professor carries with it no presumption of promotion to full, tenured professor."[2] Harvard promotes assistant professors to the rank of associate professor when Harvard believes they possess the intellectual ability, creativity, and drive to be excellent *candidates* for promotion to tenure at Harvard. *Id.* ¶ 7. But only those tenure-track faculty who become "scholars of the first order of eminence" and satisfy the University's other very high standards will, in fact, receive offers of tenure. *Id.* ¶ 7. Review for promotion from the ranks of associate professor to the rank of full, tenured Professor typically occurs in the next-to-last year of the associate professor's appointment.

Harvard's FAS tenure process contains eight separate steps:

- *First,* the tenure candidate assembles his or her "Promotion Dossier," including detailed information describing the candidate's publication record, research, and teaching. *See* Ex. B, at 13;

---

[2] Theidon's complaint mischaracterizes this letter, as a "recommendation for tenure." Complaint, ¶ 27. It was nothing of the kind. Indeed, as the Tenure-Track Handbook states, *see* Ex B at 11, the letter was the "formal record of the feedback and advice resulting from the review" for promotion to Associate Professor. In Theidon's case, the letter provided an "appraisal of where we think you stand right now and what we think you will need to accomplish in the next several years in order to be a good candidate for tenure at Harvard." The letter informed Theidon, among other things, that "it will be extremely important that your book [Intimate Enemies, then in manuscript form] be published and reviewed in major journals in the fields of socio-cultural anthropology and Latin American Studies *before* the process of tenure review begins" (emphasis added) and that Theidon "should endeavor to publish articles in a set of journals that are recognized as the top outlets for social anthropology research [including] American Ethnologist, American Anthropologist, Comparative Studies in Society and History, Ethnology, and Current Anthropology." Discovery will determine whether Theidon followed the advice she was given in her June 2008 promotion letter before she was considered for tenure in 2013.

- *Second,* the department's chair appoints a review committee to review a candidate's promotion dossier and recommends to the candidate's department whether the tenure review should continue. *Id.* at 13, 16.

- *Third,* if the department agrees to continue the review, the department chair or a Harvard dean usually solicits twelve to fifteen letters from external scholars who are asked to review the candidate's scholarship. These external evaluations help the candidate's colleagues determine whether, in their view, the candidate's work has met the FAS standards for tenure. Because FAS wants these external reviewers to provide the most candid evaluations possible, the letter soliciting external reviews ask the scholars to keep the request confidential and promise that Harvard "will make every effort to keep [the] response confidential to the extent permitted by law and to make it available only to the senior members of the relevant Department . . . and others directly involved in the formal review process." *Id.* at 13, 16; Smith Aff. ¶ 7.

- *Fourth,* following the departmental tenure committee's preparation of a report, the tenured members of a candidates vote on whether the case is strong enough to proceed. *See* Ex. B, at 13, 17.

- *Fifth,* if a significant majority of the tenured faculty in the associate professor's department vote in support of the associate professor's candidacy, the individual members of the department each writes a *confidential* "internal" letter to the FAS Dean. These letters provide an opportunity for each faculty member in the associate professor's department to individually voice their views of the associate professor's case for promotion to tenure. The internal letters become part of the associate professor's dossier. *Id*; Smith Aff. ¶ 9.[3]

- *Sixth,* the candidate's department chair and tenure review committee members finalize a "case statement" for submission, with the promotion dossier the candidate assembled, to the FAS Dean. *See* Ex. B, at 13, 17.

- *Seventh,* the FAS Committee on Appointments and Promotions (comprised of select tenured faculty and senior administrators from across the FAS) reviews the candidate's dossier and advises the FAS Dean on next steps. If the dossier is sufficiently strong, the Dean recommends to the President that she consider approving an appointment as professor with tenure in the department. In some cases (where it appears that the candidate is *clearly* not qualified for tenure), the FAS Dean and the Committee on Appointments and Promotions conclude that the dos-

---

[3] Again, every tenure candidate understands that these letters, like the external letters, are treated as "confidential"— the Tenure-Track Handbook makes that clear. Ex. B at 13.

sier is not sufficiently strong to merit further consideration, and the tenure process ends. In most cases, however, the dossier is forwarded to the President for further consideration. *Id.* at 13; Smith Aff. ¶ 7

- *Eighth,* as the Handbook states, the "President makes the final decision regarding all tenure appointments." To help in making the decision, the President or Provost typically presides over an *ad hoc* committee that reviews the case. After receiving advice from the *ad hoc* committee, the President makes her final decision, which is hers and hers alone. *Id.* at 13; Smith Aff. ¶ 9

*The Role of the Ad Hoc Committee. Ad hoc* committees are not formed, as plaintiff alleges in her Complaint, "when Harvard wants to deny tenure." Complaint, ¶ 89. Instead, to help the President make her decision, the President (or Provost) typically presides over an *ad hoc* committee convened to discuss the associate professor's case for promotion. Smith Aff. ¶ 10. Either the President or Provost may preside over the *ad hoc* meeting, depending on scheduling or other issues, and no significance attaches to which of the two is present for the meeting and presides. *Id.*  Whether the President or Provost presides over the *ad hoc,* the final tenure decision rests with the President. *Id.* The function of the *ad hoc* committee is to provide a forum where the President (or Provost) can ask questions of subject matter experts and receive further confidential information about whether the candidate's work meets the standard for tenure within the FAS. *Id.* The *ad hoc* committee usually consists of three active full professors from outside Harvard, two active full professors at Harvard (who are not from the department making the recommendation), the President or Provost, the Dean of the Faculty, the Senior Vice Provost for Faculty Development and Diversity, and the FAS divisional dean responsible for the case. *Id.* Like the external letter writers, the external members of the *ad hoc* committee are active scholars who are full professors and are chosen for their deep understanding of the associate professor's field. Such scholars are uniquely qualified to advise the President (directly, or through the Provost) on who in their field is a scholar of the first order of eminence. *Id.*

- 7 -

At the *ad hoc* committee meeting, several departmental "witnesses" come individually to speak to the committee. *Id*. These witnesses usually include the department and review committee chairs, one senior faculty member who was in favor of the promotion, and one who voted against it (if any did so). *Id*. The goal in inviting such witnesses is to ensure that the full range of views within the department is represented. *Id*. During the course of the meeting, members of the *ad hoc* committee are invited to participate actively in asking questions of witnesses. *Id.* Once the committee has heard from the witnesses, the President or Provost continues the proceedings with a discussion of the entire case for tenure with only the *ad hoc* committee. *Id*. To conclude this discussion, the President or Provost asks each (non-administrative) member of the committee to summarize his or her views and also to provide a recommendation as to whether the candidate qualifies for tenure at Harvard. *Id*. Following the *ad hoc* Committee meeting, Harvard's President may make further confidential inquiries about the case before making the final tenure decision. *Id*. All aspects of the President's deliberations before, during, and after the *Ad hoc* are kept strictly confidential—as faculty members are informed well in advance. *Id*; *see also* Exhibit B, at 19 ("In order to protect the candidate from any additional anxiety and to ensure the integrity of the process, all aspects of the President's deliberations, including the timing of the *ad hoc*, are strictly confidential.") [4]

*Confidentiality is Critical to the Tenure Process.* Dean Smith's Affidavit describes in detail the reasons why confidentiality is critical to Harvard's tenure process. Harvard's tenure process relies heavily on candid and confidential evaluations made by the tenure candidate's

---

[4] The *ad hoc* committee meeting is not recorded, and no formal record is made of the proceeding. In this case, the Senior Vice Provost for Faculty Development and Diversity made notes during the meeting, which Harvard expects to produce subject to the Protective Order it seeks.

scholarly peers both inside and outside the university. Smith Aff.  ¶ 11. Indeed, such peer review is the linchpin of the tenure process. *Id.* As Dean Smith attests:

> The peer review process is fragile in a number of respects: it relies on extensive, detailed and candid evaluations by scholars outstanding in their own right, with many calls on their time; it relies on those scholars' willingness to state their judgments of people with whom they may work closely, either at their own universities or in other professional activities; and it relies upon the readiness of the peer reviewers to provide their honest assessments even though they are under no compulsion to provide them and customarily receive no remuneration for doing so. A reliable promise of confidentiality is indispensable to obtaining peer reviews of the quality, detail and candor necessary to make a decision as consequential as an offer of tenure. For these reasons, Harvard has traditionally extended, and evaluators have traditionally expected, assurance that their opinions will be held to the maximum extent possible in confidence by those who seek the evaluations and will make the tenure decision.

Smith Aff. ¶ 12. Moreover, FAS does not consider candidates for tenure in a vacuum. Harvard solicits detailed and specific advice from scholars at other universities and requests a detailed comparison of the candidate's qualifications compared to other scholars in the candidate's field. *Id*. ¶ 13. These "comparands" may teach or do research at the university (or in the very department) where the letter writer teaches. *Id.* Dean Smith explains why it is "critically important" for Harvard to rely on scholars from other universities:

>  In the first place, using peer reviewers from outside the university results in more informed decision making. A tenure review process that utilizes peer reviews from a dozen or more experts at a dozen or more universities will almost certainly result in more discerning judgments about tenure candidates than an effort confined to the university's own department.  Moreover . . . [g]iven the present high degree of academic specialization, the number of scholars qualified to render opinions concerning a candidate's stature in a competitive ranking in his or her academic discipline will necessarily be located outside of Harvard (and not simply inside Harvard.) These scholars will be located on campuses throughout the country (and sometimes in other countries as well), as no university has a monopoly on teaching and research in any particular discipline. Thus, when Harvard considers whether to grant tenure to a faculty member whose work focuses on a

particular specialized discipline, or the study of a particular region or time period, Harvard must by necessity consult scholars expert in that discipline, geographical area, or time period from other universities as well as professors in the candidate's own department, who may be leading scholars in the discipline generally, or in some aspect of that discipline, but who may have limited knowledge of the candidate's own sub-specialty.

Smith Aff. ¶ 14-15. FAS asks external scholars evaluating a tenure candidate to provide very candid, detailed appraisals:

When FAS asks an external reviewer to compare and contrast the leading scholars in his or her field to assist FAS in its decision making, FAS anticipates that the external reviewer will not respond merely by providing a numerical ranking, or with conclusory statements of praise or criticism. FAS is asking external reviewers to provide specific, searching and candid appraisals. The evaluators' analyses generally set forth the basis for their judgments, usually by specific reference to the candidate's recent works and often to the recent works of others.

Smith Aff. ¶ 17. There is every reason to believe that external reviewers would decline to provide appraisals, or be less candid— pull their punches—if they believed that either the tenure candidates or the "comparands" would see their evaluations.  As Dean Smith states:

The disclosure of such appraisals would almost certainly have serious repercussions. External reviewers are often speaking of people they know well, professionally and possibly personally. The candidate and the 'comparands' are people that the evaluator may be working closely with at the moment or may find herself working closely with in the future. They may serve together on a professional society's task forces, on editorial boards of the discipline's journals, or on peer review panels for federal grant funding. Indeed, the evaluator may find herself soon submitting a paper for publication, or a grant proposal for funding, on which a colleague whom she has evaluated must pass. Such publication or funding decisions can be critical to the evaluator's career, and it requires little imagination to envision the embarrassment—and worse, the possible prejudice to publication or funding—that could result if appraisals attributed to the evaluator were distributed beyond the very limited bounds for which they were written.

[Because] [p]articipation in Harvard's tenure process customarily confers no financial benefit on the external reviewer . . . participation in the process and the honesty that the process requires depend on nothing more than the external re-

- 10 -

viewers' sense of professional obligation. If external reviewers believe that their evaluations will *not* remain confidential, many reviewers who have legitimate criticism of a tenure candidate's scholarly merits will, in my judgment, simply choose not to participate in the process.

Smith Aff. ¶ 18-19. Indeed, Dean Smith states: "As a peer reviewer myself for other institutions, I know that I would certainly write much less informative and comparative letters if I were not given an assurance of confidentiality."

This need for confidentiality applies with equal force to the confidential tenure letters written by members of the tenure candidate's own department. Dean Smith, who has been re-viewing tenure dossiers as Dean of the Faculty of Arts and Science since 2007, states:

It is simply a fact of life that, if faculty members believed that their own confiden-tial letters to the FAS Dean might be disclosed publicly, or even to the candidate, they would be less inclined to engage in the kind of detailed, searching inquiry that is required to ensure that Harvard grants tenure to the very best, and only the very best, candidates. If a professor believed that the tenure-track faculty member in the next office would, if tenured, know for the rest of his or her academic ca-reer that the professor's confidential letter raised questions about the candidate's scholarship, the professor would be sure to express any negative opinions he or she had less forcefully, or not express those views at all.

Smith Aff. ¶ 20.[5]  While the close link between confidentiality and candor applies with special force to university tenure decisions because tenured faculty appointments are, in essence, life-time appointments, that link is fundamentally a reflection of basic facts about human behavior. As the Supreme Court has recognized: "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for

---

[5] Dean Smith's Affidavit also raises concerns about confidentiality relating to the tenure files of other professors whose tenure records plaintiff seeks. Smith Aff. ¶ 21.  Harvard expects that plaintiff will seek to compel production of files other than Theidon's and the parties will either resolve that dispute or require the Court's assistance. To the extent that Harvard either agrees to produce such files (or is ordered to do so), Harvard seeks essentially equivalent confidentiality protections to those it seeks here.

their own interests to the detriment of the decisionmaking process." *United States v. Nixon,* 418 U.S. 683, 705 (1974). The need for candor in many important decisions leads to rules making deliberations confidential. That is why, for example, jury deliberations are confidential: "[f]reedom of debate might be stifled and independence of thought checked if jurors were made to feel their arguments . . . were to be freely published to the world." *Clark v. United States*, 289 U.S. 1, 13 (1933).

This Court has recognized the connection between confidentiality and candor.  In *In Re Bextra & Celebrex Mktg. Sales Practices and Prod. Liab. Litig.*, 249 F.R.D. 8, 15 (D. Mass. 2008), the Court declined to enforce a subpoena served on the New England Journal of Medicine for information about its peer review process. The Court found "persuasive" New England Journal of Medicine's assertions that maintaining peer reviewers' names confidential "permits the reviewers to 'be as frank as possible in their assessments of the submitted science'"; that disclosure of names would result in a "'chilling effect' on the peer review process and as a result upon the medical community'" and that "'reviewers lacking confidentiality might face retaliation from those authors whom they have criticized.'"  While the context is here is somewhat different (the *Bextra* case involved a subpoena issued to a non-party), the Court's recognition that confidentiality and candor are closely linked is directly on point. *See also* 6-26 Moore's Federal Practice-Civil §26.46 ("The courts have consistently maintained a well-founded concern for the confidentiality of information in tenure review files. Tenure review committee members obtain much of the peer review information contained in those files by virtue of promises of confidentiality, and if of those assurances occurred as a matter of course in denial of tenure lawsuits, the integrity of the tenure process might be severely compromised.")

B4462064.1

If there were any doubt about the close connection between candor and confidentiality, the Court need look no further than the federal court's own hiring system. The electronic system for federal law clerk applications requires law professors writing letters of recommendation to upload those letters directly to the systems. The FAQs for law clerk hiring contain the following indication of the importance of confidentiality in hiring decisions:

- **Who can upload letters of recommendation to OSCAR?**
- Only recommenders, faculty assistants, and OSCAR law school administrators can upload letters of recommendation into OSCAR.
- The OSCAR program does not support the uploading of recommendation letters by applicants. *The OSCAR Working Group, a group of federal judges and law school representatives, explicitly designed the system so that recommendation letters remain confidential and are not visible to applicants.*
- The Administrative Office of the United States Courts (AO) does not support applicants circumventing this process by uploading their own letters of recommendation into OSCAR and does not upload letters on behalf of recommenders.

https://oscar.uscourts.gov/faq/recommender_faq#q24 (emphasis supplied). The hiring of federal law clerks is surely important, but it rarely represents a lifetime commitment. A university's tenure decision on the other hand, represents precisely that kind of commitment. For that reason, ensuring that university administrators can get candid input is extraordinarily important. As a consequence, permitting them to receive that information confidentially is critical.

B.    Contrary to Plaintiffs' Contentions, the Supreme Court's Decision *in EEOC v. University of Pennsylvania* is Entirely Consistent with the Relief Harvard Seeks.

In the status conferences conducted by the Court, plaintiff's counsel has referred to the Supreme Court's decision in *Univ. of Pa. v. EEOC*, 493 U.S. 182, 197-98 (1990), which rejected a broad peer-review privilege that would, if adopted, have broadly shielded *all* university tenure records from discovery in litigation. But the Supreme Court's decision declining to recognize a broad privilege does not tell us whether the Court may, under Fed. R. Civ. P. 26(b)(2)(C) and

26(c), fashion an appropriate protective order that protects Harvard's interests in confidentiality while permitting plaintiff to press her discrimination and retaliation claims. The Supreme Court deliberately chose *not* to decide that issue. The Supreme Court recognized that "confidentiality is important to the proper functioning of the peer review process under which many academic institutions operate," 493 U.S. at 183, and explicitly left open whether identifying information in tenure files could be redacted to preserve universities' ability to obtain confidential information about tenure: "We also do not consider the question, not passed upon by the Court of Appeals, whether the District Court's enforcement of the Commission's subpoena will allow petitioner to redact information from the contested materials before disclosing them." *Id*. at 202, n. 9; n. 2.[6]

C.  <u>Harvard's Proposed Protective Order is Appropriate Under Fed R. Civ. P. 26 (b)(2)(C) and 26(c) Because it Protects Harvard's Legitimate Interest in Confidentiality Without Impeding Plaintiff's Ability to Prosecute Her Discrimination and Retaliation Claims</u>.

Fed. R. 26 (b)(2)(C) and 26(c) provide the Court with broad authority to issue orders to ensure that discovery is tailored to meet the needs of the case.  Rule 26(b)(2)(C) provides that the Court must "limit the frequency or extent of the discovery otherwise allowed by these rules or by local rules if it determines that "the burden or expense of proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of discovery in resolving the

---

[6] The Third Circuit had noted: "[o]n this limited record, we believe the University has offered reasons that may justify redaction." *University of Pa. v. EEOC*, 850 F. 2d 969, 982, and n. 10 (3rd Cir. 1988) (referring specifically to the University's contention "that the identity and affiliation of individuals who evaluate the tenure candidates are irrelevant to the EEOC's investigation of discrimination"). At oral argument in the Supreme Court, at least one (unidentified) Justice noted the issue: "Well, … it seems to me that the Third Circuit certainly thought at least that furnishing the names might not be as relevant and not as necessary and that that could be redacted Now, it seems to me there ought to be perhaps some residual power in the court to determine the degree of relevance and perhaps to redact names if it thought that wasn't essential." *See* 1989 U.S. Trans. LEXIS 74, *28.

issues."[7]  Rule 26(c) provides that a party may seek a protective order "to protect a party or per-

son from annoyance, embarrassment, undue burden or expense" by "forbidding inquiry, or limit-

ing the scope of disclosure or discovery to certain matters" or requiring that otherwise discovera-

ble "confidential research, development, or commercial information not be revealed or be re-

vealed only in a specified way." (emphasis added).  Fed. R. Civ. P. 26(c).

Rule 26(c) is "highly flexible, having been designed to accommodate all relevant inter-

ests as they arise." *Voice Domain Techs. v. Apple, Inc.*, 2014 U.S. Dist. LEXIS 143903 *1, *4:

(D. Mass.) "The 'good cause' standard in Rule 26(c) is a flexible one that requires an individual-

ized balancing of the many interests that may be present in a particular case." *Id.*  Fed. R. Civ. P.

26(c) "confers broad discretion on the trial court to decide when a protective order is appropriate

and what degree of protection is required." *Baker v. Liggett Grp., Inc.*, 1990 U.S. Dist. LEXIS

9954, at *6 (D. Mass. 1990). "Restrictions on the right to disseminate information obtained in

discovery are appropriate if it is shown that such restrictions are necessary to protect a producing

party from 'annoyance, embarrassment or oppression,' including, *but not limited to*, true trade

secrets and confidential research, development and commercial information." *Id.* at *7 (emphasis

added).

Harvard's research has identified no First Circuit precedent after the Supreme Court's

decision in *University of Pa. v. EEOC* addressing redactions in tenure files. Here, however, the

Protective Order Harvard seeks is appropriate given (1) the importance of the need for confiden-

---

[7] Unless Congress acts, this rule will be amended on December 15, 2015. The amendment makes Harvard's point even more clearly, as it limits the scope of discovery to "any nonprivileged matter that is relevant to any party's claims or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."

tiality (described in detail above), (2) the governing legal standard, which makes clear that courts should not, absent evidence of discrimination or other illegal conduct by a university, second-guess university tenure decisions, and (3) the lack of any significant practical impact the Protective Order would have on the plaintiff, at least through the summary judgment stage.

*Special Considerations Govern Tenure Cases*. As the First Circuit has held, "[w]here the basis of an employment discrimination suit is a denial of tenure, some special considerations apply." *Villanueva* v. *Wellesley College*, 930 F.2d 124, 129 (1st Cir. 1991).  It is "a settled principle: courts do not decide whether candidates' tenure qualifications were judged incorrectly, but only whether the ultimate decision was based on an unlawful factor."  *Jackson v. Harvard University*, 900 F.2d 464, 470 n.2 (1st Cir. 1990).

> In the context of academic tenure cases, this court has been attentive to the need to balance the right of a plaintiff to be free from discrimination against the undesirable result of having the court sit as a 'super-tenure committee.' *See Villanueva* v. *Wellesley College*, 930 F.2d 124, 129 (1st Cir. 1991).  . . .  Aware of the fine balance of competing considerations that preserve academic freedom, this court has noted that 'in tenure cases, courts must take special care to preserve the University's autonomy in making lawful tenure decisions.' *Brown* v. *Trustees of Boston Univ.*, 891 F.2d 337, 346 (1st Cir. 1989).

*EEOC v.  Amego, Inc.*, 110 F. 3d 135, 145 (1st Cir. 1997). The relevant inquiry here is not the "wisdom of [Harvard's] tenure decision," *Villanueva* v. *Wellesley College*, 930 F.2d at 131. Indeed,

> Courts must be extremely wary of intruding into the world of university tenure decisions. These decisions necessarily hinge on subjective judgments regarding the applicant's academic excellence, teaching ability, creativity, contributions to the university community, rapport with students and colleagues, and other factors that are not susceptible of quantitative measurement. Absent discrimination, a university must be given a free hand in making such tenure decisions. . .

- 16 -

> Inevitably, some tenure decisions . . . will be very close -- may, indeed, split the university community and lead responsible people to very different conclusions on the merits. Courts have no license to resolve such disputes except where there is evidence from which to conclude that an illicit motive was at work. The fact that a court might be sympathetic to a tenure award is not enough from which to find discrimination unless the University's stated reasons are palpably unworthy of credence or there is other evidence pointing to discrimination.

*Kumar v. Board of Trustees*, 774 F.2d 1, 12 (1st Cir. 1985) (Campbell, C.J., concurring), *cert. denied*, 475 U.S. 1097, 89 L. Ed. 2d 896, 106 S. Ct. 1496 (1986). Courts must recognize "the importance of allowing universities to run their own affairs (and to make their own mistakes). To do otherwise threatens the diversity of thought, speech, teaching, and research both within and among universities upon which free academic life depends." *Vargas-Figueroa v. Saldana*, 826 F. 2d 160, 162-63 (1st Cir. 1987).

These principles should guide the Court in fashioning of a protective order that provides an "individualized balancing of the many interests that may be present in a particular case," *Voice Domain Techs. v. Apple, Inc.*, 2014 U.S. Dist. LEXIS 143903 at *4. Here, the search for information "that is relevant to any party's claim or defense," Fed. R. Civ. P. 26(b), requires the parties and the court to focus on information likely to bear on whether Theidon was the victim of discrimination and retaliation, not to permit the plaintiff to conduct a generalized inquiry asking whether Harvard should have awarded tenure to Theidon, or even whether the denial of tenure was motivated by "interpersonal conflict or petty academic politics*." Fabunmi v. University of Md.*, 1999 U.S. App. LEXIS 2726 (4th Cir. 1999).

*Harvard's Proposed Protective Order Will Not Meaningfully Impact Theidon's Ability to Pursue Her Claims.* Theidon's ability to seek evidence of alleged discrimination and retaliation will not be impacted by Harvard's proposed Protective Order.

B4462064.1

Redacting Names and Personally Identifying Information of Letter Writers. Harvard pro-
poses to redact the names and personally identifying information from the confidential assess-
ment letters written by sixteen external scholars and thirteen members of the Anthropology De-
partment included in Harvard's tenure dossier.[8]   Harvard does not propose to redact any of the
substantive comments any of those letter writers made about Theidon. The faculty of the An-
thropology Department (in the case of the external letters) and the President and *ad hoc* commit-
tee considered the views of these scholars about Theidon as expressed on paper only. With the
exception of knowing the names of the letter writers, plaintiff and her counsel will stand in ex-
actly the same position as Harvard's decision makers with respect to these letters. But redaction
will permit Harvard to preserve the confidentiality of tenure deliberations—an important value.[9]

Even after the Supreme Court's decision in *Univ. of Pa. v. EEOC*, other courts have per-
mitted parties to redact identifying information in similar circumstances. In *Black v. New York
Univ. Med. Ctr.,* 1996 US Dist. LEXIS 7632 (S.D.N.Y. 1996), for example, plaintiff brought a
gender discrimination case based on defendant's failure to promote plaintiff to the rank of full
professor. The court concluded that "letters of outside evaluators submitted in the promotion re-
view process and materials concerning the deliberations of committees that considered plaintiff's
candidacy for promotion and subsequent grievance" sought relevant information. *3. But the
court continued, and discussed the need for redaction:

---

[8]Harvard initially proposed to plaintiff that these documents be produced as "attorneys' eyes only" but in response to
plaintiffs' objection has agreed to narrow that request.  Harvard also proposes to include among the redactions iden-
tifying information concerning scholars who declined to provide letters when requested.

[9] Harvard does *not* intend to redact the names of any of the Harvard or external scholars or administrators who par-
ticipated in the *ad hoc* committee meeting; Theidon's counsel will be able to question each of them to determine
their views on Theidon's candidacy and the reasons they held those views. *See infra* at 20-23.

This relevance determination does not mean, however, that these documents should not be subject to an appropriate protective order, pursuant to which the names and other language identifying the outside evaluators and committee members could be redacted. *See Pennsylvania*, 493 U.S. at 187 n.2 (leaving open question of whether academic institution can engage in any redaction of the disputed records before producing them) . . . Given that plaintiff has made no showing that disclosure of the identities of these persons are necessary or important (or even relevant), the Court believes that they should be kept confidential at this stage of the litigation. Therefore, defendant should undertake to make appropriate redactions of the letters and committee documents in order to protect the privacy of the evaluators and committee members.

*Id*. at *15-17 (footnotes omitted). The Court's acknowledgement that the *identity* of the letter writers, rather than the *content* of the letters lacks relevance applies with equal force here. Plaintiff should not be permitted to use the discovery process to seek evidence that is not relevant to her claims or Harvard's defenses, or to use the discovery process to seek information, not relevant to this dispute, in an effort to bolster unsubstantiated allegations. [10] Similarly, in a more recent case, *Thayer v. E. Me. Med. Ctr.,* 2009 U.S. Dist. LEXIS 50878 *8-9 (D. Me. 2009), plaintiff claimed that she had been a victim of gender discrimination because she was treated differently than a male counterpart in the hospital's peer review process. The court rejected a broad federal medical peer review privilege but permitted the defendant to produce significant parts of the discovery in redacted form. In particular, the Court permitted the defendants to redact the names of any participant or person who provided information in connection with the peer review process, except for the plaintiff and two other doctors whose actions in the case were particularly important *Id*. at *8-9. This is the equivalent of the relief Harvard seeks, as Harvard does not seek to redact the names of the individuals who were the most significant participants in the process:

---

[10] The Court directed that the defendant provide the redacted documents to the Court for *in camera* review, something Harvard does not seek here but would certainly not object to.

the individuals who participated in the *ad hoc* committee process. *See also Mitchell v. Adm'r and Dir. of Assigned Counsel Plan*, 2005 U.S. Dist. LEXIS 13301 *2-4.  1572158 *1-2, *8 (S.D.N.Y. 2005) (in case where plaintiff sued after being removed from a list of attorneys assigned to represent indigent clients and sought, in discovery, an order requiring disclosure of attorneys and judges who had provided evaluations to the committee that removed him from the list, the Court concluded that the harm caused by disclosing the identities of the judges and attorneys outweighed the need for the identification of those who provided the evaluations); *Sabharwal v. Mount Sinai Med. Ctr.*, 2011 U.S. Dist. LEXIS 2011 *13 (E.D.N.Y. 2011) (the court rejected the defendant's claim that a medical peer review privilege generally protected peer review files from disclosure, but held that "evaluative reports of Ms. Sabharwal with the names, signatures, and job titles of the reviewers indicated  . . . should be produced  redacted only as to this identifying information . . ."); *Figal v. Vanderbilt Univ.*, 2013 Tenn. App. LEXIS 656, 1 (Tenn. Ct. App. Sept. 17, 2013) (Court rejected plaintiffs' efforts to offer additional evidence from scholars who had written letters; because the tenure decision was made on the basis of the original letters, further explanatory information was not relevant.)[11]

Redacting Names of "Comparands."  Harvard also proposes to redact the names and personally identifying information of the four professors from other institutions to whom Harvard asked external scholars to compare Theidon (and also the names of any comparands identified by the external scholars. The identity of those scholars does not have any "tendency to make any

---

[11] In one pre-*Univ. of Pa. v. EEOC* case, the Court held that Harvard could redact the identity of comparators "[i]n recognition of the interest of the university in maintaining the confidentiality of its tenure files and the identity of persons involved in the tenure process," *Jackson v. Harvard Univ.* 111 F.R.D. 472 , 476 (D. Mass. 1986).  After that Judge retired, the Judge who took over the case expressed criticism of the decision, *Jackson v. Harvard Univ.* 721 F. Supp. 1397, 1406-1408 (D. Mass 1989), but that decision also preceded *Univ. of Pa. v. EEOC*, which explicitly left room for a court to exercise discretion to permit redactions.

relevant fact more or less probable than it would be without the evidence" -- here whether Harvard's denial of tenure to Theidon was based on gender or in retaliation for the exercise of protected rights, rather than based on non-discriminatory reasons. *See* Fed. R. Evid. 401 (defining relevant evidence). They are complete strangers to this litigation; there are obvious, legitimate reasons to protect their identities.

Disclosing the Identities of *Ad Hoc* Committee Members and Participants on an Attorneys' Eyes Only Basis. Under Rule 26(c), the Court has discretion to permit disclosure of information on an attorneys' eyes' only basis. *See generally Trs. of Boston Univ. v. Everlight Elec Co., Ltd,* 2014 U.S. Dist LEXIS 146542 *10 (D. Mass. 2014), *America v. Growth Capital v. Pfip*., 2014 U.S. Dist. LEXIS 8438 (D. Mass 2014). Here, Harvard has agreed (reluctantly) to disclose to plaintiffs' counsel the identities of the *ad hoc* committee members and the members of Theidon's departmental tenure review committee. Unlike the external and departmental letter writers whose views President Faust considered "on the papers," these ten individuals—five *ad hoc* committee members (two from Harvard; three scholars from other universities), four *ad hoc* committee witnesses, and one faculty member who served on Theidon's departmental tenure review committee but did not participate in the *ad hoc* committee, played significantly more direct roles in Theidon's tenure process than the external and departmental letter writers. Moreover, the *ad hoc* committee members and witnesses participated in a meeting discussing her candidacy that plaintiff's counsel will no doubt wish to ask those witnesses about.

The considerations that drive Harvard's legitimate interest in confidentiality (*see* discussion at 8-13 *supra*) with respect to the external and departmental letter writers apply with at least equal force to the individuals who participated in the *ad hoc* committee process. Disclosing their names on an attorneys' eyes' only basis—at least until the case reaches a decision at the sum-

- 21 -

mary judgment stage—provides the best balance between Harvard's interest in confidentiality and the plaintiff's counsel's need to try to make her case. The limited restrictions suggested by the plaintiff (that the use of the information be restricted to this case, and this case alone) fails, as a practical matter, to prevent the harm Harvard legitimately fears. Once plaintiff learns the names of those individuals, that bell will never be unrung. The possibility of retaliation is very real. *See In Re Bextra & Celebrex Mktg. Sales Practices and Prod. Liab. Litig.*, 249 F.R.D. 8 at 15 (crediting assertion that academic "reviewers lacking confidentiality might face retaliation from those authors whom they have criticized"); *see also* Smith Aff. ¶18. In small academic circles, scholars "may serve together on a professional society's task forces, on editorial boards of the discipline's journals, or on peer review panels for federal grant funding. Indeed, the evaluator may find herself soon submitting a paper for publication, or a grant proposal for funding, on which a colleague whom she has evaluated must pass." *Id.* Theidon's knowledge that another scholar's comments may have adversely impacted her tenure chances is a fact unlikely to fade from her memory at the end of this case, no matter the outcome. Like the plaintiff in *Voice Domain Techs. v. Apple, Inc*., 2014 U.S. Dist. LEXIS 143903 at *4, there is good reason for the Court to "question[] whether it is possible [for Theidon] to avoid the subconscious use of [Harvard's] confidential material in [her] future endeavors." *See also Cherdak v. Koko Fitclub, LLC,* 2015 U.S. Dist. LEXIS 54621 (D. Mass. 2015)(Court issued protective order limiting discovery materials to attorneys' eyes' only, even where plaintiff was pro se and effect of order was to limit disclosure of discovery to plaintiff's experts, because "there is no present need for the plaintiff to have access to all of the defendants' highly confidential information.")

Plaintiffs' counsel will know the identities of the individuals who participated in the *ad hoc* committee and can question those individuals under oath at their depositions to determine

whether their actions were motivated by gender discrimination or a desire to retaliate against plaintiff. Here, as in *Deluca v. Gateways Inn,* 166 F.R.D. 266, 267 (D. Mass. 1996), where the Court directed that a deposition be conducted "for counsel's eyes only," there is **no** reason to believe plaintiff's personal knowledge of the identity of *ad hoc* committee participants is "necessary to [her] right to make out" her case. *See* Fed. R. Civ. P. 26(c)(1)(E) (granting Court the power "for good cause [to] issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . . designating the persons who may be present while the discovery is conducted.") *See also Galella v. Onassis*, 487 F. 2d 986, 997 (2d Cir. 1973) (excluding plaintiff from deposition).[12]

*Referring to Witnesses by Pseudonym or Letter Designation*.  Finally, Harvard asks the Court to direct that the parties use agreed-upon pseudonyms or letter designations when they refer to the *ad hoc* committee members or witnesses (and any letter writer or other individuals whose identity the Court otherwise orders Harvard to disclose over its objection).[13] The valuable benefits conferred by confidentiality in the tenure process would be eroded quickly if the names of participants whose identities are generally kept confidential were needlessly to enter the public domain. Pseudonyms have been used in similar contexts.  For example, in *Abuelyaman v. Ill. State Univ.*, 2009 U.S. Dist. LEXIS 106329 *3 n. 1 (C.D. Ill. 2009), a tenure denial case, the Court issued a Protective Order (agreed to by the parties) which directed the parties to "utilize pseudonyms to maintain anonymity of the faculty member whose identity has been disclosed."

---

[12] Harvard recognizes that, if the case survives Harvard's summary judgment motion and heads toward trial, the Order Harvard seeks will have to be revisited.

[13] Harvard requests that this provision also apply to the individuals identified in the Complaint as complaining witnesses in the sexual harassment matter and the professor they complained about.

And in *Doe v. Leavitt*, 552 F. 3d 75, 77 (1st Cir. 2009), a case concerning alleged misconduct by a medical professional, the First Circuit itself chose to use pseudonyms:

> In the case at hand, the protagonists' identities and the specific details of the alleged misconduct are easily separated from the central legal question. Accordingly we sketch the background with the aid of pseudonyms and generalities. That course allows us to balance two but sometimes conflicting interests: on the one hand, safeguarding the privacy of physicians and other health care professionals; on the other hand, providing public access to judicial decisions.

*See also Smith v. Holder*, 627 F. 3d 427 (1st Cir. 2010) (in immigration case, names redacted from published opinion). The use of pseudonyms or agreed-upon designations—at least through summary judgment—is likely to obviate or greatly reduce the likelihood that the parties will need to seek permission to file documents under seal.[14]

## IV.      CONCLUSION.

Harvard's ability to keep aspects of its tenure process confidential is critical to its ability to ensure that its faculty members are, in fact, truly "in the first order of eminence" in their disciplines. The Protective Order Harvard proposes respects Harvard's important interest in maintaining confidentiality. It also provides no practical impediment to plaintiff's ability to search for evidence of Harvard's alleged discriminatory and retaliatory motives in choosing not to promote her—evidence that, in any event, Harvard is confident simply does not exist. Harvard respectfully requests that the Court issue the Protective Order it proposes.

---

[14] Should the case proceed to trial, Harvard does not intend to ask the Court to have witnesses testify anonymously.

B4462064.1

Respectfully submitted,

President and Fellows of Harvard College

By its attorneys,

*/s/ Martin F. Murphy*
Martin F. Murphy, BBO #363250
Robert A. Fisher, BBO #643797
Jennifer Kirby, BBO #678885
Foley Hoag LLP
155 Seaport Blvd
Boston, MA 02210
Tel: (617) 832-1000
Fax: (617) 832-7000
mmurphy@foleyhoag.com
rfisher@foleyhoag.com
jkirby@foleyhoag.com


Dated: October 1, 2015.

## CERTIFICATE OF SERVICE

I, Martin F. Murphy, Esq., certify that, on October 1, 2015, the foregoing Memorandum, filed through the ECF system, was served electronically on the registered participants as identified on the notice of electronic filing.



/s/ Martin F. Murphy
Attorney for Defendant

B4462064.1