# EXHIBIT
# 2

# Sexual Assault at Harvard

By REINA A.E. GATTUSO and JESSICA C. SALLEY, CRIMSON STAFF WRITERS   March 7, 2013

 10

"I want to know what happened in that room when they were making a decision that changed my entire life."

Julie, an undergraduate, says she will never understand why the Administrative Board decided in its closed deliberations in the Forum Room on the third floor of Lamont Library to allow the student who sexually assaulted her to remain on campus.

Julie, who has been granted anonymity by The Crimson because she fears retaliation from her perpetrator, initially felt optimistic about the College's response to her sexual assault. After reporting the rape, Julie felt encouraged by the responses of Harvard University Police Department and the Office of Sexual Assault Prevention and Response. Assured that there was significant evidence to build a case against the perpetrator, Julie took her case to the Ad Board.

In light of this, she said, the Ad Board's ultimate decision not to require the perpetrator to withdraw was particularly disheartening.

MANDI NYAMBI

The Untold Story of Sexual Assault at Harvard

Paola, another College student who was sexually assaulted on campus, also found OSAPR to be a helpful resource. Yet she expresses deep disappointment with the way that administrators respond to students coming forward with experiences of sexual assault. "They question the event so much and ask if you were in the wrong so many times that, after a while, one begins questioning if it even happened," she writes in an email to The Crimson. Paola, who has been granted anonymity by The Crimson to protect her privacy, decided not to pursue her case with the Ad Board in part because she knew the perpetrator.

For a growing number of students on campus, stories like Julie's and Paola's highlight what they describe as a disparity between Harvard's many resources for the victims of sexual assault and the policies that govern the ways in which incidents of sexual assault are investigated and adjudicated. These critics, who include sexual assault survivors and campus activists, say that the Ad Board's written policy language is not favorable to victims of sexual assault, and that the Ad Board's lack of transparency about its processes intimidates students who bring their cases before the Board.

Harvard is currently conducting an ongoing review of its sexual assault policies across its various schools and has recently hired its first ever University-wide Title IX coordinator, who begins work this month. Still, some students feel that these efforts are not enough. They say that changes in the way administrators handle cases of sexual assault at the College level are progressing too slowly, and are not sufficiently responsive to student concerns.

## It Happens Here

Several nights a month, Julia F.P. Ostmann '15 staffs an anonymous desk in Lowell or stays by the phone from 8 p.m. to 8 a.m.. Ostmann is a Response Peer Counselor, and she spends her late nights waiting for fellow students to contact her with their concerns about relationship problems, intimate partner violence, harassment, and sexual assault.

Despite increasing national and campus conversation about sexual assault, Ostmann says there remains the perception among some students that sexual violence is not a problem on Harvard's campus.

"There's this rhetoric that, 'We're the best and the brightest. How could someone here do this to another human being?'" says Ostmann, who is a Crimson magazine comper. Yet, she continues, sexual assault "is one of the major issues that we handle at Response."

In 2011 alone, 26 Harvard students reported a rape or indecent assault to HUPD, OSAPR, or Harvard University Health Services, according to statistics published under the Clery Act, which requires colleges and universities to disclose information about crime on their campuses. And 85 to 95 students—60 to 70 percent of them undergraduates, the rest graduate students—worked with OSAPR to confidentially discuss experiences of sexual misconduct, ranging from harassment and stalking to dating violence and rape, according to Sarah Rankin, the director of OSAPR.

Harvard is not alone. According to a report released by the National Institute of Justice in 2011, between 20 and 25 percent of women, and approximately 6.1 percent of men are victims of an attempted or completed sexual assault while they are in college.

Members of Harvard's prevention community say that, even with current discussions about sexual assault, there remains a persistent attitude that rape doesn't—and can't—occur at Harvard.

From 2005 to 2010, eight cases of sexual misconduct went in front of the Ad Board. As a result of these investigations, three perpetrators were required to withdraw from the College, meaning they were asked to leave the College for a period of at least six months. The Handbook of Students stipulates that "a student who commits rape, sexual assault, or other sexual misconduct is subject to severe penalties." However, no students received a "recommendation to dismiss," the Ad Board term for permanent expulsion, for sexual misconduct during this period.

"In the last few months, there's been a lot of talk about sexual assault on campus, both in publications and in referendums. But a lot of people still don't understand the extent or severity of exactly what's going on on campus," says Jonathan K. Stevens '14, a member of the Consent Assault Awareness & Relationship Educators (CAARE), an OSAPR-sponsored student group that that works to educate Harvard students about domestic and sexual violence. "Nothing in the Harvard selection process selects out the kind of issues that we have to deal with when we talk about sexual assault," Stevens says.

## Campaigning for Change

The referendum of which Stevens speaks, a piece of student legislation passed in November, directly challenges the College's current sexual assault policies. The vote on the issue was initiated by Our Harvard Can Do Better, a campus group that advocates for reform of the College's policies and practices regarding sexual assault.

This fall, 3,066 undergraduates—85 percent of those who voted in the Undergraduate Council election—voted to approve the referendum asking Harvard to re-examine its policies related to sexual violence. In December, the Undergraduate Council officially endorsed Our Harvard Can Do Better's platform.

According to Kate Sim '14, a founder of Our Harvard Can Do Better, part of the campaign's mission is to bridge the gap between policy and practice in terms of administrative response to sexual assault at the College.

"Harvard is one of the few colleges with a center like OSAPR," Sim says. "Most colleges don't even have that, so I'm grateful that we have that." But this, she continued, is not adequate. "Having a little bit better system doesn't mean you have the best system."

Particularly, she says, this discrepancy applies when it comes to the College's hesitance in adopting an official standard of affirmative consent. Harvard's current policy defines rape as "any act of sexual intercourse that takes place against a person's will or that is accompanied by physical coercion or the threat of bodily injury," stating that "unwillingness may be expressed verbally or physically." In contrast, an affirmative consent policy defines sexual assault as occurring in the absence of enthusiastic verbally or physically expressed consent.

A number of colleges and universities throughout the country, including the University of Iowa and Antioch College, have official policies of affirmative consent.

In addition, the campaign's platform criticizes the current standard of evidence required by the Ad Board, which mandates that Board members must be "sufficiently persuaded" that an incident took place in reaching a verdict about sexual assault or any other case. Many believe this standard of evidence to be unclear and, perhaps, to place the burden of proof disproportionately on the victim.

Instead, many suggest the "preponderance of the evidence" standard, which requires simply that an incident is more likely than not to have occurred.

National discussion about the "preponderance of the evidence" standard came to the fore after the Office for Civil Rights released a "Dear Colleague" letter delineating Title IX expectations for university response to gender discrimination, particularly regarding sexual assault. The letter suggested that colleges and universities adopt the "preponderance of the evidence" standard.

In June 2012, in response to the Office of Civil Rights investigation following a Title IX suit, Yale changed its policies to reflect the "preponderance of the evidence" standard. This legal pressure came in the wake of an incident on Yale's campus in which fraternity brothers chanted "No means yes! Yes means anal!" outside of a dormitory during an initiation event the previous fall.

Yale's decision leaves Harvard and Princeton as the only two Ivy League schools that have not adopted this standard.

For Julie, the wordings of policies are more than just semantics: They have a real impact on how cases like hers are decided by the Ad Board.

Julie felt that there was a lack of clarity in what the "sufficiently persuaded" standard meant. "I thought that they were 'sufficiently persuaded,'" Julie says. From her perspective, it seemed, "Everybody...was not just sufficiently persuaded, but convinced."

Julie says she believes the results of her case represented a fear of action on the part of the institution. "I think it's just that they're scared. I really do think that they are afraid that, if they make the wrong decision...they're going to get all this legal action," she says.

Liz Canner, a filmmaker currently documenting the epidemic of sexual assault on college campuses, also points to fear of legal action as a potential reason why universities in general are hesitant to punish perpetrators.

"There have been lawsuits against schools around sexual assault and how it's handled, not so much from the victim...but it tends to be that it's the perpetrators and the perpetrators' family that take out law suits against the school," she says.

This threat of legal action, says Canner, means that university decisions often favor assailants over victims. "A lot of universities are risk-averse, and because it's perpetrators who are suing, in some ways things are leaning towards the perpetrators," she says.

**Working Towards Reform**

After the results of this fall's referendum indicated widespread community support for the changes proposed by Our Harvard Can Do Better, the Office of Student Life established a Sexual Assault Resources Student Working Group at the behest of Dean of Harvard College Evelynn M. Hammonds. But, according to Emelyn dela Pena, Assistant Dean of Harvard College for Student Life and the College's Title IX coordinator, this working group is not a direct result of the referendum.

"What I think we need to know is whether or not students feel that the kind of services they get from OSAPR and the Office of Student Life are sufficient or really address the concerns that students have when sexual assault happens," says Hammonds of her reason for calling the working group.

The group consists of students representing a variety of organizations on campus, including Our Harvard Can Do Better, the Undergraduate Council, the University's new Office of BGLTQ Student Life, fraternities, sororities, and male and female final clubs. Dean Hammonds does not sit on the committee.

According to dela Pena, policy change is outside of the limits of the committee established by Hammonds.

"The policy in place is faculty legislation. The Dean of the College could not alone make changes to the policy; all changes to faculty rules must be voted by the faculty, which would first require a much broader conversation that would certainly involve the new Title IX coordinator and many others," dela Pena writes in an email.

Jeff Neal, spokesperson for the Faculty of Arts and Sciences, writes in an email that policy change is an extensive process. "Changing Harvard's policies around sexual assault would require a broad conversation that would certainly involve the new Title IX coordinator and many others at the College, FAS and the University," he writes. With possible new federal legislation on the horizon and Title IX discussions between the University and the Office of Civil Rights ongoing, he writes, "I think we don't know yet what changes might occur in the future."

Neal writes that the goal of the working group is "to assess the resources that are already available, how we communicate them to students and what additional resources or communications might be needed going forward." Right now, he adds, "It is not clear that students know what resources are available to them or how to access them."

For Sim, however, a focus on resources, while important in highlighting potential inadequacies, is not enough. "If this group is indeed strictly [focused] on the resources, then we haven't sufficiently addressed the problem," she says.

Tara Raghuveer '14, Undergraduate Council president, says that students are concerned with policy. "We've heard from multiple people that there needs to be a discussion of policy in this working group, and thus far it's only been about resources, and the agenda hasn't been set by the students involved at all," she says.

According to dela Pena, it is the responsibility of student representatives to reach out to their communities to solicit concerns. "We have not dictated how this needs to happen," writes dela Pena.

"With that said, members of these organizations may also independently contact their representatives to forward ideas or concerns to the Working Group."

Yet, says Raghuveer, the mission of the working group limits the scope of what actions students may request. "I strongly believe that if students feel that they need to be talking about policy and the potential for policy reform, that discussion needs to be engaged, and we will definitely be working towards that in the future," she says.

The students in the working group contacted for this article all expressed that they had been forbidden from discussing certain aspects of the working group.

According to dela Pena, this policy is in place "in order to protect the integrity of the working group process."

But for Sean M. Khosravi '13, a student member of the Sexual Assault Resources Student Working Group representing campus fraternities, this requirement for confidentiality is unsettling. "People were like, 'We can't tell anyone? This is not at all what we asked for.'"

Khosravi worries that the current working group is structured to appease student concern, rather than address it. "I had a lot of high hopes," Khosravi says of his thoughts going into the working group. "And then I show up to the meeting and I was like, 'wow, I'm just a show right now, the administration is trying to use me as a show.'"

According to Raghuveer, student action to call for specific policy reform is complicated by administrative response. "Our actions are limited by the fact that Dean Hammonds immediately responded with this working group," she says.

Khosravi feels that this group's approach feeds into a pattern of inattention towards this issue on campus. When it comes to sexual assault, he says, "I think the term that would most describe the administration is negligent." Surrounding the issue of sexual assault on campus, he claims that "the administration obviously wants to keep it quiet."

## The Politics of Prevention

While perpetrators and victims of sexual assault can be of any gender, the vast majority—nine out of every 10, according to anti-sexual violence organization Rape, Abuse and Incest National Network—of rapes that occur in the United States involve a female victim and a male perpetrator.

These statistics signify that conversations about sexual assault necessarily entail consideration of gender dynamics.

Schuyler H. Daum '12, who was a member of the OSAPR Student Alliance, now CAARE, while she was a student, found herself drawn to the group initially because of her frustration with gender issues on campus.

"One of the things that I found especially jarring at Harvard was the dichotomy between the capability

and the independence of a lot of my friends, but then this sort of disconnect between advocating for yourself in the classroom and advocating for yourself in relationships," Daum says.

While Harvard women are taught to be aggressive in the workplace or the classroom, she suggests, in many cases they are hesitant to assert clearly what they want in social situations. "It's something that women are taught not to do because we want people to like us," Daum says.

For Daum, this fear of advocating for oneself, coupled with the fact that sexual interactions on campus often involve alcohol, creates blurred lines of communication even in consensual relationships. "As a result, that hides or camouflages the behavior of genuinely predatory people," she says.

Daum's critique evokes a broader discussion about the connection between sexual assault and male-dominated social spaces.

Referencing sociological research, Canner says, "There's a direct correlation between competitive all-male institutions—sports teams, frats, that kind of thing—and sexual assault." In the course of making her film, Canner spent a semester documenting a course at Dartmouth examining campus norms surrounding sexual violence.

"Men in those kinds of organizations are more likely to engage in these kinds of behaviors," Canner claims. "That's because these kinds of institutions support a certain kind of misogynistic behavior."

These dynamics, says Canner, are apparent in social spaces on campus. "Looking at the spaces where social life is taking place, where the party is taking place," she says. "How does space play into it, or control of social space? Are we getting free alcohol? What's the unspoken economic agreement when we're getting free alcohol and party spaces?"

Whether fair or not, at Harvard, the discussion about male-dominated party spaces tends to focus on men's final clubs, unrecognized social groups with off-campus real estate known for hosting parties.

"My attack happened in a final club," writes Paola, the student who was sexually assaulted by an acquaintance whom she describes as "just disgustingly drunk" at the time. "I spoke to friends and I found out he had attacked or been a little too forward with other women as well."

Jack J. Holuba '13, a final club member and a member of Harvard Men Against Rape, acknowledges the potential dangers—and the resulting necessity for intervention—of male-dominated party spaces.

"Most assaults are hetero, male with female, usually in a male-dominated space, frats, whatever it may be," Holuba says. "So it is important to keep everyone, I don't want to say on their toes, but just aware of what's important in our social space."

Prevention groups on campus are attempting to address the safety risks that can result from these kinds of atmospheres. On an invitation basis, OSAPR conducts trainings with social groups—both recognized and unrecognized, including fraternities and final clubs—regarding sexual assault prevention.

To Khosravi and other men at HMAR, the mission of male-targeted prevention is to reach out to those

men who are not perpetrators, but who may be complacent.

"19 out of 20 men will never commit an assault," he says. "It's only five percent of men who are doing these things. The vast majority of men are not. For those of us who are not, it's not enough to say we're not doing anything."

Kevin Murt '14, a fellow HMAR member, agreed. "Silence is not appropriate," he says. "A community that is silent is allowing or enabling something as awful as this to persist."

Dela Pena emphasizes the necessity of cultural change, pointing out the pitfalls of a student approach that just focuses on policy. "I know that there are people on this campus who are hungry for cultural change, a cultural shift in the way we talk about sexual assault," she says. "And cultural change happens through so many different layers. Just changing the policy—that's not going to bring about cultural change. That needs to come from the ground up."

But many critics say cultural change is not enough to create a safe campus.

**Moving Forward**

Throughout the Ad Board process, Julie says she felt intimidated by the Board's staunch confidentiality policy.

These confidentiality rules, stated on the Ad Board's website, require students "to refrain from discussing the case or any of its details with anyone other than those who have a need to know." In addition, the rules state that "all confidentiality obligations remain in full force even after the conclusion of any case."

For Julie, who felt that the policy had not been made clear to her, confidentiality restrictions led to a feeling of isolation. "I didn't know what to tell my friends, I didn't know what to tell anybody," she says. "So one of the things they could do is make it even clearer—what does it mean, somebody who 'needs to know'?"

"If I say the wrong thing, someone could discipline me for that," she says. "That doesn't seem right." She continued, "I felt very trapped during the whole Ad Board process."

Even after the case, Julie says, the verdict left her feeling threatened. "What I was concerned about, what I wanted, was to have him not be here," Julie says about her aims in the Ad Board case. "I just wanted to feel safe."

Victims of sexual assault must adjust their own schedules or change their housing if the perpetrator is allowed to remain on campus, and not the other way around, she says—one of the many reasons why she believes that Harvard should be more willing to punish students accused of sexual assault.

"If they're not kicked out, they're given the same rights as you," Julie says. "And that was really shocking."

According to Diane L. Rosenfeld, a lecturer at Harvard Law School, the implications of policies like these extend beyond the rulebook and into students' daily lives.

"If women on campus know that a rape survivor has been silenced somehow by the administration or by the school or by just not having a process that has given her any kind of relief, then it's entirely possible that they are not enjoying equal access to educational opportunities because they know that they too could be victimized with no recourse as well," Rosenfeld says.

For Paola, cultural change among the student body does not necessarily equal institutional support.

In light of recent attention surrounding the issue of sexual assault, Paola writes, "Students are talking about it more and being increasingly sensitive about the subject. People are realizing that it happens a lot on campus and they are fighting more visibly to end our rape culture. They are more open to conversations on the matter and are not afraid to stand up for other students who have suffered abuse. I feel in a more supportive atmosphere now than I did my freshman year."

In contrast, she writes that she believes the administration "is still a bit more antiquated and hostile."

Even as students advocate for what is, to many, much-needed culture shift, frustrations remain for those who have already been the victim of a sexual assault.

The worst frustration among these, according to Julie, is the knowledge that she is not the only person on campus to have an experience of this kind. "What hurts me the most is to find out that there are so many cases like mine here."

*This article has been revised to reflect the following correction:*

**CORRECTION: March 7, 2013**

An earlier version of this article incorrectly stated the class year of Jack J. Holuba '13.

MULTI-PAGE VIEW

Tags   CRIME   COLLEGE   SCRUTINY   ON CAMPUS   UNDERGRADUATE COUNCIL   FRONT FEATURE   HIGHLIGHT   FM FRONT FEATURE

**Want to keep up with breaking news?** Get the latest, straight to your inbox.

MOST READ

1. With Naming Rights on the Table, Harvard Gave Its Price
2. School of Public Health Renamed with $350 Million Gift, Largest in Harvard History
3. CS50 Logs Record-Breaking Enrollment Numbers
4. Fifteen Hottest Freshmen '17: Date Spots
5. Former Anthropology Professor Plans

**To Sue University**

**162 Comments**      **The Harvard Crimson**      ☐ **Login** ▾

Sort by Newest ▾                                    Share ☐   Favorite ☐

Join the discussion…

**Guest** • 3 months ago

Instead of arguing about statistics and throwing hateful comments back and forth, maybe those who wonder how much rape is actually an issue would find some perspective by reading actual survivors' stories. They can put aside the debate for a moment and just read the experiences of people involved. That grounds the issue in actual experiences, actual situations, so that we avoid getting wrapped up in emotional debates over generalities. Listen to what actual victims say before you judge what must have happened.

The OSAPR puts out a publication called Saturday Night that shares victims' stories and reflections.

Also, maybe you'd like to check out this perspective— I think MRAs could really find common ground with feminists and survivors through seeing this as part of a greater gender issue, not just a "women's issue":

Jackson Katz, http://www.ted.com/talks/jacks...

Love, a fellow student

☐ ┃ ☐ • Reply • Share ›



**pierceharlan** › Guest • 3 months ago

First, I am not an "MRA." But your suggestion is good. The only thing you left out is that feminists would do well to read the actual experiences of persons (men AND women) who've been wrongly accused. Start with the Innocence Project site.

☐ | ☐ • Reply • Share ›



Guest › pierceharlan • 3 months ago

Also, speaking of specific examples, let's look at False Rape Society's post (http://falserapesociety.blogsp... about this PSA on youtube (https://www.youtube.com/watch?... . Do you think what the guy does in the video, unbuttoning the girl's shirt and telling her to stay quiet without wondering whether she wants it or not, is okay? As in, put aside for the moment whether you think this is a typical case or not– just answer, do you think it's okay for him to do that? Do you think it's okay for the other guy to just watch and not stop him?



**see more**

☐ | ☐ • Reply • Share ›



**pierceharlan** › Guest • 2 months ago

Wait, wait, wait. I write Community of the Wrongly Accused, one of the only blogs in America devoted to the wrongly accused. That doesn't mean I don't think rape is a serious problem or that women routinely "lie" about rape.

I write this as one of about 100 people in America who voted for the Ferraro-Mondale ticket because I thought it would be cool to have a woman as vice president, and as someone who is to the left of President Obama (which isn't difficult) on a host of issues. At my Web site, we go to great lengths to make clear our profound concern for rape victims and our strong belief that every rape claim must be taken seriously and never prejudged. Fighting the evils of both rape and of wrongful rape claims is not, and should never be, a zero sum game, and there is no necessity to

trivialize the victimization caused by one in advocating for the victims of the other.

Listen to what I am going to tell you: for many men and boys, our site is among the few outlets available to let them know they are not alone. We

**see more**

☐ | ☐ • Reply • Share ›

 **Guest** › pierceharlan • 2 months ago

Wrongful conviction is terrible, and I support people working against wrongful conviction. Nonetheless, I don't see how you can defend that you also seem to be responsible for the False Rape Society blog I referenced earlier. If you truly are concerned about rape victims as well, how can you write or support posts like that?

☐ | ☐ • Reply • Share ›

 **pierceharlan** › Guest • 2 months ago

I am not even sure what you were asking me. My record in support of rape victims is solid. I have supported bystander intervention (I do not support Jackson Katz, who once penned a carnival curiosity of a piece advocating that we stop referring to Nafissatou Diallo, who accused Dominique Strauss-Kahn, of rape, as exactly what she was, DSK's "accuser." Katz declared: "Every time someone calls her an 'accuser' they undermine her credibility and bolster his." Katz's rationale for this fantastic epiphany was nothing more than a cavalcade of worn out, politicized incantations, proving once more that it is possible to say nothing with words. Katz's solution to the "problem" he manufactured from whole cloth? "It's simple: refer to the complaining witness in a rape case as 'the victim.'")

I am sorry that you are offended when someone points out that false rape claims are a social pathology. Pretending to care and caring are two different things.

☐ | ☐ • Reply • Share ›

 **Guest** › pierceharlan • 3 months ago

Please read this OB/GYN's thoughts:

[http://drjengunter.wordpress.c...](http://drjengunter.wordpress.c...)

Did you read Jackson Katz's talk? Thoughts?

.

⬜ | ⬜ • Reply • Share ›



**politicalanalyst** • 4 months ago

As a Harvard grad interested in women's rights, I don't like seeing any thread brigaded by complete outsiders . Publicity-seeking repeat commenter Pierce Harlan has just posted a link to this thread on reddit.com/r/MensRights with the heading, "Dr. Theidon, stop blaming me for Harvard's decision to deny you tenure." I fail to see any express statement of Dr. Theidon's in that regard here, though he quotes a partial paragraph to imply that there is such a linkage.

I assume that will lead to another rash of commenters from MRA groups such as NWO Slave (a typical Men's Rights Activist - see other comments of his at http://wehuntedthemammoth.com/..., Evil Pundit, radio edit, zimbazumba, librtee_dot_com, and drunicus rex, plus I assume more who did not post under their usual handle. Harlan seems to be trying to get another brigade started. And all to talk about a tangential issue and incidentally derail discussion of the purpose of this article. Anyone who dares to talk about sexual assaults against women in colleges unfortunately is being targeted by these groups, who would much rather we shut up.

1 ⬜ | ⬜ • Reply • Share ›



**Guest** > politicalanalyst • 4 months ago

You and your like-minded commentators would do well to actually respond to the substance of what I said instead of attempting to belittle me with your Harvard name-calling. My point is very narrow and is not some misogynistic, right-wing rant. It's Innocence Project stuff. This really is a tyranny of political correctness here. Your comment is almost as disgraceful as Kimberly's name-calling.

⬜ | ⬜ • Reply • Share ›



**Shelagh Stephen** • 10 months ago

I refer you to the appalling pseudo-science of Susan A. Clancy in The Trauma Myth: The Truth About the Sexual Abuse of Children—and its Aftermath. This is what you can expect from Harvard.

⬜ | ⬜ • Reply • Share ›



**Erin '02** • a year ago

Nothing has changed at Harvard. It was the same when I was there. While I was not a victim, I had friends who were. Nothing is done to change the culture and that is the biggest issue. Harvard needs to work on the product they produce instead of just hiding behind a brand name.

1 ⬜ | ⬜ • Reply • Share ›



**Disgusted** • a year ago

Why is an academic committee responsible for finding criminal fault? Ever? Rape is a legal matter, regardless of where it occurs, and should be handled through the law enforcement/legal process.

3 ▢ | ▢ • Reply • Share ›



**Anon** • a year ago

I was sexually assaulted at Harvard ten years ago and treated horribly. I am glad things have started to change. It ruined my life.

2 ▢ | ▢ • Reply • Share ›



**Girl '13** • 2 years ago

This piece does a disservice to female undergraduates at Harvard by claiming to speak for all of us without actually doing so. I feel protected by OSAPR and I do not want to switch to a "preponderance of evidence" standard. "Innocent until proven guilty" is something that is important to me and probably to others at this university as well. The UC ballot advocated re-examination but did not say anything about switching to that standard or I would not have supported it. Also, can you give it up with the final clubs tirade already??? Implying that girls who go to final clubs are helpless victims of a male conspiracy removes female agency and independence. These are just regular college parties, like the ones found at a gazillion other schools!!!!

9 ▢ | ▢ • Reply • Share ›



**Uncertain** › Girl '13 • a year ago

The requirement of "preponderance of evidence" is now a federal standard... So you can want "innocent until proven guilty" all you want, but the federal government would fine Harvard or even shut down any victim services (ie OSAPR) until they adhere to the new SOP

1 ▢ | ▢ • Reply • Share ›



**pierceharlan** › Uncertain • 4 months ago

No court has held that Harvard is required to follow the Dept. of Education's interpretation of the law.

▢ | ▢ • Reply • Share ›



**alum '12** • 2 years ago

This article fails to answer one major question: why on earth would anyone take a criminal matter to the Ad Board? Harvard is in the city of Cambridge. Call the Cambridge Police. 911 immediately after the event, or 617-349-3300 if not an emergency.

10 ▢ | ▢ • Reply • Share ›



**glorrierose** > alum '12 • a year ago

FYI: http://www.hupd.harvard.edu/fa...

QUOTE: What's the difference between the HUPD and the city police, like Cambridge, Boston Police, etc.?

The only difference is jurisdiction. HUPD officers are licensed special State Police officers and deputy sheriffs in both Middlesex and Suffolk Counties. Those powers give them the authority to respond to any crime on our campus and any "breach of the peace" on city streets in Cambridge, Somerville, and Boston. Officers receive the same academy training as officers from Cambridge.

If a crime is committed on campus, I assume that HUPD handles it. Are there any times when the Cambridge or Boston Police would get involved?

With the exception of a couple of crimes, such as a homicide, we have primary jurisdiction over all crimes occurring on our property. However, we maintain a good working relationship with Cambridge Police and the Boston Police and will coordinate with them at times in order to ensure the most appropriate response to maintain a safe and secure environment.

****

1 ▢ | ▢ • Reply • Share ›



**glorrierose** > alum '12 • a year ago

Because campus police have jurisdiction over crimes that happen on campus, that is why. If you call the police they will simply refer your case to campus police. Sorry that you are so ignorant about this -- unfortunately you have a lot of company.

▢ | ▢ • Reply • Share ›



Kimberly Theidon • 2 years ago

I suggest readers visit the COTWA website that Pierce Harlan mentions in one of his posts. [whttp://www.cotwa.info] It allows you to see the sort of evidence used by various parties to these debates, and to evaluate for yourself which arguments are most convincing.

3 ▢ | ▢ • Reply • Share ›

 **Destruction** > Kimberly Theidon • 2 years ago

There is no reason to give their anti-intellectualism a second thought. They are part of an online hategroup known as the "men's right's movement", which organizes raids on other websites and forums, in an attempt to silence any feminist thought or discussion. There isn't a "group of writers" on that blog, it's one delusional man, filled with hatred for women, who is completely lacking in any semblance of intelligence.

They reached this from a group on reddit, /r/mensrights, where he asked for people to come in and invade this comment section. The votes, and comments do not represent the people who normally read anything on this site.

8 ☐ | ☐ • Reply • Share ›

 Kimberly Theidon > Destruction • 2 years ago

Thank you for posting this. The COTWA website is very similar to some of the white supremacist websites on the internet. The tone, the ranting nature of the writing, the bullying (those uppity Others into submission), and the vitriol. And they seem to have no interest in the men who suffer sexual and gender-based violence at the hands (or other appendages) of other men. In their hierarchy of victims, this in a strange omission. Again, thanks for clarifying how the stream of hate landed on this site. Finally, I want to lend a voice of support for the many people — men, women and other genders — who work with great commitment on the Harvard campus to insure that everyone receives equal, respectful and dignified treatment.

8 ☐ | ☐ • Reply • Share ›

 politicalanalyst > Kimberly Theidon • 4 months ago

True. Harlan is an intelligent man whose failing is narcissism. He brings his hobbyhorse to discussions that have nothing to do with him over and over, like a wind-up puppet. He has zero empathy for women, rape of women, employment of women, Harvard's attempts to control sexual assault, or anything else. He couldn't care less about the issue of this professor's advocacy for Harvard women or the dire results for her. he has no connection to Harvard at all. Speaking as a Harvard grad, I do believe Harvard is trying to change its 400 years of discrimination against women.

☐ | ☐ • Reply • Share ›

 **pierceharlan** > politicalanalyst • 3 months ago

I love you, too, politcalanalyst.

Maybe sometime you will actually read my blog instead of just making assumptions? And perhaps -- dare I even think it? -- you might even do your vaunted Harvard degree honor by, you know, pointing out even a single shred of evidence to support your wild and conclusory musings?

I mean, it would be nice.

☐ | ☐ • Reply • Share ›



**pierceharlan** › Kimberly Theidon • 5 months ago

I have just now seen this comment. Thanks for the hate. If you can't prevail in a debate, trot out the "white supremacist" tag.

It is unfortunate that you don't bother to deal with the substance of any of the assertions we posit. You would do well to school yourself on these issues before further engendering disrepute of genders studies professors. Here is a good primer: http://www.cotwa.info/2012/06/...

1 ☐ | ☐ • Reply • Share ›



Lel › pierceharlan • 4 months ago

You sound like you have terrible game and/or no life. Also combative =\= persuasive.

☐ | ☐ • Reply • Share ›



**pierceharlan** › Lel • 3 months ago

Your schoolboy shorthand is scarcely comprehensible. Is that what they teach you at Harvard? To write like a doofus? It's like you're waving a flag, "This one isn't worthy of debate."

Next.

☐ | ☐ • Reply • Share ›



drunicusrex › Kimberly Theidon • 2 years ago

Everyone, that is, excepting heterosexual men, because they are "in most cases" responsible for all of this rampant, epidemic, yet strangely invisible violence and exploitation.
I personally had no idea that the women of Harvard/Radcliffe live in a continual state of rape gang-induced terror, a la post-colonial Africa or Rome after the fall. I had no.idea how terribly oppressed and violated

large swathes of them are - I rather stupidly assumed that after four or five years of study & internships they go.off to assume their birthright at investment banks or consulting firms.

But after learning how hideously oppressed, terrorized, and violated these upper to upper middle class females all are, Im going to go to construction sites, shipyards, foundries, mines, military bases, or any "male-dominated" space to take up a collection for these poor dears. And also, to spread the word amoungst all of these savage, Neanderthal men to stop running around Harvard yard savagely raping, harassing, terrorizing, or "othering" every single Harvard/Radcliffe girl they possibly can.

2 ▢ | ▢ • Reply • Share ›



**Kimberly Theidon** > drunicusrex • 2 years ago

You seem to think there is a class-based dimension to sexual violence — both those who commit the violence ( you imply they are working class males and thus your foray to shipyards, foundries, etc where you assume the men will share your disparaging attitude toward women) , as well as those who report sexual violence (women who assume their "birthright," by which you imply there are wealthy, have a sense of class entitlement, etc). Why do you believe this is a class-based phenomenon? Why are you so quick to cast the problem in those terms? You are in error, regardless of your motivations. You do a grave injustice to the working class men and allegedly wealthy women you stereotype.

3 ▢ | ▢ • Reply • Share ›



**drunicusrex** > Kimberly Theidon • 2 years ago

I fail to see how protecting the rights of the accused, or for supporting the wrongfully convicted, is in any way a "vitriolic" attack upon women - unless we are saying that large numbers of women make false rape accusations, or that they have that right. I am sorry, but I simply don't understand that. Why is asking for equal rights or equal justice so offensive to feminists? Why are they so enraged by the notion that men deserve equal rights as well, or that there are in fact women - not the majority, but a significant percentage - who will mis-use laws meant to.protect them to mistreat, often hideously, men? Why is it anathema for feminists to even entertain that idea?

And OF COURSE there are class and social dimensions to rape. Poor or working class females are FAR more vulnerabl to violence of all sorts than are the (mostly) highly privileged female undergrads at the Ivies.

Upper and middle class females are in fact SIGNIFICANTLY less likely to experience violence of any sort than are men, particularly working class men. One would, in fact, be very hard pressed to find ANY group, throughout human history, that'd LESS likely to experience violence than

a 21st century IvyLeague female undergrad. Men who are in prison are

**see more**

5 ⬜ | ⬜ • **Reply** • **Share** ›



**Kimberly Theidon** > drunicusrex • 2 years ago

Re-read your earlier posting. You cast your argument in terms of elite women ("birthright") and working class men (foundries, factories, etc) as thought those were the class dynamics fueling sexual violence. I was questioning how your framed this antagonism.

2 ⬜ | ⬜ • **Reply** • **Share** ›



**drunicusrex** > Kimberly Theidon • 2 years ago

And I think you are willfully missing the point I am making, which is that working class men face far greater dangers, daily, than an Ivy League female faces in her lifetime. She'll also face less risk than her poorer sisters, but is extremely unlikely to have her life ruined (or ended) by a false rape accusation.

And please, tell me why it's "hateful" or a "vitriolic attack on women" to ask that men, even men accused of sexual assault, have the same presumption of innocence other criminal defendents have.

And why, given so many prominent instances of false allegations, are feminists so DEAD SET on the notion that they hardly ever occur? Why, given everything that the Innocence Project has done, is it "hateful" or "misogynistic" to say that this stuff happens?

Why (class differences or privilege or pricey educations aside, for just a minute) why oh why is it "hateful" or morally wrong to ask for justice, FOR EVERYONE?

Just please answer me that. Unless you're only interested in revenge, why can't BOTH men and women have justice?

4 ⬜ | ⬜ • **Reply** • **Share** ›



**drunicusrex** > drunicusrex • a year ago

I suppose we have to come to a conclusion both sad & ugly - the reason that feminists believe that false accusations rarely or never occur is because they believe, quite strongly, that all men are rapists.

Much as a racist believes all Jews are stingy or crooked, or that all Irish Americans are drunks, or that all African-American s are violent criminals, much of mainstream feminist thought sees men, all men (working class or WASP, white or black, really any heterosexual male) as a rapist, violent and bestial.

Sad but true. If you look at the words feminists use - "rape culture," "male

violence," "patriarchy," "sex as coercion," "gender based violence" - the conclusion is ones in escapable.

Feminists do not believe false accusations exist, because only men are rapists, and ALL men are rapists.

1 ☐ | ☐ • Reply • Share ›



**glorrierose** › drunicusrex • a year ago

Wow. On what planet do you live on? You know diddly squat about feminism.

1 ☐ | ☐ • Reply • Share ›



Kimberly Theidon › drunicusrex • a year ago

Can you please cite the feminists who allegedly state or have stated that "all men are rapists"? If you move beyond a rant to citing the literature, your totalizing statement is untenable.

2 ☐ | ☐ • Reply • Share ›



drunicusrex › Kimberly Theidon • a year ago

Sure. Andrea Dworkin, Catherine MacKinnon, and you.

Your insistence that false accusations never happen is based on your belief that all men are rapists. This is why you don't believe men should have civil rights, if a rape accusation is involved. Dehumanizing and stigmatizing a group, depicting them as less than human, makes it easier to perpetrate injustices against them, which is basically feminism's Playbook.

2 ☐ | ☐ • Reply • Share ›



Gangtok › drunicusrex • 4 months ago

Hi, drunicus rex, you're publishing a lie here and that's not a good plan. I challenge you to quote a statement from Professor Theidon which explicitly states that false rape never occurs. Unless you can do so, you are a malicious libeler.

☐ | ☐ • Reply • Share ›



Kimberly Theidon › drunicusrex • a year ago

I have published extensively on this and other issues. Please visit my Harvard website, read my work, and find just one line --- just one --- in

which I say "all men are rapists." When you have completed that fruitless search, make a point of reading further. You will see that I have worked with men who are survivors of sexual violence, and for whom I have great compassion. You do all men a disservice with your uninformed ranting on this and other websites.

3 ☐ | ☐ • Reply • Share ›



**drunicusrex** > Kimberly Theidon • a year ago

So then, what are we to understand from your statements saying that false accusations almost never occur, and that studies of masculinity necessarily involve studies of violence? Or that

☐ | ☐ • Reply • Share ›



**drunicusrex** > drunicusrex • a year ago

Or that fraternities are practically rape clubs?
I admit to not having perused all your scholarly works, but I suspect that finding any statement to the effect that not all men are rapists (nor are they all violent, bestial, etc) would prove fruitless also.

☐ | ☐ • Reply • Share ›



**Gangtok** > drunicusrex • 4 months ago

I see you're backtracking from your previous libel, that the Professor stated that false accusations never happen. Now you're saying that she states they "almost" never happen. I guess it's a matter of semantics, isn't it, false rape reports are about 2-8% of the population of complaints, the same as false reports of other crimes. Now you're getting close to the truth.

☐ | ☐ • Reply • Share ›



**Kimberly Theidon** > drunicusrex • a year ago

No. That is why you should read texts prior to critiquing them.

2 ☐ | ☐ • Reply • Share ›



**drunicusrex** > Kimberly Theidon • a year ago

OK, interesting work on Maoist guerillas in Peru, and the brutal counter-insurgency fought by their government.
However, here in the United States we have a far stronger rule of law, one

that (in theory, if not always in practice) provides for some presumption of innocence for the accused, and for the burden of proof to be placed on the prosecution, not the defendant.

Why aren't men allowed that, if the accuser is a woman? If we throw our notions of justice out because we don't always like the result, how are we any better than a totalitarian state, or than an armed mob?

And why is it "hateful" or full of "vitriol" to ask these questions?

Why, again, can't men and women BOTH have justice?

Reply • Share ›



**Destruction** > Kimberly Theidon • 2 years ago

They have no interest in the plights of men, in fact, I'm one of the people they rejected - a single father, and a combat vet who deals with suicidal thoughts - simply because I let it known that I was a feminist. I received messages telling me to kill myself, that I deserved it for "protecting the global feminist conspiracy", and for being a "gender traitor". They rush at the chance to call any man who dare speak out against them a "mangina" or a "white-knight", as if speaking up against their vitriol is just an attempt at "getting into the pants of women" (they don't see how ironic it is to claim that women are sexist, while devaluing their fellows man's gender, and comparing us to robots unable to stop seeking women's approval)

Mark my words, these people are dangerous ideologues, only interested in their political agendas, and nothing more. While silencing them isn't the answer someone needs to catalog just how dangerous they have become. Much of what they argue could be found in Andre Breivk's manifesto, the one he wrote before going on a killing spree, or any mediocre right wing conservative pundits talk show.

5 • Reply • Share ›



**Anonymous** • 2 years ago

Your comments section has been invaded by a hate group. These people's opinions are not representative of anyone outside their hate group. I just thought I'd let you know.

14 • Reply • Share ›



Gangtok > Anonymous • 4 months ago



These attacks on women who try to help victims of sexual assault are becoming routine. Derailing is one tactic, trying to attack the credentials of the target is another. Here the issue is whether a professor at Harvard's defense of student rape victims led to denial of tenure. But they only want to talk about men. and post so many comments this thhread gets overwhelmed and the true point is lost.

1 □ | □ • Reply • Share ›



**faggg** › Anonymous • 5 months ago

Translation: I don't want to argue over what I perceive to be incontrovertible facts, but which are, to saner eyes, simply my norms eclipsing reason.

□ | □ • Reply • Share ›



**William Ryan** › Anonymous • 2 years ago

This. I would appreciate some sort of moderation which prevents discussions of community issues being taken over by a bunch of random internet people who are trotting out generic offensive arguments and have no actual knowledge of the situation. Comments by people in the Harvard community who have knowledge of this are useful, this is just making our comments board into an MRA circle jerk.

7 □ | □ • Reply • Share ›



**pierceharlan** › William Ryan • 4 months ago

Ryan is for censorship. Why am I not surprised.

□ | □ • Reply • Share ›



Copyright © 2014 The Harvard Crimson, Inc.

PRIVACY POLICY    RIGHTS & PERMISSIONS    CONTACT US    CORRECTIONS    SUBSCRIPTIONS    ARCHIVES    WRITERS