UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KIMBERLY THEIDON,

    Plaintiff,

    v.

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE, et. al.,

    Defendants.

CIVIL ACTION NO. 1:15-cv-10809-LTS

**FILED UNDER SEAL AND IN REDACTED
FORM PURSUANT TO PROTECTIVE
ORDER**

**LEAVE TO FILE GRANTED ON AUGUST 31,
2017**

## HARVARD'S MEMORANDUM OF LAW IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT

In May 2013, Harvard President Drew Gilpin Faust came to the considered academic judgment that Harvard should not grant tenure to plaintiff Kimberly Theidon, then an Associate Professor in Harvard's Anthropology Department. President Faust reached that decision personally and independently, after she reviewed Theidon's tenure file and considered the views of Harvard's Provost and a distinguished committee of five scholars—including three anthropologists from outside Harvard—convened to provide advice about Theidon's tenure case. President Faust made her decision solely on the merits. As she testified:



As is typical in tenure cases, there were a range of views about Theidon's work. In Harvard's tenure process, however, the president's judgment is determinative, as she alone can grant tenure. In evaluating tenure cases, the courts cannot and do not substitute their views for that of the

academic institution. *See, e.g.*, *Villanueva v. Wellesley Coll.*, 930 F.2d 124, 129 (1st Cir. 1991) ("[I]t is not the function of the courts to sit as 'super-tenure' committees.").

Plaintiff contends, however, that President Faust did not base her decision on the merits of Theidon's candidacy. According to Theidon, President Faust's stated assessment of Theidon's achievement as a scholar was a pretext: President Faust denied her tenure, plaintiff alleges, to retaliate against her for making online comments about sexual assault on campus and providing advice to an Anthropology Department employee who expressed concerns about the conduct of a senior professor in the Anthropology Department. Theidon also claims that President Faust denied her tenure simply because Theidon is a woman.

These claims are not only wholly without any legal or factual merit, but they are also deeply offensive; that is simply not how Harvard decides, in this case or any other, whether to make a lifetime appointment to a faculty member. Years of discovery have failed to produce *any* evidence supporting plaintiff's claim. Plaintiff simply cannot establish that President Faust, Provost Alan Garber, or any of the five ad hoc committee members who provided advice about Theidon's tenure case even *knew of* any of the activities that Theidon alleges provoked retaliation against her.

Left without evidence of bias, discrimination, or retaliation, Theidon contends that Harvard failed to follow its own procedures when it denied her tenure application. This claim is not only false, it is beside the point: even if plaintiff *could* establish that Harvard did not follow its ordinary tenure procedures (and she cannot), the First Circuit has held that "an employer's failure to follow internal procedures, standing alone, normally is not evidence of discriminatory animus." *Shorette v. Rite Aid*, 155 F.3d 8, 17 n. 8 (1st Cir. 1998).

B4733090.1

Because all of Theidon's claims are meritless, and because there is no genuine issue of material fact, the Court should grant summary judgment for the defendant.[1]

## I.   FACTUAL BACKGROUND

### A.  The FAS Tenure Process

At Harvard the conferral of tenure carries with it a promise of lifetime employment.  For this reason, Harvard's Faculty of Arts and Sciences ("FAS") reserves tenured appointments for

> scholars of the first order of eminence who have demonstrated excellence in teaching and research and who have the capacity to make significant and lasting contributions to the department(s) proposing the appointment. The foremost criteria for appointment are scholarly achievement and impact on the field, evidence of intellectual leadership and creative accomplishment, potential for future accomplishments, teaching and advising effectiveness in a variety of settings with both undergraduate and graduate students, and potential contributions to the University and broader scholarly communities.

Statement of Material Undisputed Facts ("SF") ¶¶8-9. The formal tenure review process ordinarily begins in the next-to-last year of the tenure candidate's appointment as an associate professor (an untenured rank), typically after the scholar has been a Harvard faculty member for seven years. SF ¶10. The process has a number of discrete stages, described here briefly:[2]

1. The department forms a tenure review committee from among its senior faculty, and the candidate submits materials for his or her dossier. SF¶¶10-11.

2. The department solicits "external" letters from scholars outside the university comparing the candidate with leading scholars in the candidate's field; those letters are included in a

---

[1] Plaintiff incorrectly named "Harvard University" as a separate defendant in the Complaint. Defendant President and Fellows of Harvard College ("Harvard") is also known as "Harvard University."

[2] *See* SF ¶¶8-28. The formal procedures themselves are set forth in writing in the FAS Appointment and Promotion Handbook. A summary of the procedures addressed specifically to FAS's tenure-track faculty is contained in the Tenure-Track Handbook. *See id.*

B4733090.1

candidate's tenure dossier, which also includes the candidate's research statement, teaching statement, and a "case statement" prepared by the tenure review committee. SF ¶¶13, 15.

3. The department votes on the case. If a significant majority of the tenured faculty in the associate professor's department vote in support of the candidacy, the dossier is forwarded to the FAS Committee on Appointments and Promotions (comprised of select tenured faculty and senior administrators from across the FAS; sometimes called "CAP"), and each tenured faculty member in the department is asked to write a confidential, internal letter to the FAS Dean. SF ¶¶15-18.

4. The FAS Dean, in consultation with CAP, decides whether to forward the tenure case to the President for her consideration. CAP and the FAS Dean often recommend that the President convene an ad hoc committee of five scholars to help the President make this decision. SF ¶¶18-20.

5. The ad hoc committee usually consists of three active full professors from outside Harvard, two active full professors at Harvard (who are not from the department making the recommendation), the President or Provost, the FAS Dean of the Faculty, the Senior Vice Provost for Faculty Development and Diversity, and the FAS Divisional Dean responsible for the case. The ad hoc committee typically hears from four witnesses from the candidate's department. The President or Provost (either may preside over the ad hoc meeting) then continues the proceedings with a discussion of the entire case for tenure with only the ad hoc committee. SF ¶¶22, 25-26.

6. After the ad hoc committee meeting, Harvard's President makes the final tenure decision. SF ¶28.

Two features of this process merit particular attention. First, FAS consciously chooses to seek opinions from scholars from other universities—both external letter writers and ad hoc committee members—to provide perspective about a tenure candidate's standing in her field. SF ¶23. The high degree of academic specialization in universities makes certain that many of the scholars qualified to render opinions about a candidate's stature in her academic discipline will teach at universities other than Harvard. SF ¶23. External letter writers and external ad hoc committee members also provide a critical check in the tenure review process, as it may be difficult

- 4 -

for departmental faculty to be as objective towards close colleagues as external reviewers could be. SF ¶24.

Second, FAS asks each senior faculty member to write a private letter to the FAS Dean stating his or her candid views about a tenure candidate's qualifications. SF ¶¶15-16. Harvard recognizes the reality that senior faculty members may be reluctant to state negative views about a tenure candidate—one who is not only *now* a colleague but could be one for decades to come—openly. SF ¶16. For this reason, Harvard has deliberately chosen to ask senior faculty to communicate their views privately. Harvard believes that this kind of candor helps ensure that the life-long commitment afforded by tenure is granted to the very best, and only the very best, candidates. SF ¶17.

**B.  <u>Theidon's Tenure Case</u>**

*Background.* Theidon received her Ph.D. in 2002 from the University of California, Berkeley and was hired as an Assistant Professor at Harvard's Anthropology Department in 2004. SF ¶¶1-2. That year, a Peruvian academic press published Theidon's first book, *Entre Prójimos* (2004), which described Theidon's fieldwork in Peru in the wake of civil conflict there. SF ¶3. Theidon published *Entre Prójimos* in Spanish. SF ¶3. In 2008, Harvard promoted Theidon to Associate Professor. SF ¶29. Harvard sent Theidon a formal promotional letter giving her recommendations for her " ███████████████████████████████ " in preparation for seeking promotion to full professor with tenure. SF ¶30. The recommendations were quite explicit and included:

- ████████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████████
  ████████████████████████████████████████████████

- ███████████████████████████████████████████████████████████████████
  ███████████████████████████████████

███ ████████████████████████████████████████████████████████████████████
██████████████████████████████████

SF ¶30. Harvard puts such recommendations in writing in order to provide clear advice about how a tenure-track faculty member should best position herself for tenure. SF ¶34. Indeed, Theidon testified that ███████████████████████████████████ SF ¶33.

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
█████████████████████████████████████████

Harvard began its tenure review process for Theidon after she returned in June 2012. SF ¶45. ████████████████████████████████████████████████████

████████████ Theidon failed to accomplish *any* of the three tasks her 2008 promotion letter advised her to focus on. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████



SF ¶44.

*The Anthropology Department Considers Theidon's Tenure Case.* The Anthropology Department commenced Theidon's tenure process in June 2012. SF ¶45. The Department appointed a four-professor tenure review committee to work on Theidon's tenure case.[4] Theidon drafted a research statement describing her past and future areas of scholarly inquiry. SF ¶46. The Department solicited confidential letters about Theidon's work from 25 external evaluators. SF ¶58. Between December 2012 and January 2013, the Department received sixteen letters from external scholars evaluating her work. SF ¶58. Although most of the letters were positive, some enthusiastically so, some scholars expressed reservations. SF ¶62-64. For example,

---

[3] *Pasts Imperfect* (if in fact it ever existed) has never been published or, by plaintiff's admission, finished. SF ¶135. Theidon now blames her failure to finish this book, which she told Dean Marsden she would finish in 2011, on Harvard's decision to deny her tenure in 2013, testifying that "the last three years following my tenure denial were very difficult...I view that as part of my damages." SF ¶136. In discovery, Harvard requested "[a]ll documents concerning any efforts [Theidon] took to publish books or articles, including copies of any proposals, outlines, drafts or manuscripts…submitted," and the Court ordered Theidon to produce all responsive documents. D.N. 129. Theidon has not produced a manuscript, outline, draft, or proposal for *Pasts Imperfect*. SF ¶141.

[4] Its members were ███████████████████████████████. SF ¶45.

B4733090.1

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████ SF ¶66.

After the Anthropology Department received the external letters, Theidon's departmental tenure review committee began creating a case statement describing Theidon's candidacy for submission to the Department's senior faculty and, if approved, to CAP. SF ¶69. Members of Theidon's departmental tenure review committee also identified weaknesses in Theidon's case. SF ¶¶67, 69. ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████[5]

---

[5] SF ¶67. A line-by-line comparison reveals that 36% of *Intimate Enemies* is a direct English translation of *Entre Prójimos*. SF ¶68.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████ SF ¶71.

One member of the tenure review committee then told the committee chair, "I████████████████████

████████████████████████████████████" SF ¶72.

After the departmental vote, the senior anthropology faculty members submitted confidential letters to FAS Dean Smith providing their personal opinions and evaluation of Theidon's candidacy for tenure. SF ¶73. █████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████ SF ¶77.

*The Committee on Appointments and Promotions Considers Theidon's Case.* CAP met to discuss Theidon's tenure case on April 10, 2013. SF ¶78. The FAS Dean of Social Science, Prof. Peter Marsden, drafted notes summarizing his view of the case. SF ¶81. His notes included the following comments:



- ████████████████████████████████████████████
  ██████████████████████████

■ ████████████████████████████████████████████
████████████████████████

■ ████████████████████████████████████████████
███████████████████████████

SF ¶81. Contemporaneous notes from the CAP meeting itself demonstrate that CAP's members raised similar concerns about ████████████████████████████████████████. SF ¶82.

████████████████████████████████████████████

████████████████████████████████████████████

SF ¶83.  (Recommending an ad hoc is a common outcome at CAP.) SF ¶20.  FAS Dean Michael Smith forwarded this recommendation to President Faust's office with a cover letter summarizing Theidon's candidacy. SF ¶132.

*The Ad Hoc Committee Examines her Record and Provides Advice.* President Faust accepted Dean Smith's recommendation that the Theidon tenure review proceed to an ad hoc committee. SF ¶83. Harvard invited three external Social Anthropology professors to participate:

████████████████████████████████████████████

███████ SF ¶84. All three are eminent anthropologists; ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ served as the Harvard faculty members of

the ad hoc.[6] SF ¶86. Three of the five ad hoc committee members (████████████████████)
could read and speak Spanish. SF ¶90. (The fact that three of the five members of the ad hoc
committee were women was not an accident: as Harvard Professor and Senior Vice Provost Judith
Singer testified, ███████████████████████████████████) SF ¶¶88-89.

In advance of the meeting, Harvard sent each member of the ad hoc committee ████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████ SF ¶93. Provost Alan Garber presided. FAS Dean Michael Smith, Divisional Dean Peter
Marsden, and Senior Vice Provost for Faculty Development and Diversity Judith Singer attended
as *ex officio* members. SF ¶91. Four departmental witnesses met with the committee. SF ¶98. ████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████ SF ¶99.
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[6] Harvard's policy is that the two Harvard faculty members should not be from the candidate's department.
[7] SF ¶110. *Intimate Enemies,* published in 2013, represented the most significant work Theidon had accomplished in her nine years at Harvard. ████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

As reflected in Singer's handwritten notes of the meeting (which were later sent to President Faust as she considered whether Theidon warranted being granted tenure), ████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████ SF ¶96, 161. Indeed, there is no evidence that any member of the ad hoc was even aware of any of the activities Theidon alleges in the complaint. SF ¶¶162-63.

---

████████████████████████████████████████████. SF ¶¶ 95-96, 110.

After the ad hoc committee meeting, Garber met with President Faust and summarized the proceedings. SF ¶106. He recommended that, ██████████████████████████ SF ¶106. President Faust did not merely rubber-stamp Garber's recommendation. SF ¶107-12. She reviewed Theidon's dossier carefully, and followed up with other questions for Garber and for Singer, who had also attended the ad hoc committee. SF ¶¶107-110. Faust's contemporaneous emails show that she made a thoughtful, independent decision about Theidon's candidacy. SF ¶¶107-110. Faust emailed Garber and Singer, ███████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████ Singer responded, focusing exclusively on the merits of Theidon's case:

- ██████████████████████████████████████████████████
██████████
██ ██████████████████████████████████████████████
████████████
██ ██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████

SF ¶110. Ultimately, Faust concluded that Theidon did not meet the FAS criteria for promotion to tenure. As she explained her decision in the deposition plaintiff's counsel conducted:



_____

[8] SF ¶112. Provost Garber's contemporaneous emails demonstrate that ████████████████ ████████████████████████████████████████████████████████████

B4733090.1

*Women in the Anthropology Department and FAS.* Theidon, as noted above, claims that Faust denied her tenure application based on gender bias. Discovery offers no support for this proposition. In fact, in the two years preceding Theidon's candidacy, Harvard appointed three women as tenured full professors in the Anthropology Department. SF ¶6.[9] And, in 2013, Harvard published an analysis of comparative rates of granting tenure to male versus female candidates in FAS over the prior five academic years. The study showed "no statistical difference...between the two groups." SF ¶ 7.

## II.    THEIDON'S CLAIMS

On March 24, 2014, Theidon filed a complaint with MCAD and, later, this lawsuit, alleging she was denied tenure because she is a woman and in retaliation for alleged protected activity under Title IX and c. 151B.[10] Theidon's complaint identifies three forms of activity she contends were legally protected from retaliation. *First*, on March 7, 2013, Theidon posted statements supporting victims in the "comments" section of the online version of a Harvard *Crimson* article about sexual assault on campus. *Second*, Theidon allegedly allowed a student to hand out leaflets after her class supporting victims of sexual assault. *Third*, Theidon spoke on March 27, 2013 with

---

SF ¶108. The focus of the Carr Center is on human rights, not anthropology. In notes of a meeting she had with Prof. Jorge Dominguez on July 3, 2013, Theidon herself noted that

SF ¶167

[9] One, Prof. Jean Comaroff, was appointed jointly to the Department of African and African American Studies. SF ¶6.

[10] Theidon filed an internal grievance shortly after being denied tenure. A Harvard faculty panel denied the grievance on May 12, 2014. SF ¶169.

- 14 -

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████ Theidon took no action herself on ██████ complaint (in fact, she told ███████

███████████████████████████████████████████████████

███████████████████████████████████████ █ ██████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

SF ¶¶156, 159.

Following her tenure denial, Theidon sought employment at other prominent universities but did not join any university's anthropology department. SF ¶170. Instead, she obtained a tenured position, as an Associate, not full Professor, at the Fletcher School of Diplomacy at Tufts University. SF ¶171.

## III.   ARGUMENT

Harvard is entitled to summary judgment on all of plaintiff's claims. Plaintiff's sex discrimination claims must fail because, based on entirely legitimate, non-discriminatory reasons, President Faust concluded that Theidon was not a scholar of the first rank, and plaintiff cannot establish that those reasons were a sham or pretext to mask discrimination. Plaintiff's retaliation claims also fail. Plaintiff has no evidence that she engaged in "protected activity" within the meaning of Title IX and c. 151B. And even if the activity she identifies were seen as protected activity, Theidon cannot establish that the decision to deny her tenure was motivated by any

---

[11] Asked at her deposition ██████████████████████████████████████
█████████████████████ SF ¶155.

B4733090.1

purpose other than a good faith assessment of the merits of her scholarship, productivity, and likely contribution to anthropology. Indeed, Theidon cannot establish that President Faust, the decision maker, or any of the ad hoc members, including the *ex officio* members, even knew of the activities.

*The Standard.* Summary judgment is appropriate when "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Sanchez-Rodriguez v. AT&T Mobility Puerto Rico, Inc.*, 673 F.3d 1, 9 (1st Cir. 2012) (affirming summary judgment for employer in discrimination action); *see also* Fed R. Civ. P. 56. While the court draws "all reasonable inferences in favor of the non-moving party," it "ignor[es] conclusory allegations, improbable inferences, and unsupported speculation." *Goncalves v. Plymouth Cty. Sheriff's Dep't*, 659 F.3d 101, 104 (1st Cir. 2011). "To be genuine, a factual dispute must be built on a solid foundation—a foundation constructed from materials of evidentiary quality." *Nieves-Romero v. United States*, 715 F.3d 375, 378 (1st Cir. 2013). In deciding summary judgment motions in university tenure cases, the courts do not "sit as 'super-tenure' committees." *Villanueva v. Wellesley Coll.*, 930 F.2d 124, 129 (1st Cir. 1991). "A court may not simply substitute its own views concerning the plaintiff's qualifications for those of the properly instituted authorities; the evidence must be of such strength and quality as to permit a reasonable finding that the denial of tenure was 'obviously' or 'manifestly' unsupported." *Id.* (quoting *Brown v. Trustees of Boston Univ.*, 891 F.2d 337, 346 (1st Cir. 1989)).

### A. Harvard and President Faust Did Not Deny Tenure to Theidon Because She is A Woman  (Counts II and III)

Theidon makes claims for sex discrimination under Title VII, 42 U.S.C. § 2000e-2 (Count II), and Mass. Gen. Laws ch. 151B. §4 (Count III). Title VII and Chapter 151B each forbid employers from making adverse employment decisions "because of" an employee's gender. *See*

- 16 -

42 U.S.C. § 2000e-2(a)(1); Mass. Gen. Laws ch. 151B. §4(1). Theidon's federal and state law gender discrimination claims are governed by the familiar three-stage burden-shifting analysis announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ray v. Ropes & Gray LLP*, 799 F.3d 99, 113 n.8 (1st Cir. 2015) ("Massachusetts law also makes use of the *McDonnell Douglas* burden-shifting framework.").[12]

*Stage One*. Under *McDonnell Douglas*, plaintiff may establish a *prima facie* case of discrimination by showing: (1) that she is a member of a protected group; (2) that she was a qualified candidate for tenure under the college or university's standards, practices, or customs; (3) that despite these qualifications she was rejected; and (4) that men were granted tenure in the department during the same general time period. *Villanueva*, 930 F.2d at 128 (1st Cir. 1991) (citing *Banerjee v. Bd. of Trs.*, 648 F.2d 61, 62 (1st Cir. 1981)).

*Stage Two*. If Theidon makes such a showing—here, that she was qualified to be a tenured Professor at Harvard—the burden shifts to Harvard to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 127.

*Stage Three*. If Harvard articulates a legitimate, non-discriminatory reason for denying tenure to Theidon, the burden shifts back to plaintiff, requiring her to produce evidence that the offered reason was a pretext for discriminatory animus. *Id.* "Only if there is evidence from which a reasonable inference of discrimination can be drawn has the plaintiff defeated the summary judgment motion." *Id.* at 128.

---

[12] *See also Villanueva*, 930 F.2d at 127 n.2 (noting the "standards of liability under [Title VII and 151B] are substantially identical"); *Sullivan v. Liberty Mut. Ins. Co.*, 825 N.E.2d 522, 530 (Mass. 2005) (applying *McDonnell Douglas* to plaintiff's 151B claims);*Wheatley v. Am. Tel. & Tel. Co.*, 636 N.E.2d 265, 268 (Mass. 1994) ("It is our practice to apply Federal case law construing the Federal anti-discrimination statutes in interpreting G. L. c. 151B.").

Summary judgment is appropriate here because Harvard generally (and President Faust in particular) had legitimate, non-discriminatory reasons to deny tenure to Theidon and, in fact, denied Theidon tenure for those reasons.[13] President Faust denied Theidon tenure solely on the merits, based on her close review of Theidon's dossier and on the advice she received from Provost Garber and the ad hoc committee. She concluded that Theidon "███████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████" *See Villanueva,* 930 F.2d at 130 (Wellesley College "plainly articulated" a legitimate and non-discriminatory

---

[13] While the court need not reach the issue at summary judgment because the record is clear that Theidon has no evidence of pretext, Theidon also fails the first stage of the analysis—that she was qualified. Theidon failed to meet the expectations in her 2008 promotion letter and the ████████████████████████ ███████████████████████████████████ Theidon's conduct in the tenure process also disqualified her from consideration for a lifetime appointment. Theidon's research statement, which Theidon submitted to Harvard when the tenure process began, █████████████████ SF ¶50. Theidon does not have and never had a contract for *Pasts Imperfect,* as the editor of the University of Pennsylvania Press confirmed. SF ¶125. *See also* SF ¶131. Theidon has admitted that to date she has not completed a manuscript for *Pasts Imperfect.* SF ¶135.  In fact, in the course of discovery, Theidon failed to produce any manuscript, outline, or proposal for *Pasts Imperfect.* SF ¶141.

Theidon thus made false, material statements about her academic accomplishments during her tenure review: that she had a book, which did not in fact exist then any form, which was "under contract" with a prominent academic press. ¶¶125-28, 130. She thereby committed fraud. Accordingly, she cannot claim that she was qualified to be a full professor at Harvard under the "after-acquired evidence" doctrine. *McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352 (1995) (where the employer establishes that "the wrongdoing was of such severity that the employee in fact would have been [subject to an adverse action] on those grounds alone if the employer had known of it at the time of the [adverse action]," the plaintiff is not entitled to equitable relief). Further, she should be barred from recovery due to her inequitable conduct. *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 880 (1st Cir. 1995) (finding a court may deny equitable relief to a party who has acted in bad faith or with unclean hands); *Women Employed v. Rinella & Rinella*, 468 F. Supp. 1123, 1128 (N.D. Ill. 1979)(rejecting Title VII claim on the additional grounds of unclean hands); *Fogg v. Gonzales*, 407 F. Supp. 2d 79, 92 (D.D.C. 2005), *rev'd in part on other grounds by* 492 F.3d 447 (D.C. Cir. 2007)(affirming the district court's refusal to award front pay based on unclean hands because the plaintiff had misrepresented his former job title at hearings and on his website).

- 18 -

reason for denying tenure where evaluators "indicated a sense of reservation as to the merits" of the candidate's work, and some "considered [her] productivity to be inadequate").

Because Harvard had legitimate and non-discriminatory reasons to deny tenure to plaintiff, Theidon can defeat summary judgment only if she can offer "evidence of pretext *and* discriminatory animus." *Goldman v. First Nat'l Bank*, 985 F.2d 1113, 1117 (1st Cir. 1993) (emphasis in original);[14] *see also Ray*, 799 F.3d at 113. A plaintiff "cannot meet h[er] burden of proving 'pretext' simply by refuting or questioning the defendants' articulated reason." *Jackson v. Harvard Univ.*, 721 F. Supp. 1397, 1402 (D. Mass. 1989). Rather, she "must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination." *Ray*, 799 F.3d at 113.

There is absolutely no evidence, direct or circumstantial, that President Faust harbors a discriminatory animus towards women candidates for tenure or, indeed, of discriminatory animus at any stage in Theidon's tenure review process. Pretext requires a showing of discriminatory animus and "deceit used to cover one's tracks." *See Ronda-Perez v. Banco Bilbao Vizcaya Argentaria-Puerto Rico*, 404 F.3d 42, 45 (1st Cir. 2005); *see also Jackson*, 721 F. Supp. at 1404 ("[T]he elasticity of promotion standards for teachers in an academic setting does not constitute, in and of itself, evidence of discrimination."). Here, the reasons for Theidon's tenure denial are anything but a sham. Rather, they flow directly from her failure to follow the recommendations

---

[14] Massachusetts diverges slightly from federal authority in this respect. *See Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.*, 50 N.E.3d 778 (Mass. 2016) (noting Massachusetts requires the plaintiff-employee to provide evidence of pretext only). While under 151B Theidon need not show discriminatory animus at the summary judgment stage, she must show that each legitimate non-retaliatory reason Harvard had for denying her tenure was pretextual. *See id.* at 794 (finding at summary judgment stage plaintiff must produce evidence that employer's "facially proper reasons given for its action against him [or her] were not the real reasons for that action"). Theidon cannot do so here.

set forth in the 2008 letter promoting her to associate professor, as well as other legitimate concerns about her scholarly impact and productivity. These concerns were raised by external and internal evaluators at every stage of her review and ultimately informed President Faust's decision.

Nor is there any evidence of any more general discriminatory practice or pattern that affected Theidon. Plaintiff bears the burden to produce a statistical or comparative analysis that could support such a theory, and Theidon has produced none. To the contrary, the evidence shows that in the two years preceding Theidon's candidacy, Harvard appointed three women as tenured full professors in the Anthropology Department.

### B.  Harvard Did Not Retaliate Against Theidon (Counts I and IV)

Plaintiff claims President Faust denied her tenure application in retaliation for Theidon's online *Crimson* comments about sexual assault, because she permitted students to leaflet about sexual assault after one of her classes, and because she provided advice to a departmental employee who complained that a senior faculty member had behaved inappropriately. Harvard is entitled to summary judgment on these claims.

Where, as here, there is no direct evidence of retaliation, the *McDonnell Douglas* burden shifting applies to 151B and Title IX retaliation claims.[15] To establish a prima facie case of retaliation, plaintiff must prove that she (1) engaged in protected activity, (2) suffered an adverse

---

[15] To survive summary judgment on a Chapter 151B claim of retaliation, a plaintiff must "produce evidence from which a jury could infer four elements": (1) that the employee "reasonably and in good faith believed that the employer was engaged in wrongful discrimination," (2) that the employee "acted reasonably in response to that belief," (protected activity) (3) "that the employer took adverse action against the employee," and (4) "that the adverse action was a response to the employee's protected activity (forbidden motive)." *Verdrager*, 50 N.E.3d at 800 (quotations and citations omitted). Under 151B, Theidon's claim fails because (as described in greater detail *infra* at 22-23) she did not engage in protected activity as 151B defines it. In addition, *McDonnell Douglas* burden-shifting is used to determine whether a jury could infer "forbidden motive," and here plaintiff has failed to offer evidence sufficient to warrant a trial on that issue.

employment action, and (3) that the adverse employment action was causally connected to the protected activity. *Ray*, 799 F.3d at 107; *Sullivan v. Raytheon Co.*, 262 F.3d 41, 48 (1st Cir. 2001); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (1st Cir. 2002) ("the jurisprudence of Title VII supplies an applicable legal framework" to Title IX retaliation claims); *Nelson v. Univ. of Me. Sys.*, 923 F. Supp. 275, 280 (D. Me. 1996).

Both c.151B and Title IX claims of retaliation require that plaintiff demonstrate a "'but-for' causal connection between the protected activity and the tenure denial."[16] *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (holding Title VII retaliation claims require "but-for" causation); *Rock v. Lifeline Sys. Co.*, No. 13-11833-MBB, 2015 U.S. Dist. LEXIS 144335, at *43 (D. Mass. Oct. 23, 2015) (analyzing a retaliation claim under 151B: "On summary judgment the plaintiff must establish that no reasonable jury could conclude he would have faced the adverse employment actions had he not engaged in protected conduct"). If the plaintiff makes a prima facie showing of retaliation, and the defendant proffers a legitimate non-discriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to prove that the proffered reason is pretext for retaliation. *Ruffino v. State Street Bank and Trust Co.*, 908 F. Supp. 1019, 1045 (D. Mass. 1995).

Here, plaintiff's claims founder for three distinct reasons. *First*, she cannot demonstrate that she engaged in protected activity, as courts have defined that term in c. 151B and Title IX

---

[16] The *Nassar* case clarified that "but-for" causation is required for retaliation claims under Title VII, and the First Circuit has held that Title IX retaliation claims follow the Title VII retaliation framework. This Court found in *Fox v. Town of Framingham*, 2016 U.S. Dist. LEXIS 124107, at *22 (2016) that the retaliatory motive must play "a substantial part in prompting the adverse action." Harvard respectfully argues this standard is incorrect in light of *Nassar*, but the Court need not decide the issue since Theidon can point to no facts supporting that any alleged retaliatory conduct was a factor, let alone a substantial one, in President Faust's decision to deny Theidon tenure.

cases. *Second*, she cannot make a prima facie showing of retaliation. *Third,* she cannot establish that President Faust's reasons for denying tenure were pretexts to mask retaliation.

   1.   <u>Theidon Did Not Engage In Protected Activity</u>

   Under Title IX, retaliating against an employee who engages in protected activity—in particular, who complains to supervisors about sexual harassment or discrimination—is itself actionable discrimination. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 180 (2005) ("Reporting incidents of discrimination is integral to Title IX enforcement and would be discouraged if retaliation against those who report went unpunished."). "[C]omplaints need not be formal complaints to an enforcement agency, but also include internal acts of opposition to discrimination, including merely voicing concerns to superiors within the university." *LeGoff v. Trs. of Bos. Univ.*, 23 F. Supp. 2d 120, 128 (D. Mass 1998) (citing *Wyatt v. City of Boston*, 35 F.3d 13, 15 (1st Cir. 1994)). Similarly, under Chapter 151B, "it is unlawful for an employer 'to discharge, expel or otherwise discriminate against any person because he has *opposed* any practice forbidden under this chapter.' Mass. Gen. Laws ch. 151B, § 4(4).

   Here, plaintiff's allegations that she made online comments, permitted students to leaflet, and gave advice (without herself taking action) to a department employee do not rise to the level of protected activity. Theidon made no complaint, formal or informal, to anyone at Harvard regarding ███████ concerns or the concerns of victims of sexual assault on campus. Neither did Theidon's responses to online commenters who made inflammatory remarks about victims of sexual assault (████████████████████████████████████████████ ███████) constitute protected activity that could form the basis of a Title IX claim.[17] SF ¶143.

---

[17] Theidon testified that ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████

Theidon did not complain to anyone at Harvard about Harvard's policies; indeed, her online comments praised the "many people … who work with great commitment on the Harvard campus to insure that everyone receives equal, respectful and dignified treatment." SF ¶143.

Harvard knows of no case where an employee's criticisms of third parties (like the individuals who ████████ the Crimson comments thread) has been judged to be protected activity under Title IX. *Cf. LeGoff*, 23 F. Supp. 2d at 128 (finding "Title IX prohibits retaliation against those who *complain* of violations of the act"). In sum, none of Theidon's actions—or inactions— is the kind of activity that courts have found to be protected under Title IX or Chapter 151B. Because Theidon did not engage in protected activity, this ends the inquiry, and summary judgment in favor of Harvard should be granted.

2. <u>Theidon Cannot Make Out a Prima Facie Case of Causation</u>

Even if Theidon's activities were assumed to constitute protected activity under 151B or Title IX, no reasonable jury could find that the alleged protected activities were either the "but-for" cause of her denial of tenure or even a substantial factor leading to that action. No member of the ad hoc committee knew anything about Theidon's alleged protected activities. Nor did President Faust, Provost Garber, Senior Vice Provost Singer, or any of the Deans present. This is determinative. To show a causal nexus exists, "the employee must show that the retaliator knew about her protected activity—after all, one cannot have been motivated to retaliate by something he was unaware of." *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 139 (1st Cir. 2013); *see also*



SF ¶145.

*Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (analyzing under the pre-*Nassar* framework but finding no retaliation claim under Title IX when alleged retaliator did not know about complaint).

The fact that Theidon's alleged protected activity was within a few months of her tenure denial does not permit her to avoid summary judgment. "[C]hronological proximity does not by itself establish causality, particularly if '[t]he larger picture undercuts any claim of causation.'" *Cornelius-Millan v. Caribbean Univ., Inc.*, No. 13-1873 (BJM), 2016 U.S. Dist. LEXIS 66519, at *20 (D.P.R. May 18, 2016) (quoting *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003)); *see also Walker v. City of Holyoke*, 523 F. Supp. 2d 86, 112 (D. Mass. 2007). This is particularly the case when the reasons for the decision, ███████████████████████████ ███████████████, were raised long before her alleged protected activity even occurred.

3.   Plaintiff Cannot Establish that President Faust's Stated Reasons for Denying Tenure Were Pretextual

Nor could a reasonable jury conclude that Harvard's stated reasons for the non-promotion were a pretext for retaliation. As described in detail earlier, President Faust's independent judgment about Theidon's candidacy, informed by reading her dossier carefully and learning what happened at the ad hoc committee meeting, was the sole cause of her decision to deny tenure.

C.   **The "Cat's Paw" Doctrine Does Not Apply Here**

Theidon cannot avoid summary judgment by invoking the "cat's paw" doctrine—that is, by alleging someone from Harvard other than President Faust was motivated to discriminate or retaliate against Theidon and President Faust unwittingly did his or her bidding.[18] To prevail on a

---

[18] As the Supreme Court has explained, the term "cat's paw" comes from one of Aesop's fables. "In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done

cat's paw theory, Theidon must show that that a reasonable jury could conclude that a discriminatory motive (of someone other than President Faust) was the "proximate cause" of her tenure denial. *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011). In this context, proximate cause requires some direct relation between the tainted evaluator's actions and the adverse employment action; the requisite causal link cannot be "too remote, purely contingent, or indirect." *Id.* "That is, an employer may be held liable [only] if the final decision maker merely acted as a rubber stamp, or 'the cat's paw,' of others who were acting from discriminatory motives and who possessed leverage, or exerted influence over the 'titular decision maker.'" *Murphy v. Mattis*, No. 2:14-cv-00400-JAW, 2017 U.S. Dist. LEXIS 46565, at *98-99 (D. Me. Mar. 27, 2017).

Here, Theidon's designated villain appears to be ████████████████████████ ████ Harvard suspects that Theidon will contend that ████████████████████████ ████████████████████—sought to sabotage her candidacy by expressing support for Theidon in public settings but reservations about her candidacy privately.[19] Theidon's theory

---



so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 n.1 (2011).

[19] Playground bluster aside, calling ████████████████████████—does not create the inference that ████████ concerns about Theidon's candidacy were the product of either a retaliatory motive or gender bias.

SF ¶17. The logic here is no different than in many other settings where confidentiality is valued. Indeed, if there were any doubt about the close connection between candor and confidentiality, the Court need look no further than the federal court's own hiring system. The electronic system for federal law clerk applications, OSCAR, requires law professors writing letters of recommendation to upload those letters directly to the system. "The OSCAR program does not support the uploading of recommendation letters by applicants. The OSCAR Working Group, a group of federal judges and law school representatives, explicitly designed

appears to be that when ███████████████████████████████████████████████████

███████████████████████████████ then sought to retaliate against Theidon by sabotaging her

tenure case. [20] If that is Theidon's theory, it fails—on both the facts and the law. The discovery

record plainly contradicts this theory. First, ███████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

　　　Second, even if ████████ views about Theidon's had been motivated by bias or retaliation

(and, to be clear, there is no evidence that they were), ████████ role in the tenure process was not,

as a matter of law, central enough to the tenure process to have been the proximate cause of

---

the system so that recommendation letters remain confidential and are not visible to applicants." https://os-
car.uscourts.gov/faq/recommender_faq#q24.

[20] Plaintiff's counsel has also put forward an alternative claim. ████████████████████████████████

D.N. 134, n. 6 (unredacted version filed under seal). But plaintiff has never explained why ████████—or any-
one, for that matter—would connect the results of Theidon's tenure decision to the disclosure of allegations
████████████████████████

- 26 -

Theidon's tenure denial, or to undermine the integrity of President Faust's independent conclusion—the key requirements of "cat's paw" liability. This Court's decision in *Whitney v. NBC Operating, LP*, No. 14-40066-LTS, 2015 U.S. Dist. LEXIS 162213, at *3 (D. Mass. Dec. 2, 2015), is directly relevant. In *Whitney,* the plaintiff offered evidence that a department supervisor—"a person with influence in the promotion process...had made remarks indicating gender-based animus against [plaintiff] as a male." The court nevertheless granted defendant's summary judgment motion because "four individuals who supported the decision to put [plaintiff] on [a] Development Plan [rather than promote him]…generally concurred with the sentiment that his performance did not warrant a promotion." *Id.*[21]

Here, ███████ was one of four department witnesses who participated in the ad hoc committee meeting. Plaintiff does not allege that any of the other *twelve* individuals who played some role in the ad hoc (three other witnesses: ██████████████████████████; five ad hoc committee members: ██████████████████████████████, who evaluated Theidon's candidacy; Provost Garber or Vice Provost Singer, who provided information and advice to President Faust about the case; or the Committee's other ex officio members, FAS Faculty Dean Smith and Divisional Dean Marsden) knew anything about Theidon's allegedly

---

[21] The Sixth Circuit's opinion in *Seoane-Vazquez v. Ohio State Univ.* 577 Fed. Appx. 418 (6th Cir. 2014) (unpublished) is also instructive. In that case the plaintiff, prior to his tenure review, had filed internal complaints and an EEOC complaint against two professors. These professors then participated in the tenure review process. 577 Fed Appx. at 420-21. The plaintiff alleged that they poisoned the process by discussing the EEOC claims at the departmental vote, selecting biased reviewers, preventing the faculty from seeing a rebuttal letter written by plaintiff, and omitting materials from his tenure dossier. *Id.* at 424-25. The Sixth Circuit held that summary judgment was appropriate, however, where the university's decision was based not only upon the input of these two professors, but also upon the input of four others who were not alleged to be biased. *See id.* at 429; *see also Baldwin v. N.Y. State*, No. 15-3910, 2017 U.S. App. LEXIS 8261, at *7 (2d Cir. May 10, 2017) (finding plaintiff did not raise a genuine issue of material fact by suggesting that one evaluator had animus, where the decision-maker had conducted his own review of the materials and received input from other evaluators).

B4733090.1

protected activities or was motivated to engage in gender discrimination. At least six participants other than ████████████████████████████████████████, including three from outside Harvard, expressed reservations about her candidacy (as did several external letter writers), and Provost Garber and Vice Provost Singer shared those reservations with President Faust. President Faust reviewed Theidon's file conscientiously and asked probing, merits-based questions to Singer and Garber about it. President Faust chose to deny tenure only after careful, personal, and independent thought. Plaintiff simply cannot show that the ambivalent views ████ expressed about Theidon's candidacy—whatever their motivation—were the proximate cause of her tenure denial.

### D. Plaintiff's Procedural Claims Are Meritless

Theidon has also suggested that Harvard administrators failed to follow its stated procedures when Harvard considered Theidon's tenure case. This claim is factually incorrect and legally irrelevant. Take, for example, Theidon's claim that Harvard violated its internal requirements by failing to send Theidon's articles about her work in Colombia to the external scholars Harvard asked to write letters about her candidacy; this, plaintiff alleges, violates Harvard's policy that departments should send "a sampling [of the candidate's] work" to external reviewers. SF ¶ 13. The discovery record reveals that Harvard did not, in fact, violate its own rules.

First, the selection of publications, and the method in which they are transmitted to external evaluators, are determined by the tenure review committee and vary on a case-by-case basis— there is no FAS requirement that *all* of a candidate's publications be sent to evaluators. SF ¶¶ 13-14. Second, Theidon's website at the time, which was hyperlinked in the cover letter to external evaluators, contained .pdf links to several of the Colombia articles she claims were not "sent" to external evaluators. SF ¶ 53. In fact, at least five external evaluators commented on her publications

- 28 -

on Colombia, including those articles she claims were omitted. SF ¶61. Third, the dossier reviewed by CAP, the ad hoc committee, and President Faust contained four of the Colombia articles Theidon complains the external letter writers did not receive.[22] SF ¶80. This supposed procedural "irregularity," like the others Theidon has pointed to[23], is a red herring—at all stages of the tenure review, evaluators and decision makers had everything they needed to make an informed decision.

Even if Theidon could demonstrate procedural irregularities, it is well established that these are not sufficient by themselves to suggest discrimination. *Shorette v. Rite Aid*, 155 F.3d 8, 17 n. 8 (1st Cir. 1998) ("[A]n employer's failure to follow internal procedures, standing alone, normally is not evidence of discriminatory animus…")(citing *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995)); *see also Ronda-Perez v. Banco Bilbao Vizcaya Argentaria-Puerto Rico*, 404 F.3d 42, 46-48 (1st Cir. 2005)("variety of alleged procedural irregularities" did not ultimately "add up to the slightest suggestion of an effort to deceive or cover up a hidden motive").

## IV.    CONCLUSION

The discovery record reveals that President Faust decided not to grant tenure to Theidon because President Faust came to the considered academic judgment that Theidon was not a scholar of the first rank in Anthropology. Plaintiff may well disagree with that assessment, but that was President Faust's judgment, and absent evidence of discrimination or retaliation (and there is no

---

[22] The only article Theidon published about Colombia not included in this tenure dossier was published in 2001—before Theidon had earned a Ph.D. and three years before she joined Harvard. SF ¶55.

[23] The other purported deviations hardly go to the core of Harvard's process. The supposed irregularities include: the acceptance of █████████ revised evaluation letter recommending against tenure, which, in any event, was never incorporated into the tenure dossier reviewed by the ad hoc committee members or President Faust; the failure to include certain post-CAP revisions to the case statement in the final dossier; and the failure to include certain descriptive elements in the case statement, including the rationale for selecting the comparands and how the candidate fits into the department's academic plan.

such evidence here), her determination decides the matter. Harvard therefore respectfully requests

that the Court grant its Motion for Summary Judgment and dismiss Theidon's complaint with

prejudice.

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE
By its attorneys,

/s/  *Martin F. Murphy*
Martin F. Murphy, BBO 363250
Jennifer A. Kirby, BBO 678885
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts  02210-2600
617-832-1000
mmurphy@foleyhoag.com
jkirby@foleyhoag.com

DATED: August 31, 2017

## CERTIFICATE OF SERVICE

I hereby certify that the unredacted version of this document filed under seal was sent by first class mail and electronically to Plaintiff's counsel at the addresses below on the 31st day of August 2017. I hereby certify that this redacted document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 31st day of August 2017.

*/s/ Jennifer A. Kirby*
Attorney for Defendant

Counsel for Plaintiff

Elizabeth A. Rodgers
Philip J. Gordon                          Linda M. Correia
Gordon Law Group, LLP                     Correia & Puth, PLLC
111 Devonshire Street                     1775 K Street, NW, Suite 600
Boston, MA 02109                          Washington, D.C. 20006
erodgers@gordonllp.com                    lcorreia@correiaputh.com
pgordon@gordonllp.com

- 30 -

B4733090.1