UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

KIMBERLY THEIDON,                        )
                                         )
             Plaintiff,                  )
                                         )
      v.                                 )      Civ. A. No. 15-cv-10809-LTS
                                         )
HARVARD UNIVERSITY, and the              )
PRESIDENT AND FELLOWS OF                 )
HARVARD COLLEGE,                         )
                                         )
             Defendants.                 )
                                         )
_____ )

REDACTED ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

February 28, 2018

SOROKIN, J.

On March 12, 2015, plaintiff Kimberly Theidon filed suit against Harvard University and

the President and Fellows of Harvard College (collectively, "Harvard"), alleging that Harvard

denied her application for tenure either because of sex discrimination or as retaliation for her

advocacy of victims of sexual harassment all in violation of federal and state law. Doc. No. 1.

With discovery concluded, Harvard moves for summary judgement, Doc. No. 151, and Theidon

opposes, Doc. No. 156. The undisputed facts and, where disputed, the facts established by

Theidon are set forth below with all reasonable inferences drawn in Theidon's favor.[1]

_____

[1] Theidon "disputes" numerous statements as set forth in Defendant's Statement of Material
Facts, as "subjective, self-serving statements which do not constitute undisputed fact." See, e.g.,
Doc. No. 157-1 at ¶¶ 16-18, 20, 32, 34, 56, 67-69, 71-72, 74-77. Theidon's statement that a fact
is disputed does not make it disputed. She must set forth admissible, contrary evidence that
establishes a genuine dispute. Fed. R. Civ. P. 56(a), (c). Furthermore, there is nothing per se
inadmissible about self-serving statements; most statements presented by a party in a lawsuit

I. FACTUAL BACKGROUND[2]

## A. Tenure at Harvard

At Harvard University, a tenure appointment is a life-long appointment. Doc. Nos. 157-1 at ¶ 17; 152 at 3. Such appointments are reserved for scholars "who have the capacity to make significant and lasting contributions to the department(s) that proposes the appointment." Doc. No. 157-1 at ¶ 8.

Harvard renders tenure decisions pursuant to an elaborate eight step process, see id. at ¶¶ 1028; Doc. No. 29-2 at 5:

1. The chair of the candidate's department explains the review process and asks the candidate to provide materials for her promotion dossier.[3] Doc. No. 29-2 at 14.
2. The department chair and divisional dean appoint a committee composed of senior faculty to review the candidate's dossier and formulate a recommendation to the department whether to proceed with the review process. Id.
3. The department requests approximately fifteen letters from external scholars comparing the candidate with other leading scholars in her field and making a recommendation as to the candidate's tenure. Id. The letters are added to the candidate's dossier. Id.

---

will, to some extent, serve that party—that is the reason the party is presenting the statement. Theidon has not submitted any case standing for the proposition that the self-serving nature of a factual assertion renders it disputed or so unreliable the Court may not consider it on summary judgment. And, contrary to Theidon's claim, statements such as, "On October 8, 2012, [Professor 2] emailed [Professor 1] to ask if he 'had a chance to look at Kimberly's Spanish book and compare it to Intimate enemies.' [Professor 1] wrote: 'they both deal with a similar set of concerns and research agendas[.]'" Doc. No. 157-1 at ¶ 56, are not "subjective, conclusory or imaginative," Torrech-Hernandez v. Gen. Elec. Co., 519 F.3d 41, 47 (1st Cir. 2008).

[2] The Court draws the record from the materials cited by the parties and considers the arguments raised by the parties in their memos. It is not the Court's duty to comb through the record in search of evidence in support of parties' motions or to construct arguments on parties' behalf. See Neelon v. Krueger, No. 12-CV-11198-IT, 2015 WL 4750842, at *2 (D. Mass. Aug. 11, 2015) (explaining that it is the parties' "burden to raise [] argument[s] and identify [] evidence," and that it is "not the court's burden to parse . . . [the] record . . . to construct an unbriefed argument on [parties'] behalf"); Fed. R. Civ. P. 56(c)(3) ("The court need only consider the cited materials[.]"). With this admonition in mind, the Court did not parse through each exhibit, including the single-spaced one hundred and sixteen page expert report filed by Theidon's counsel, Pl. Ex. No. 61.

[3] A candidate's promotion dossier includes a curriculum vitae, copies of all publications in her field, teaching and advising materials, a teaching statement, and a research statement. Doc. 29-2 at 15; Doc. No. 157-1 at ¶ 10.

1

4. The reviewing committee writes a case statement regarding the strengths and weaknesses of the materials in the dossier which is shared with the department. Id.[4] The tenured members of the department then vote on the candidate's case. Id.

5. If the vote is favorable,[5] the candidate's dossier is forwarded to the Committee on Appointments and Promotions (CAP),[6] and each tenured member of the candidate's department submits his or her own confidential letter to CAP. Id. Confidential letters are not shared with the candidate or anyone else other than the members of the CAP and the other participants in the later steps of the tenure decision process. Doc. No. 29-3 at 4.

6. The members of the CAP and the Dean of the Faculty of Arts and Sciences review the dossier, including the confidential letters, and decide on next steps, including whether to forward the candidate's materials to the President for her consideration. Id. CAP sometimes recommends that the President assemble an *ad hoc* committee of five scholars to assist the President in making her decision. Doc. No. 157-1 at ¶¶ 18-20. The *ad hoc* committee's role is solely advisory. Doc. No. 29-3 at 30.

7. If an *ad hoc* committee is formed, the committee is typically composed of "three active full professors from outside Harvard and two active full professors at Harvard from outside the department [of the candidate]." Doc. No. 157-1 at ¶ 22. The committee ordinarily hears "from four witnesses from the candidate's department," and then the committee members and "President or Provost (either may preside over the ad hoc meeting)" discuss "the entire case for tenure." Id. at ¶¶ 25-26. At the end of the discussion, the President or Provost (whichever is presiding) asks "each member of the committee to summarize his or her views." Doc. No. 29-3 at 30. This discussion is "strictly confidential." Doc. No. 157-1 at ¶ 27. Its function is to provide information to the President as to whether "the candidate's work meets the standards for tenure [at Harvard.]" Doc. No. 29-3 at 30.

8. The President makes a final decision regarding the candidate's tenure. Doc. Nos. 29-2 at 14; 157-1 at ¶ 28.

Harvard's tenure track handbook explains all the steps of the process so that Harvard professors understand the process in advance. See Doc. No. 29-3. Harvard "encourage[s]" all tenure track

---

[4] The Committee on Appointments and Promotions (CAP) may request revisions to the reviewing committee's case statement. Doc. No. 157-1 at ¶ 19.

[5] A vote is considered favorable when comprised of "affirmative votes by a significant majority of the tenured faculty in the department." Doc. No. 29-2 at 14.

[6] CAP is composed of the Dean of the Faculty of Arts and Sciences, the Divisional Deans, the Deans of the Undergraduate College, the Graduate Schools of Arts and Sciences, and Faculty Affairs, the Senior Advisor on Faculty Development, and one senior faculty member from each division. Doc. No. 29-3 at 30. The 2012-2013 CAP included Dean Michael Smith, Divisional Deans Peter Marsden and Stephen Kosslyn, Assistant Dean Kruegler, and Professor Evelyn Hammonds, former Dean of Harvard College. Doc. No. 157-1 at ¶ 82; Pl. Ex. No. 13 at 329; see Doc. No. 29-3 at 30.

professors to "review the materials [in the handbook] . . . as [they] progress through the steps of reviews[.]" Id. at 4.

### B.  Kimberly Theidon is Hired

In 2004, Kimberly Theidon was hired as an Assistant Professor, a tenure track position, in Harvard's Anthropology Department. Doc. No. 157-1 at ¶ 2. That same year, Theidon's first book, a Spanish language work *Entre Prójimos*, was published by a Peruvian academic press, Institute of Peruvian Studies, which is regarded as one of the best academic presses in South America. Id. at ¶¶ 3, 176; Def. Ex. No. 52 at HVRD0002029.[7]

### C.  "Be a 'dutiful daughter'"

When Theidon arrived at Harvard in 2004, [Professor 2] was the only tenured woman in the Anthropology Department. Doc. No. 157-1 at ¶ 200. [Professor 2] warned Theidon that "she would be held to a different, higher standard than men in the Department" and that Theidon would "have to be a 'dutiful daughter' to make it here [at Harvard]," which meant that Theidon "would have to do more committee and advising work than men" but "should not complain about the extra workload." Id. at ¶ 203. Theidon found [Professor 2]'s advice "hard to hear . . . It wasn't the guidance [she] wanted from [her] only senior, female colleague." Id. at ¶ 210; Pl. Ex. No. 5 at 122.[8]

---

[7] Citations to "Def. Ex." are to the exhibits attached to Defendants' Statement of Material Facts, which appears as Document 153 on the docket in this matter. Page numbers are those assigned by Harvard which appear in the lower right-hand corner of each page.

[8] Citations to "Pl. Ex." are to the exhibits attached to Plaintiff's Response to Defendant's Statement of Material Facts, which appears as Document 157 on the docket in this matter. Plaintiff did not assign numbers to the pages of her exhibits. Some of the exhibits, such as depositions, have previously assigned page numbers, which the Court cites where possible.

B4803972.3

**D. Theidon's Promotion**

In 2008, Harvard promoted Theidon to an Associate Professor position, an appointment

"held by individuals who have demonstrated sufficient promise and achievement in teaching and

research to qualify for tenure at a major research institution within three to five years." Doc. No.

157-1 at ¶¶ 10, 29; Doc. No. 29-2 at 4.

Theidon received a letter from Harvard with her promotion. See Def. Ex. No. 4 at

HVRD0013068. In the letter, Harvard explained "We . . . are pleased that you are placing articles

in human rights publications . . . It is nevertheless important to balance these [publications] with

publications aimed at a disciplinary audience [*i.e.* anthropologists.]" Id. The letter also included a

list of recommendations to aid Theidon in the tenure review process, including:

1. Publish her second book, *Intimate Enemies*, and secure reviews in "major journals in the fields of socio-cultural anthropology." Id. at HVRD0013069.
2. "[P]ublish articles in a set of journals that are recognized as top outlets for social anthropology research. This list includes American Ethnologist, American Anthropologist, Comparative Studies in Society and History, Ethnology, and Current Anthropology. This will allow your work to reach a wider audience within the discipline prior to your consideration for tenure, in which a range of scholars both within your subfield(s) and in social anthropology more broadly will be consulted." Id.
3. "[H]av[e] a second project substantially underway, not only in terms of a book manuscript but also significant articles published or in press." Id.

Def. Ex. No. 4 at HVRD0013069.

The letter additionally commended Theidon for her work on violence and reparations but

cautioned her "not to stretch [herself] too thin," and that "this [work] should not be permitted to

distract from or to slow the production of [her] written work." Id.

**E. Theidon's Successes**

Over the next few years, Theidon received numerous accolades, including, in 2010, the

Loeb Endowed Chair, which recognized her achievements in research, teaching and citizenship.

4

Doc. No. 157-1 at ¶ 187. Additionally, her book *Entre Prójimos* won the Ibero American

Prize for outstanding Spanish or Portuguese language book in the social sciences and was the

inspiration for the Academy Awards celebrated film "Milk of Sorrow." Id. at ¶ 177. Theidon's

"reception by students [was also] consistently above average and often enthusiastic." Def. Ex.

No. 52 at HVRD0002016.

### F. Theidon Expresses Concerns

In 2010, Theidon exchanged emails with the then Chair of her Department, Ted Bestor,

regarding her concerns about her salary, promotion prospects, and the possibility of looking for

jobs outside of Harvard, and Bestor suggested that she speak with Divisional Dean Stephen

Kosslyn. Doc. No. 157-1 at ¶ 212; Pl. Ex. No. 88. Following Bestor's advice, Theidon met with

Kosslyn and afterwards sent a follow up email thanking him and expressing her hope that there

would be a "smoother road ahead for the next batch of untenured females in the [Anthropology]

department." Doc. No. 157-1 at ¶ 213; Pl. Ex. No. 92.[9] Theidon also met with Senior Vice Provost

Judith Singer to discuss obstacles for females in her department. Doc. No. 157-1 at ¶ 216; Pl. Ex.

No. 47. During the meeting, which took place in August of 2010, Theidon raised several issues,

including: (1) [T]here was only one "sr [senior] woman in the dept. [department of

anthropology];" (2) "[Professor 2], the one [senior] woman . . . counseled [Theidon] in ways that

were totally inappropriate;" and (3) "Women are given the lion's share of the undergrad teaching

load" [in the department of the anthropology]. Pl. Ex. No. 47 at HVRD0008125. Singer took

_____

[9] At the hearing on Harvard's motion, Theidon's counsel contended that Theidon requested an
"assessment" of her tenure prospects in 2010. In support, counsel cited Plaintiff's exhibits 88 and
89. The cited exhibits do not support counsel's assertion. Rather they reflect just what is
described in the text above. Moreover, the record does not support the larger implied point
counsel made — that, absent unlawful action, Theidon was a lock for tenure, had been promised
tenure, or was so overwhelmingly accomplished that tenure was guaranteed.

notes during the meeting, which suggest Theidon also perceived [Professor 2], who had

identified the "dutiful daughter" role for women at Harvard several times, negatively. Id.[10]

Singer sent her notes to a committee from the Harvard Board of Governors ("The Visiting

Committee,") who were visiting Harvard to evaluate the Anthropology Department. See id.; Pl.

Ex. No. 46; Doc. No. 157-1 at ¶ 221.

### G. Theidon Comes Up For Tenure

An associate professor's tenure review process typically begins the summer after her

seventh year at Harvard—summer of 2011 in Theidon's case. Doc. No. 157-1 at ¶¶ 10, 37.

However, in 2011, Theidon requested that her "tenure clock be paused" for a year. Def. Ex. No.

9 at HVRD0014662; Doc. No. 157-1 at ¶ 37. In her request, she explained, "With my tenure

clock stopped for the year . . . I would come up for tenure review with: two published books . . .

and a complete draft of my third book, *Pasts Imperfect: Working with Former Combatants in

Colombia*." Def. Ex. No. 9 at HVRD0014662. Her request was granted by the Divisional Dean

Peter Marsden. Doc. No. 157-1 at ¶ 40. Theidon then spent the 2011-2012 academic year on

leave at Princeton University, which she described as a "year in which [she would] get to write . .

. and finish a polished draft of [her] third book." Id. at ¶ 38.

### H. Theidon's Tenure Review Committee

Theidon returned to Harvard in June 2012 and was notified that her tenure review

committee had been assembled. Id. at ¶ 45; Def. Ex. No. 23 at HVRD0006422. On June 4, 2012,

Dean Marsden emailed Dean Smith a comprehensive overview of personnel actions, diversity

goals, and hiring priorities for all of the Faculty of Arts and Sciences at Harvard. Def. Ex. No.

---

10 Theidon was not alone in her negative view of [Professor 2]. Singer noted a negative view as
well. Pl. Ex. No. 47.

22. It contained a one page status report of the Anthropology Department describing briefly each of the following topics: outlook, current full-time equivalents (FTEs) and instructional workload, recent additions, pending actions, departures, scheduled retirements, scheduled promotion reviews, tenure-track faculty pipeline, and priorities and recommended searches for 2012-13. Id. at HVRD0012184. As for tenure prospects, Dean Marsden, in less than three lines, remarked some professors were "promising", one was "weak," others were "beginning," and, as to Theidon, her "prospects [were] mixed." Id. No further detail or supporting material accompanies this document which was not part of the tenure package sent to President Faust or the *ad hoc* committee.

In August of 2012, after being notified that her review committee had been assembled, Theidon submitted her dossier, and teaching and research statements[11] to her review committee, which consisted of [Professor 2], [Professor 4], [Professor 3], and [Professor 1]. Doc. No. 157-1 at ¶¶ 45-46; Def. Ex. No. 26 at HVRD0031381. At this time, Theidon's second book *Intimate Enemies* was still unpublished (though it was close to publication and was published prior to Theidon's consideration for tenure by President Faust), her third book *Pasts Imperfect* remained incomplete and was not, nor has ever been, published, and she had not published a single article in the top anthropology journals listed in her promotion letter. Doc. No. 157-1 at ¶¶ 49, 124, 134-135.

---

11 On August 16 of 2012, just one week before Theidon submitted her research statement to her tenure review committee, Theidon wrote to a colleague about the statement, saying "writing this is a pain in the neck . . . Sigh . . . I cannot bear to spend more time on this," and asking if it would be "career suicide" to leave the statement as is. Doc. No. 157-1 at ¶ 47; Def. Ex. No. 25. Her colleague forwarded the email to Vice Provost Singer stating that Theidon's "problem with developing [the] statement" typified her "difficulties in managing her career." Def. Ex. No. 25.

B4803972.3

In the course of submitting her dossier, on August 8, 2012, Theidon emailed [Professor 1], the Anthropology Department administrator (Tamny), and [Professor 2] suggesting that her tenure committee send out to external reviewers her book *Intimate Enemies* and a folder containing her various articles on Colombia "as this is the focus of my third book manuscript." Pl. Ex. No. 79. Theidon's research statement, which she submitted with her dossier, contains a "projects" section, where she describes her first and second books, as well as several book projects currently underway. Def. Ex. No. 52 at HVRD0002079. Notably she characterizes her two books as related, but separate projects. Id. at HVRD0002079-2083. She goes on to state: "During my leave at the Institute for Advanced Study at Princeton (2011-12), I completed drafts of three book chapters, and *Pasts Imperfect* [the third book] is under contract with the University of Pennsylvania Press." Id. at HVRD0002085.[12]

In September of 2012, Singer emailed the notes from her August 2010 meeting with Theidon to Harvard Deans Peter Marsden and Christopher Kruegler. *See* Pl. Ex. No. 47 at

---

[12] In her research statement, submitted with her dossier, Theidon stated that her third book, *Pasts Imperfect*, was "under contract" with Pennsylvania Press. Doc. No. 157-1 at ¶ 129. She later testified an "option clause" from a prior contract with Pennsylvania Press was the basis for her "under contract claim." Id. at ¶ 129. Theidon had previously entered into a contract with Pennsylvania Press for *Intimate Enemies*, her *second* book, with an option clause requiring that Theidon offer "her next book-length nonfiction manuscript first" to Pennsylvania Press. Id. ¶¶ at 119-20. Theidon does not, and did not, have a separate contract for *Pasts Imperfect* with Pennsylvania Press. Doc. No. 157-1 at ¶ 128. Nothing about the option required the Pennsylvania Press to publish Theidon's book. The case summary prepared by Theidon's tenure review committee repeats virtually verbatim Theidon's "under contract" representation. *See* Def. Ex. No. 52 at 5 (stating second major project "under contract with the University of Pennsylvania Press"). Of Theidon's characterization of her third book as "under contract" with Pennsylvania Press, Harvard's expert, Willis Regier stated "I know of no reasonable academic officer who would interpret 'under contract' to mean an option clause in a prior contract." Id. at ¶ 131. Harvard argues that Theidon's statement that *Pasts Imperfect* was under contract with Pennsylvania Press was fraud and that she is barred from recovery due to her inequitable conduct and/or under the "after-acquired evidence" doctrine. Doc. No. 152-1 at 18 n. 13. The Court need not reach the issue here because Theidon has not set forth sufficient facts to state a claim for relief. Infra.

HVRD0008125; Doc. No. 157-1 at ¶¶ 226-27. She noted Theidon's complaints about women's workload in Anthropology and added "having just come from an *ad hoc* [tenure review committee that sometimes occurs at step seven of Harvard's tenure process] where the woman was shouldering immense teaching and service responsibilities, I can (sadly) say that this isn't just an Anthro problem." Doc. No. 157-1 at ¶ 226; Pl. Ex. No. 47 at HVRD0008125. Singer concluded her email, "The upshot, I think, is that the [Anthropology] department has been . . . dysfunctional and [Theidon has] not been well mentored," and volunteered to meet with Theidon to discuss the current climate of the Anthropology Department. Pl. Ex. No. 47 at HVRD0008126.

### I.   Theidon's Alleged Advocacy

During her time at Harvard, Theidon spoke about sexual assault and/or harassment and supported her student's advocacy concerning sexual violence. See Doc. No. 157-1 at ¶¶ 142-51. For instance, in the fall of 2012, Theidon gave a talk concerning gender violence at Harvard. Doc. No. 157-1 at ¶ 142. Theidon testified that she received no criticism from anyone in the Anthropology Department regarding her talk. Id. Theidon also permitted a student to distribute leaflets about sexual assault after her class. Id. at ¶ 148. She blogged and tweeted about sexual assault, and wrote letters in support of student victims and letters criticizing Harvard's inadequate protections of them. Id at ¶¶ 150, 335. There is no evidence in the record that any official at Harvard nor, more importantly, any member of the *ad hoc* Committee or the President, expressed, at any time, in any way, any concern or dissatisfaction with these actions by Theidon.

### J.   Theidon's Committee Prepares Her Case Statement

On October 8, 2012, [Professor 2] emailed [Professor 1] to see if he had read and compared Theidon's

first and second books. Doc. No. 157-1 at ¶ 56. He admitted that he had not yet read both books

closely but noted that both works "deal with a similar set of concerns and research agendas" and that he believed that the second work "take[s] on new problems and issues not addressed in the former." Def. Ex. No. 29 at HVRD0096028.

The Department then, on October 17, 2012, solicited confidential letters from external scholars reviewing Theidon's work. Doc. No. 157-1 at ¶ 58. Several invited scholars declined to participate for various personal or other irrelevant reasons. The record does not establish precisely the source(s) of the names of the external reviewers though apparently Theidon had some role in the selection of the list. Def. Ex. No. 20. Sixteen scholars submitted letters, which were largely positive, although one reviewer expressed reservations as to Theidon's "foothold in anthropology." Doc. No. 157-1 at ¶ 62; see Def. Ex. No. 52 at HVRD0002227.[13] Another reviewer, External Letter Writer 1, who initially submitted a positive letter, submitted a second letter dated January 8, 2013 recommending against tenure after reading *Entre Prójimos* and *Intimate Enemies*. Doc. No. 157-1 at ¶ 66. She found that the two works "were substantially the same book." Id. She commented that the second book "does not represent a new project that takes previous research in new directions or addresses new theoretical questions and concerns" and that for that reason she did "not believe [Theidon] ha[d] met the criteria for promotion to full professor with tenure." Id. External Letter Writer 1's letter makes clear that External Letter Writer 1 had great respect for Theidon, but, in her view, a second book "that charts new ground" was an important requirement for tenure, and Theidon had not produced that. Id.; Def. Ex. No. 37. Although aware of Theidon's Colombia articles, External Letter Writer 1 did not describe them as either a second book or as charting new ground from

---

13 Several other external evaluators expressed similar concerns. See Pl. Ex. No. 32 at HVRD0096510 (noting that External Letter Writer 2 expressed a concern about how "infrequently [Theidon] has published in anthropology journals or even Latin American studies journals" and External Letter Writer 3 wrote that Theidon's record "could have [been strengthened]" if she had published in "A-rated anthropology journals.").

Theidon's first work. See id. at HVRD0000485. This second, negative, letter was received by

[Professor 1] but inadvertently omitted from Theidon's dossier as it went forward. Doc. Nos.

157-1 at ¶¶64-66; 161-1 at 10 n.7; compare Def. Ex. No. 37 with Def. Ex. No. 52 at

HVRD0002186.

Theidon's reviewing committee then began preparing their case statement regarding

Theidon. See Doc. No. 157-1 at ¶ 69. On February 17, 2013, while preparing the statement,

[Professor 1] emailed [Professor 2] after having "reviewed Kimberly Theidon's two books."

Def. Ex. No. 38. In the email, he expressed a concern that *Entre Prójimos* and *Intimate Enemies*

"pertain to the same research project" and that "the overwhelming majority of anecdotes,

testimony, etc. included in [*Intimate Enemies*] is present in the earlier [*Entre Prójimos*.]" Id.;

Doc. No. 157-1 at ¶ 67. He concluded that the "two books, the first in Spanish, the second in

English, substantially represent work on the same project." Id. Impliedly referencing back to the

promotion letter Theidon received in 2008 informing her that tenure required a second major

research project, the committee drafted Theidon's case statement describing her articles about

Colombia as her "second major research project"[14]—not her second book *Intimate Enemies*.

Def. Ex. No. 52 at HVRD0002032.

Although Theidon's case statement prepared by the committee describes her Colombia

articles as her "second major research project," and Theidon had requested that the Committee

send those articles to her external reviewers, Pl. Ex. No. 29, these articles had not been sent to the

external scholars who evaluated Theidon. Doc. No. 157-1 ¶ 278. Instead, the scholars received

only Theidon's second book *Intimate Enemies*. Id. at ¶ 287. The external scholars did receive a

link to Theidon's web page, which included links to pdfs of her Colombia articles, and

---

14 [Professor 2] explained in an email to [Professor 1] dated February 17, 2013, "Harvard
doesn't require a completed second book, but they do expect a second project substantially
underway . . ." Def. Ex. No. 38 at HVRD0008543.

seven of the sixteen external scholars commented specifically on the articles in the letters they submitted on Theidon's behalf. Id. at ¶¶ 53, 61.[15] As such, [Professor 2] concluded that the external evaluators "did receive articles . . . based on [Theidon's] 'true' second project, in Colombia." Def. Ex. No. 38 at HVRD0008543. [Professor 2] sent a draft of the case statement to her fellow members of Theidon's tenure review committee on February 19, 2013. Def. Ex. No. 39 at HVRD0008621.

Reviewing the drafted case statement,[16] [Professor 3] stated: "There is only one statement I would query . . . the case report states that [Theidon]'s other publications 'more than make up for the shortcoming' of non publication in leading anthropology journals. I cannot agree with that." Def. Ex. No. 39; Doc. No. 157-1 at ¶ 69. Professor of Anthropology [Professor 4] stated in an email to [Professor 2] "If it [Theidon's tenure case] fails, it does so owing to what we were given, not the case you wrote." Def. Ex. No. 42; Doc. No. 157-1 at ¶ 42. [Professor 4] also praised [Professor 2]'s work on the statement as "comprehensive, wise, beautifully crafted." Def. Ex. No. 39 at HVRD0008620.

### K. The Department Votes

On February 26, 2013, the tenured faculty of the anthropology department voted in favor of Theidon's tenure. Doc. No. 157-1 at ¶ 70. Thereafter, each tenured member of the anthropology department faculty submitted a confidential letter to the Dean of the Faculty of Arts and Sciences, Dean Smith, discussing Theidon's case. Id. at ¶ 73. The faculty members submitted these letters as part of the standard Harvard tenure process, i.e. step five above. Supra

---

15 External Letter Writer 1, the scholar who submitted a second negative letter regarding Theidon, specifically comments on Theidon's Colombia research in her letter. Def. Ex. No. 52 at HVRD0002188.

16 The voluminous record does not appear to contain this version of the case statement. A redline of a similar subsequent draft is available at Pl. Ex. No. 31.

at 3. Most of the letters supported tenure for Theidon; three of the letters expressed reservations about Theidon's work. Doc. No. 157-1 at ¶¶ 73-77.

In her letter, [Professor 3] wrote "My biggest concern is the absence of publication in top, peer-reviewed journals in her field[.]" Id. at ¶ 74. [Professor 3] elaborated on this point, noting that Theidon was "urged in an earlier review to publish at least one or two articles in [certain specific leading general Anthropology] journals", that Theidon "decided" publication in "journals in her sub-fields" was "more productive" and that this "somewhat diminishes her file" because publication in the field's "top journals" is "more difficult" and "requires framing one's ideas in ways that reach across sub-field boundaries and because one is reviewed by colleagues outside one's sub-field." Id.; Def. Ex. No. 52 at HVRD0002268-69. Concluding this point, [Professor 3] opined, "I consider publishing in top disciplinary journals evidence of an ability to reach the wider disciplinary community and a mark of a leading figure in the field." Def. Ex. No. 52 at HVRD0002268-69. [Professor 3] also wrote that a "second concern resolves around the similarity between the two books, the first, a shorter study in Spanish, the second a lengthy work in English." Id.; Doc. No. 157-1 at ¶ 74. Ultimately, [Professor 3] concluded that, at other Universities, Theidon would "not (yet) [be promoted] to (Full) Professor." Def. Ex. No. 52. At HVRD0002269. She did not express a definitive opinion as to whether or not Theidon should be granted tenure at Harvard. See id.

[Professor 1] wrote in his letter, "I do perceive . . . that Prof. Theidon's work has not made a significant meaningful impact in the general fields of Latin American or Andean anthropological studies." Doc. No. 157-1 at ¶ 77. He also admitted that he "voted for moving [Theidon's] case forward on two occasions" and that he "remain[ed] positive on [her] case, although [with] a few reservations." Def. Ex. No. 52 at HVRD0002284.

Professor of Anthropology [Professor 5] wrote in his letter, "What I find lacking is a theoretical grounding . . . and how [her] specific case study may inform [the Anthropology community.] Id. at HVRD0002273. He admitted to being "insufficiently qualified to evaluate [Theidon],"[17] and concluded that it should be left to his "better informed colleagues to better judge the candidate [Theidon]." Id.

### L. Revisions to Theidon's Statement

Theidon's case statement was circulated to Dean Marsden who was overseeing CAP. See Pl. Ex. No. 43 at HVRD0008743. Theidon's statement, as originally drafted by her tenure committee, contained a mistake of fact. See Pl. Ex. No. 43 at HVRD0008743. It stated:

> The concerns [] raised [by the external letter writers], which mostly had to do with [Theidon's] publication record, were in part the result of the [Harvard Faculty of Arts and Sciences] requirement that we provide only a limited sample of the materials included in Theidon's dossier.

> Pl. Ex. No. 31 at 9. [18]

There is no such requirement. See Pl. Ex. No. 43 at HVRD0008743. Dean Marsden discovered the misstatement, which he characterized as a "major mistake." Id. at ¶ 287; Pl. Ex. No. 43 at HVRD0008734. Marsden recommended that the statement be both revised to correct this error and to further describe Theidon's fit within the Department and her theoretical contribution to the field. Doc. No. 157-1 at ¶ 300; Pl. Ex. No. 43; Pl. Ex. No. 31. Theidon's tenure committee revised her statement accordingly ("March draft"). Pl. Ex. No. 49 (March draft); Def. Ex. No. 52

---

[17] [Professor 5]'s letter does not explain in what way he is unqualified to judge Theidon's candidacy for tenure.

[18] That the Colombia articles were not sent out to the external evaluators is undisputed. See Doc. No. 157-1 at ¶¶ 59, 278. That the articles were available on Theidon's website, a link to which was provided to each evaluator is also undisputed. See id. at ¶ 53. The only reference in the record as to the reason for Harvard's failure to send out the Colombia articles is the reference noted above to a non-existent FAS rule limiting the documents circulated to external evaluators.

(same). The *ad hoc* committee reviewed the copy of the case statement appearing within Def. Ex. No. 52 which mirrors the case statement appearing at Pl. Ex. No. 49, both of which contain text responsive to the concerns [Professor 1] reported in his March 9, 2013 email that he said came from Marsden. See Pl. Ex. No. 43. This is what I term the "March draft" though all the versions of the case statement bear a February date on page one. See Pl. Ex. Nos. 31; 49; 3; Def. Ex. No. 52.

### M. Further Advocacy

In March of 2013, Theidon posted in the "comments" section of the online version of Harvard's student paper regarding an article about sexual assault at Harvard. Doc. No. 157-1 at ¶ 336. In her comments, Theidon voiced support for victims. Id. at ¶¶ 336-37. Hammonds, a member of CAP, testified that she was aware of Theidon's online comments, which were brought to her attention by her chief of staff. Doc. No. 157-58. Hammonds further testified that she did not herself read Theidon's comments but that her chief of staff brought them to her attention because the discussion in the comments section of the article was "vitriolic." Id. Theidon testified that the vitriolic comments, to which she responded to "lend a voice of support for the many people . . . who work with great commitment on the Harvard campus to insure that everyone receives equal, respectful and dignified treatment" came from the Community of the Wrongly Accused, a men's rights group, not a group connected to Harvard University. Doc. No. 157-1 at ¶¶ 143-44.

Also in March of 2013, a female Anthropology department employee complained to Theidon about inappropriate behavior by a senior male member of the anthropology department. Doc. No. 157-1 at ¶ 152. Theidon directed the student to speak with [Professor 1] or [Professor 2] "because they were […] the appropriate channels to file a report." Id. at ¶ 153. Following Theidon's advice, the

female employee spoke with [Professor 2] and, on April 26, 2013, [Professor 1]. Id. at ¶¶ 156,

159. The employee testified that [Professor 1] resolved the situation to her satisfaction and

that he had seemed "pleased" that Theidon "had advised [her] to come to [him.]" Id. Theidon

"remained quiet" and did not follow up on her discussion with the female employee. Id. at ¶

155.[19] There is no evidence whatsoever that [Professor 1] handled this complaint improperly

or that he exhibited any concern at Theidon's role in the employee coming forward.

### N. CAP Meets

On April 10, 2013, CAP convened to discuss Theidon's case. Id. at ¶ 78. Before them were

Theidon's teaching evaluations, confidential internal letters from the tenured faculty of the

Anthropology department, and Theidon's dossier, which included all external letters, Theidon's

teaching and research statements, her case statement, a copy of *Intimate Enemies*, and a number of

other publications (including Theidon's Colombia articles). Doc. No. 157-1 at ¶¶ 79-80. Dean

Marsden took notes about CAP's meeting, including: "[Theidon had] published mostly in human

rights outlets rather than disciplinary journals" and "[r]elatively few of [the external] letters do a

good job of articulating exactly what her contributions to understanding are." Id. at ¶ 81. Dean

Kruegler also took notes, including "2 books, overlap" and "[Human rights] outlets more than

anth." Id. at ¶ 82. Ultimately, CAP recommended to President Faust that the case proceed to *ad

hoc* review, a recommendation that the President accepted on April 21, 2013. Id. at ¶ 83.

Following the CAP meeting, Theidon's tenure review committee completed one last draft

("April draft") of the case statement with stronger language to bolster Theidon's case. Compare

---

[19] During the hearing, Theidon's counsel argued that whether Theidon "remained quiet" is
disputed, and that, without specific citation, [Professor 2] said Theidon did more. However,
Theidon's under oath statement is that she "remained quiet." A party cannot create a disputed
issue of fact by contradicting her own under oath statements. Williams v. Raytheon Co., 45 F.
Supp. 2d 124, 129 (D. Mass. 1999), aff'd, 220 F.3d 16 (1st Cir. 2000).

Pl. Ex. No. 49 (describing Theidon's retention at Harvard as a "matter of importance" with Pl. Ex. No. 3 (describing Theidon's retention as a "matter of necessity . . . for the University as a whole."). On April 22, 2013, [Professor 1] emailed the April draft to the Anthropology Department Administrator to send to Dean Marsden and the *ad hoc* committee that reviewed Theidon's case. Id. at ¶ 91; Pl. Ex. No. 3. The March draft was circulated instead. Pl. Ex. No. 74. Harvard argues that the circulation of the older case statement was a "clerical error." Doc. No. 161-1 at 10. There is no evidence at all as to why the April draft was not circulated.

### O. *Ad hoc* Committee

In May of 2013, Theidon's *ad hoc* committee was assembled. Def. Ex. No. 88. Theidon's *ad hoc* review committee consisted of three non-Harvard anthropologists, [External Ad Hoc Member 2] of [University A], [External Ad Hoc Member 1] of [University B], and [External Ad Hoc Member 3] of [University C]; and two Harvard faculty members, Government [Internal Ad Hoc Member 1] and History of Science [Internal Ad Hoc Member 2]. Doc. No. 157-1 at ¶¶ 84-86. Dean Smith, Dean Marsden, and Vice Provost Singer served as ex officio members, and Provost Garber presided. Before the *ad hoc* review committee met, Harvard sent each member "a copy of *Intimate Enemies*, the selected publications from the dossier (including articles on Colombia) . . . research and teaching statements, and internal and external letters." Id. at ¶ 92. Singer took notes during the meeting, including: "Doesn't publish in general anthro journal despite being told to do so," "1st book is the same as the 2nd (a bit enlarged)," "unfortunate that book came out so late," "Love the book, but no one could make a case for theoretical impact," "Letter writers – many w/ personal relationships with KST [Kimberly Theidon]" and "Deeply skeptical." Id. at ¶¶ 91, 94.

Four departmental witness testified before the *ad hoc* committee. Id. at ¶ 98. Of the departmental witnesses who were called to testify before the *ad hoc* committee, two expressed

support ([Professor 2] and [Professor 6]) and two expressed ambivalence ([Professor 1] and [Professor 3]) as to Theidon's candidacy for tenure. Id. at ¶ 99. After the witnesses testified, the committee members discussed Theidon's tenure case (without the witnesses present). Id. at ¶¶ 26, 105. Ultimately, each external committee member found that Theidon would not be tenured at his or her respective institution, and each internal member found that Theidon would not be granted tenure if she were an external candidate. Id. at ¶ 105. One explained that, although it pained her, Theidon's work "didn't even come close" to that of the leading young-to-mid career anthropologist. Pl. Ex. No. 33 at HVRD0091363. Another said that she "just couldn't see [Theidon] as a tenured prof[essor] at Harvard," and one, who tried to make an affirmative case, found, "in the end," that Theidon "could be good at Harvard" but "wouldn't necessarily be good for Anthropology." Id.

Later, explaining her negative vote, [External Ad Hoc Member 1] stated:

"Kimberly Theidon had published barely any of her pieces in Anthropology journals . . . . And so if you ask who is one of the foremost leaders, is she well known and well recognized in our field, she has not published widely in our field, either Cultural Anthropology or Medical Anthropology. . . . We had a very long and thoughtful conversation about that... It was completely based on scholarly decisions and scholarly missteps, if you will. Why would an anthropologist not publish in Anthropology journals."

Def. Ex. No. 78 at 106:24-109:15.

Theidon's activism related to sexual assault and/or harassment was not mentioned during the *ad hoc* discussion or in any of the written materials before the *ad hoc* committee. Doc. No. 157-1 at ¶ 161; see Def. Ex. No. 52.

**P. The President's Decision**

After the *ad hoc* committee meeting Provost Garber met with President Faust and recommended against tenure. Id. at ¶ 106. After reviewing Theidon's materials, President Faust

emailed Garber on May 24, 2013 noting the inconsistency between Theidon's file and the *ad hoc* committee meeting notes and recommendation, and asked, "What is going on here?" Id. at ¶ 107. Specifically, Faust wondered "if the book is wonderful why is she [Theidon] not tenurable? is the book too popular, non academic in their [the *ad hoc* committee's] view?" Def. Ex. No. 56 at HVRD0091356. Garber explained, "Pretty much. It reads to me like a wonderful book, but more like great journalism than something deeply informed by an anthropological theory or perspective (BUT it is also described as wonderful ethnography maybe application of ethnographic technique without a clear conceptual framework)." Id. He went on to note a "productivity question more generally," concluding, "[Theidon] sounds like a great person in many ways but not an anthropologist who would make a mark on the field as an anthropologist . . . I think she would sound great as the head of the Carr Center at HKS [Harvard's school of Public Policy]" or "in another department or part of the university." Id.

President Faust also consulted Singer about the negative recommendation from the *ad hoc* committee, id. at ¶ 110, and Singer provided a concise comprehensive review of the relevant considerations that factored into the *ad hoc* committee and CAP discussions concerning Theidon's tenure case. Def. Ex. No. 57. Singer started with the factors that worked in Theidon's favor, which she described as "very clear and not in dispute." Id. at HVRD0009052. These included: "very smart," "very very good" teacher, "beautiful writer", widely read book author, and her "introduction of gender themes into this literature, and more broadly her consideration of gender issues, is well done". Id. However, Singer noted "many substantive negatives that the *ad hoc* committee was in a better position to evaluate than most of the [anthropology] department." Singer then proceeded to detail these negatives, which included:

1. *Intimate Enemies* "is certainly not a completely second book, and it's not even clear its even much more than the first book, which was published in Peru 6 years ago." Id.

at HVRD0009053. Notably, the Anthropology Department had been handicapped with respect to its assessment of the two books because only [Professor 1], who reads Spanish, could read the Spanish language book. Id. Three *ad hoc* members read all or part of the Spanish language book and concluded "much of the text [of the English language book] is basically an English language translation of the prior [Spanish language] book." Id.

2. [Professor 2] and [Professor 6] argued that *Intimate Enemies* made a contribution to Anthropology, but the three external *ad hoc* members ([External Ad Hoc Member 2], [External Ad Hoc Member 1], and [External Ad Hoc Member 3]) found the book "compelling" but "questioned its contribution to Anthropology." Id. "[N]one of the witnesses even [[Professor 6]] could really make the case that the book would be setting the agenda in the field" though [Professor 6] said Theidon was a "new type" of anthropologist, the *ad hoc* committee did not see her work as new or a contribution with which Anthropologists would engage. Id.

3. Given that the *ad hoc* committee viewed the two books as one project, they focused on Theidon's journal articles, but Singer noted "Kim has not done well." Id. The committee members expressed **serious concern about her not publishing in major anthropology journals**." Id. (emphasis in original). Thus, the committee concluded Theidon was "not making a contribution to Anthropology." Id. (emphasis in original).

4. The human rights journals in which Theidon had published were not considered of equivalent statute to the Anthropology journals. Id.

5. The Committee discussed Theidon's two new projects (one in Colombia) and "**people expressed the concern that they were essentially more of the same.**" Id. (emphasis in original). The "sense was that she would continue doing what she has been doing and would be unlikely to grow." Id.

6. When asked if Theidon "was seen as a rising star in the Anthropology community writ large, the Latin American Anthropology community, or the medical anthro[pology] community, the resounding answer from the three anthropologists on the committee was no." Id.

Singer then noted process issues which, in her opinion, did not change the negative tenor of the discussion. These included "a complete lack of departmental mentoring," [Professor 6] did not mentor Theidon partly because one of Theidon's advisers was his advisee and partly because of [Professor 6]'s sense Theidon "wanted to carve her own independent path"; the comparison list was "pretty much all human rights folks. If the list were broader, the committee said the [external] letters would have been much weaker"; many external letter writers had relationships with Theidon; and [Professor 2] did a "not very good job on the whole." Id. at HVRD0009054.

Finally Singer recounted the specific individual views of each Committee member and reported each member opposed awarding tenure. Id.[20]

Ultimately, President Faust denied Theidon tenure. Doc. No. 157-1 at ¶ 112.

### Q. The Aftermath

Following President Faust's decision, [Professor 1] informed Theidon that she had been denied tenure. See Doc. No. 167-3 at HVRD0087459. He then sent an email to the senior members of the anthropology department informing them that "Theidon's tenure and promotion case came back with a negative result" and requesting that they "attend most diligently to the needs of supporting Kimberly [Theidon] . . . and to ensur[ing] that what will be most distressing news for our students and friends has the least impact on our collective work, interactions and education mission[.]" Id. Bestor, copying the senior members of the anthropology department, replied "What terrible news! I know such things are always shrouded in secrecy, but do you have any sense of what issues may have been in the minds of the *ad hoc* members?" Id. To which [Professor 1] responded (only to Bestor):

> Ted (this just to you),
> I am truly shocked that you would ask me this in the more or less public forum of an email copied to all the senior members of the department! You know that I cannot and must not speculate on this matter in an open forum; nothing would be gained by that, and it would only lead to baseless speculation, and potentially to people implying that other people may have been equivocal, unsupportive, etc., and then . . . what? Ted, where would we be if we opened up a discussion among all the faculty that got us to that point? Sweet Jesus.
> Id. at HVRD0087458.

---

[20] Singer's report, like the other information provided to Faust, is significant as the information before the ultimate decision maker, and is also admissible information as to what happened.

In a subsequent email, [Professor 1] apologized to Bestor for the "tone" of his email, but explained, "it was intended as a voice from one who knows what it's like to sit in this chair to another." Id.

[Professor 1] then wrote to the members of the anthropology department that "if one wishes to write to any one of the deans to protest the [tenure] decision, I will support your right to do that, and I will join you in such action." See Doc. No. 156-1 at 30 (citing HVRD0129907).

### R. MCAD Complaint

In 2014, Theidon filed a complaint with the Massachusetts Commission Against Discrimination (MCAD), alleging that she was denied tenure because of her sex and in retaliation for her advocacy related to sexual assault and harassment. Doc. No. 152-1 at 14. The grievance was denied. Doc. No. 157-1 ¶ 169. That same year, Theidon was hired by Tufts University as an Associate Professor of Human Security in the Fletcher School of International Affairs.[21] Id. at ¶ 171.

### II.    PROCEDURAL HISTORY

Theidon has brought four claims against Harvard, alleging (1) retaliation under (a) Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 and (b) Mass. Gen. Laws ch. 151B; and (2) sex discrimination under (a) Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2, and (b) Mass. Gen. Laws ch. 151B. Doc. No. 1. On August 31, 2017, Harvard moved for summary judgment on all claims. Doc. No. 151. Theidon opposed, Doc. No. 156, and Harvard filed a

---

[21] The appointment at Tufts is neither an anthropology appointment nor is it a full professor appointment. See Doc. No. 157-74 at 400. It is a tenured position. Id.; see also Meg Bernhard, *Former Professor Suing University Granted Tenure at Tufts*, THE HARVARD CRIMSON, Apr. 3, 2015, *available at* http://www.thecrimson.com/article/2015/4/3/theidon-receives-tenure-tufts/.

reply, Doc. No. 161. On February 14, 2018, the Court held a hearing on the motions and took

Harvard's motion under advisement.

### III. THE LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). A genuine dispute "is one on which the evidence would enable a reasonable

jury to find the fact in favor of either party." Perez v. Lorraine Enters., Inc., 769 F.3d 23, 29 (1st

Cir. 2014). "A 'material' fact is one that is relevant in the sense that it has the capacity to change

the outcome of the jury's determination." Id. (citation omitted).

Once a party "has properly supported its motion for summary judgment, the burden

shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading,

but must set forth specific facts showing there is a genuine issue for trial.'" Barbour v.

Dynamics  Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 256 (1986)). The Court is "obliged to view the record in the light most

favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving

party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Even so, the

Court is to ignore "conclusory allegations, improbable inferences, and unsupported

speculation." Prescott v.  Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina–Muñoz v.

R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). A court may enter summary

judgment "against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at

trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

IV.     SEX DISCRIMINATION CLAIMS

In Count II, Theidon alleges that she was discriminated against because of her sex in violation of 42 U.S.C. § 2000e-2 ("Title VII"), which makes it an "unlawful employment practice for an employer . . . to . . . discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's. . . sex." Id. at (a)(1).

Absent evidence of direct discrimination, to prevail on her Title VII discrimination claim, Theidon must satisfy the requirements of the three-step burden-shifting analysis announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the McDonnel Douglas analysis, Theidon must first establish a *prima facie* case of discrimination by showing:

> (1) that she is a member of a protected class under Title VII; (2) that she was a candidate for tenure and was qualified under [Harvard] University standards, practices or customs; (3) that despite her qualifications she was rejected; and (4) that tenure positions in the Department of [Anthropology at Harvard University] were open at the time [Theidon] was denied tenure, in the sense that others were granted tenure in the department during a period relatively near to the time [Theidon] was denied tenure.

> Fields v. Clark Univ., 966 F.2d 49, 53 (1st Cir. 1992).

Once a *prima facie* case is established, the burden shifts to Harvard to "articulate some legitimate, nondiscriminatory reason" for its denial of Theidon's tenure. Banerjee v. Bd. of Trustees of Smith Coll., 648 F.2d 61, 63 (1st Cir. 1981). If Harvard articulates such a reason, the burden shifts back to Theidon to establish Harvard's proffered reason is pretext for discrimination. Id. To establish pretext, "[i]t is not enough for [Theidon] merely to impugn the veracity of [Harvard]'s justification; [s]he must elucidate specific facts which would enable a jury to find that the reason given [by Harvard for her denial of tenure] is not only a sham, but a sham intended to cover up the [Harvard's] real motive: [sex] discrimination." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991).

In "some situations, however, a plaintiff may be entitled to use a [different] approach."

Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60 (1st Cir. 2000). "The key that unlocks this

door is the existence of direct evidence that a proscribed factor [e.g. Theidon's sex] played a

motivating part" in Harvard's decision to deny tenure to Theidon. See id. Evidence is direct when

"it consists of statements by a decisionmaker that directly reflect the alleged animus and bear

squarely on the contested employment decision." Febres v. Challenger Caribbean Corp., 214

F.3d 57, 60 (1st Cir. 2000). If direct evidence is set forth, Harvard "must establish that [it] would

have reached the same decision regarding [Theidon] even if [it] had not taken the proscribed

factor [Theidon's gender] into account." Id.

First, the Court rejects Theidon's argument that she has submitted sufficient evidence of

direct discrimination to permit a jury to infer that Harvard denied her tenure because of her sex,

Doc. No. 156-1 at 5-7. Here, the decision at issue is President Faust's decision to deny Theidon

tenure, made after receiving the input of the *ad hoc* committee. Theidon has submitted no

evidence whatsoever that President Faust has ever engaged in sex discrimination, made any

statements suggestive of such discrimination, or engaged in any conduct suggestive of the same.

See Doc. No. 1; Doc. No. 157-1. There is also no evidence whatsoever that: any oral or written

communication to President Faust contained any statement suggestive of such discrimination; or

that any person in the process at the *ad hoc* (or for that matter at any point) made any statement

suggestive of such discrimination.

That [Professor 2], in 2004 (and repeated on several later occasions), stated that in her

opinion Theidon needed to be a "dutiful daughter" by doing more committee and advising work

than men, supra at 4, is not sufficient evidence that in 2013 President Faust discriminated against

Theidon by rejecting her tenure application, supra at 22. See Vesprini v. Shaw Contract Flooring

Servs., Inc., 315 F.3d 37, 41–42 (1st Cir. 2002) (finding the one to two year gap between comments by nondecisionmaker and contested employment decision "severely undermin[ed] the reasonableness of any inference" that the remarks were causally connected to the adverse employment decision.); see also id. (explaining commiserative statements "normally do not constitute 'direct evidence' of . . . animus"); Ayala-Gerena v. Birstol Myers-Squibb Co., 95 F.3d 86, 96 (1st Cir. 1996) ("[A]t a minimum, direct evidence does not include stray remarks in the workplace, particularly those made by nondecisionmakers."). Moreover, despite [Professor 2]'s repetition of these comments, which were descriptions of her perceptions of the University, there is nothing to suggest she discriminated against Theidon or harbored any discriminatory animus. In fact, [Professor 2] unequivocally advocated for Theidon throughout the tenure process. See Def. Ex. No. 52 at HVRD0002276-80; Doc. No. 157-1 at ¶ 99.

The same analysis applies to Theidon's general gender bias at Harvard argument, Doc. No. 156-1 at 6-7. There is evidence that the Anthropology Department was "dysfunctional," that woman faculty, during Theidon's time, bore more of the "nurturing" responsibilities including teaching and working with students, and that Theidon received poor mentoring, see Def. Ex. No. 57 at HVRD0009054. Without more, however, these facts are not evidence that discriminatory animus played a role in President Faust's decision to deny Theidon tenure. See Sabinson v. Trs. of Dartmouth Coll., No. CIV. 05-CV-424-SM, 2007 WL 4191943, at *19-20 (D.N.H. Nov. 21, 2008), aff'd, 542 F.3d 1 (1st Cir. 2008) (finding "colleagues' open hostility . . . and Dartmouth's history of racism, sexism, and anti-Semitism" is "not direct evidence as the term is used in the Title VII context."). This is especially so when Theidon does not argue or suggest that her rejection results in any way from an inability (or failure) to meet research goals due to these "nurturing" duties, President Faust was made aware of these facts during the decision making

process by Singer, Def. Ex. No. 57, and Harvard granted her a one year pause in the tenure clock to work on her third book, Doc. No. 157-1 at ¶ 39.

Turning to the <u>McDonnell Douglas</u> three step burden shifting analysis, the Court also rejects Theidon's argument that she has submitted sufficient evidence to permit a jury to infer discriminatory motive, as required at the third stage of the <u>McDonnell Douglas</u> analysis. <u>Mesnick,</u> 950 F.2d at 824. Theidon points to several alleged deviations from Harvard's established tenure procedures as evidence of Harvard's discriminatory motive. Doc. No. 156-1 at 7, 9. First, she claims Harvard deviated from its established procedures in her case when it did not send out her Colombia articles to external reviewers at stage three of the tenure review process, <u>supra</u> at 3. Doc. No. 156-1 at 9-10. Harvard has no established rule requiring these articles be sent out or that they be sent out in a particular mode. Doc. No. 157-1 at ¶¶ 13-14. Moreover, the articles' omission is immaterial in any event. Every external reviewer received a link to Theidon's web page which itself contained the Colombia articles or links to them. <u>Id.</u> at ¶ 53. Just under half the reviewers specifically commented on the articles in their letters. <u>Id.</u> at ¶ 61. Harvard plainly gave serious weight to the articles: Theidon's case statement, produced by the Anthropology Department, treated the articles as her second project,[22] and the articles were circulated to CAP and the *ad hoc* committee. <u>Id.</u> at ¶ 67, 79-80, 92.

Second, Theidon asserts that Harvard deviated from procedure when it failed to circulate her final (more favorable) case statement to the *ad hoc* committee and President Faust. Doc. No. 156-1 at 9-12. Theidon sets forth no evidence that the omission was intentional or that the language of the case statement factored into the deliberations of the *ad hoc* or President Faust. <u>See</u> <u>id.</u> Indeed neither CAP nor the *ad hoc* received [External Letter Writer 1]'s second negative letter,

---

[22] Theidon does not challenge that characterization by the committee.

plainly also an error. Doc. No. 161-1 at 10 n.7. In any event, "an employer's failure to follow internal procedures, standing alone, normally is not evidence of discriminatory animus." Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 17 n.8 (1st Cir. 1998); accord Randle v. City of Aurora, 69 F.3d 441, 454 (10th Cir. 1995) ("mere fact that an employer failed to follow its own internal *procedures* does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual."). Here, where Theidon has presented no evidence that the alleged deviations were intentional or that they had any impact on President Faust's decision, the alleged deviations do not provide a basis to infer pretext for sex discrimination. Moreover, the difference in language—a shift from "matter of importance" to "matter of necessity"—while more affirming, appears to relate to a factor of no particular significance to the decision.

Third, Theidon relies upon the "cat's paw" doctrine—*i.e.* Harvard is liable for discrimination because President Faust relied upon "the discriminatory . . . animus of an employee [[Professor 1] and/or [Professor 2]] who influenced, but did not make, the ultimate adverse decision." Doc. No 156-1 at 13. See Staub v. Proctor Hosp., 562 U.S. 411, 422-423 (2011) (holding that "if a supervisor [but not the ultimate decisionmaker] performs an act motivated by . . . animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable."). There is simply no evidence whatsoever that [Professor 2] engaged in any discrimination or possessed any discriminatory motive. The undisputed evidence establishes she unequivocally recommended Theidon for tenure: [Professor 2] wrote the circulated case statement which strongly advocated for Theidon's tenure and she proposed treating Theidon's Colombia articles as Theidon's second project given that Theidon' second book *Intimate Enemies* was viewed by many as not a distinct

second project. See Doc. No. 157-1 at ¶¶ 67, 72, 75. Def. Ex. No. 52 at HVRD0002276. That, before the tenure decision, [Professor 2] explained her opinion that the tenure road for women is more difficult and recommended Theidon act as a "dutiful daughter" hardly qualifies as evidence suggesting [Professor 2] harbored a discrimination animus. In any event, [Professor 2] advanced no negative views of Theidon's tenure candidacy at any stage during Theidon's tenure review process.[23]

At the hearing, Theidon focused her cat's paw argument on [Professor 1]. His statements early in the tenure review process and his later email, confidential letter, and testimony to the *ad hoc* committee, undisputedly, were decidedly mixed regarding Theidon's application for tenure. Compare Doc. No. 157-1 at ¶ 199 with id. at ¶¶ 67, 77, 99. But, Theidon has identified no evidence that sex discrimination motivated or influenced [Professor 1]'s statements, each of which was based on his evaluation of the merits of her application, nor has she submitted any evidence that [Professor 1] bears any sex based animus. See id. Theidon's contention that [Professor 1] was the cat's paw suffers from another problem. Theidon's tenure application failed at the President/*ad hoc* committee stage. The key points made by [Professor 1] (*i.e.* "*Entre Prójimos* and *Intimate Enemies*. . . are two works that deal in all respects that I can discern with the same project," and "Theidon's work has not made a significant and meaningful impact in the general fields of Latin American or Andeananthropological studies," Def. Ex. No. 52 at HVRD0002284-5) were made by other voices throughout Theidon's tenure review, including all three external members of the *ad hoc* committee, external letter writer [External Letter Writer 1], Harvard Professors [Professor 3] and [Professor 5], Provosts Garber and Singer.

---

23 While her work on Theidon's tenure process was viewed as less than stellar by some, no evidence suggests any shortcomings arose from animus.

In the face of this utter absence of evidence, Theidon makes several other arguments to show discrimination by [Professor 1]. First, [Professor 1] signed the case summary advocating for tenure, voted for tenure with the Department, and then wrote a letter identifying problems or weaknesses in Theidon's application. Theidon argues that this behavior is dishonest, and that the trier of fact can "reasonably infer" that [Professor 1] was "dissembling to cover up a discriminatory purpose." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 147 (2000). [Professor 1]'s "behavior" is the product of Harvard's tenure review process, which calls for confidential letters from every member of the applicant's department after the case statement and department vote. [Professor 3] charted an identical path to [Professor 1]'s. She signed the case summary, voted to support the tenure application, and then wrote a letter containing some decidedly negative comments. See Def. Ex. No. 52 at HVRD0002268. These facts do not support an inference of discriminatory purpose given the nature of Harvard's process. See Reeves, 530 U.S. at 146 ("The ultimate question is whether the employer intentionally discriminated.").

Second, Theidon argues [Professor 1] feared Theidon would expose [Professor 1]'s friend and fellow faculty member in the Anthropology Department for making unwanted sexual advances toward students and reveal [Professor 1]'s own affair with a student. However, [Professor 1] wrote his negative confidential letter on March 10—well before he learned of the allegations against his friend on April 26th. Moreover, there is no evidence showing [Professor 1] was having an affair with a current student nor is there any evidence to infer he was concerned or would have reason to think tenure for Theidon would lead to "exposure" of any of the foregoing. See Doc. No. 175-1 at 24. When Theidon forwarded an employee/grad student to [Professor 1] to discuss allegations concerning another professor in the department, he handled the matter promptly and to the employee/grad student's satisfaction. Doc. No. 157-1 at ¶ 156.

Finally, Theidon fails to advance sufficient evidence to permit a jury to infer she was "qualified" for a tenured position in Harvard's Anthropology Department. The undisputed evidence establishes that, when Harvard promoted Theidon in 2008 to an associate professorship, they advised her of the important criteria for tenure, two of which were publication in leading Anthropology journals and "substantial work on a second project". Def. Ex. No. 4 at HVRD0013068-70. The advisory letter went on to advise Theidon specifically not to let her dedication to other important activities in which she was involved distract her from the importance of publication in the Anthropology journals. Id. at HVRD0013068. Theidon did not actually publish in any of the leading Anthropology journals listed in Harvard's letter. Doc. No. 157-1 at ¶ 49. Theidon did not even attempt to publish in any of these journals. Id. Her failure to publish was noted by some of the external reviewers. Id. at ¶ 62-63. One reviewer commented, "Her record of journal publications in terms of number and range is on the low side for a tenure appointment. . . At my own university that would be a serious consideration for tenure, even at the Associate Professor rank." Def. Ex. No. 52 at HVRD002230. Theidon's failure to publish also troubled some members of Harvard's Anthropology department. Of a draft of Theidon's case statement, [Professor 3] said "There is only one statement I would query . . . the case report states that [Theidon's] other publications 'more than make up for the shortcoming' of nonpublication in leading anthropology journals. I cannot agree with that," Doc. No. 157-1 at ¶ 69, and in her confidential letter to Dean Smith, she wrote, "My biggest concern is the absence of publications in top, peer-reviewed journals," id. at ¶ 74. [Professor 3] described the absence as "somewhat diminish[ing]" Theidon's file. Finally, Theidon's failure to publish was a significant issue for the deliberating members of the *ad hoc* committee. Id. at ¶ 94. In her notes about the *ad hoc* meeting, Singer wrote, "The committee members expressed serious concern

about her not publishing in major anthropology journals." Id. at ¶ 110 (emphasis in original). The

testimony of external committee member [External Ad Hoc Member 1] matches Singer's notes.

Def. Ex. No. 78; id. at 109 ("[U]ltimately, the decision had to be made . . . And I am telling you

why I think it came down the way that it did. It was completely based on scholarly decisions and

scholarly missteps, if you will. Why would an anthropologist not publish in Anthropology

journals[?]"). No ad hoc member exhibited either satisfaction with Theidon's failure to publish in

Anthropology journals or disinterest in that failure (e.g. that it was not a material consideration in

reviewing her application). [24]

The letter also advised Theidon that "[h]aving a second project substantially underway"[25]

would be "an important consideration in [her] tenure review." Def. Ex. No. 4 at HVRD0013070.

Theidon's first book, *Entre Prójimos*, plainly qualified as her first research project. External

reviewers and the external commentators uniformly viewed her second book as, not a true second

project, but largely a reiteration in English of her first work which had been in Spanish. Doc. No.

157-1 at ¶ 63 ("I do not see a pattern of growth between the first and second book."); id. at ¶ 66

("*Intimate Enemies* and *Entre Prójimos* are substantially the same book."); id. at ¶ 110 ("The

conclusion of the *ad hoc* committee was that *Intimate Enemies* is certainly not a completely

second book, and it's not even clear it's even much more than the first book, which was published

in Peru 6 years ago."). Theidon has pointed to no one who, having read both books, characterized

*Intimate Enemies* as a second work. Indeed, she asked for a delay in her

--------------------------------

[24] This is not to say Harvard had to take this view, but only that many scholars took this view, it was a central issue of discussion, and a permissible clear qualification requirement in light of the letter from 2008.

[25] There was no "second book" requirement, though there was a requirement for a second project substantially underway. Def. Ex. Nos. 4; 57. The record reveals some discussion of a second book requirement, e.g. [Professor 3] confidential letter. Def. Ex. No. 52 at HVRD0002268. In any event, the President did not impose a second book requirement.

tenure application so that she could finish *Pasts Imperfect* (a new project), which she characterized as a feat that would increase her "tenurability" by ninety percent. Doc. No. 157-1 at ¶ 39. Harvard gave Theidon the requested year delay. Id. at 40. She spent the year at Princeton on a research fellowship, but did not complete the new book. Id. at ¶ 49. Theidon had no second project substantially underway. The external anthropologists on the *ad hoc* committee did not consider Theidon's Colombia articles a second project. See Def. Ex. No. 57. [26] Finally, the comparators she identifies who received the employment position that she sought (a tenured position solely in Harvard's Anthropology Department) both had completed drafts of "true" second books under contract with publishers. Doc. No. 161-1 at 8. Theidon did not. Supra at 8 n.11. Thus, Theidon failed to establish a *prima facie* case of discrimination. See McDonnell Douglas Corp., 411 U.S. 792, 802 (1973) ("complainant in a Title VII trial must carry the initial burden . . . of establishing [among other things] . . . that he applied and was qualified for a job for which the employer was seeking applicants.").

In addition to her Title VII discrimination claim, Theidon has also brought a state law discrimination claim under Mass. Gen. Laws ch. 151B (Count III). This claim fails for the same reasons that her Title VII claim fails. See Ray v. Ropes & Gray LLP, 799 F.3d 99, 113 n.8 (1st Cir. 2015) ("Massachusetts law also makes use of the McDonnell Douglas burden-shifting

---

[26] Although Theidon's tenure committee characterized her Colombia articles as Theidon's second project in their case statement, the *ad hoc* committee members did not view the articles as a substantial project. In Singer's notes about the meeting, she explains:

> Given that the *ad hoc* committee members were basically saying that both books comprised one project, they then focused on the journal articles. And in that sphere, Kim has not done well . . . The few papers in anthro journal are in 3rd rate (at best) outlets . . . We also discussed the two new projects, and people expressed concern that they were essentially more of the same (one in Colombia and then a return to Peru for more in depth work). Def. Ex. No. 57 at HVRD0009053.

framework."). "Massachusetts is a pretext only jurisdiction," <u>Bulwer v. Mount Auburn Hosp.,</u>

473 Mass. 672, 681 (2016), which means that, to survive summary judgment, Theidon "need[s]

only present evidence from which a reasonable jury could infer that [Harvard's] facially proper

reasons given for its action against [her] were not the real reasons for that action." <u>Id.</u> Under

Massachusetts law, one type of evidence from which an inference of pretext may properly be

drawn is evidence that "the defendants did not follow their written procedures." <u>Id.</u> As explained

above, Harvard's failure to send Theidon's Colombia articles to external reviewers did not

constitute a deviation from Harvard's established procedures. <u>Supra</u> at 29.[27] The omission of

Theidon's final case statement from her dossier does not constitute the type of deviation from

established procedure, which on its own has been found to establish pretext. <u>See Bulwer,</u> 473

Mass. 672 at 688 (finding that an inference of pretext was properly drawn when defendant

departed from written procedures in numerous ways, including "by failing to include a resident

on the *ad hoc* committee, by not allowing the plaintiff to attend two of the three meetings of that

committee . . . by failing to heed the plaintiff's request for materials from those meetings. . . [and]

immediately terminat[ing] the plaintiff's employment without having informed him."). In any

event, these considerations apply only to "qualified" applicants.

     Accordingly, Harvard's motion is ALLOWED as to Counts II and III.

V.     <u>RETALIATION CLAIMS</u>

     In Count I, Theidon alleges that her denial of tenure at Harvard was retaliation for her

advocacy for women at Harvard in violation of 20 U.S.C. § 1681 ("Title IX"). To prevail on her

---

27 Sending the articles to the external reviewers would have been "better" and inline with
Theidon's request, but Harvard's failure to send them was not a deviation from a requirement
that gives rise to an inference of discrimination nor was it an inaction from which the Court can
infer discriminatory animus.

Title IX retaliation claim, Theidon must establish "facts sufficient to show that she engaged in activity protected by Title IX, that the alleged retaliator knew of the protected activity, that the alleged retaliator subsequently undertook some action disadvantageous to the actor, and that a retaliatory motive played a substantial part in prompting the adverse action." Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 67 (1st Cir. 2002).[28]

Theidon identifies four protected activities in which she engaged: she (1) complained about disparate treatment of women in her department to Singer and [Professor 2] in June, August, and December of 2010; (2) allowed students to distribute leaflets following her class in October of 2012[29]; (3) spoke out against Harvard's "insufficient response to sexual violence on campus" "including by public comment in the Harvard Crimson" on March 7, 2013; and (4) advised a

---

[28] Specifically, Theidon asserts a "reasonable jury could find that Harvard's knowledge of Theidon's protected activities was a factor that was considered in the context of her tenure application." Doc. No. 156-1 at 28. It is not sufficient for Theidon to show that a reasonable juror might find her alleged protected activities were "considered" in Harvard's tenure decision. At minimum, she must show that a reasonable juror could find that the alleged protected activities played a "substantial or motivating factor in the adverse employment action." Fox v. Town of Framingham, No. 14-CV-10337-LTS, 2016 WL 4771057, at *7 (D. Mass. Sept. 13, 2016); Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 67 (1st Cir. 2002); see also Decotiis v. Whittemore, 635 F.3d 22, 30 (1st Cir. 2011). Harvard argues that "but-for" causation is required because in Univ. of Texas Southwestern Medical Center. v. Nassar the Supreme Court held Title VII retaliation claims require "but for" causation. 570 U.S. 338 (2013). Cf. Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 67 (1st Cir. 2002) ("[T]he jurisprudence of Title VII supplies an applicable legal framework [for Title IX claims.]"). This Court need not decide whether but-for causation is also required in Title IX cases here because Theidon has not met the lower "substantial or motivating factor" threshold. Indeed, even if the Court applied the "considered" standard Theidon suggests, Theidon's retaliation claims fail.

[29] The distributed leaflets called for a demonstration on Harvard's campus to support a Harvard employee who complained of sexual harassment. Pl. Ex. No. 22 at 2. A student asked Theidon if she could distribute the leaflets during Theidon's class. Theidon did not allow the student to distribute leaflets during the class but welcomed her to do so before or after class. Id. The student testified that "students [at Harvard] often pass out leaflets in their classes, or immediately after classes, regarding activities on campus." Id.

former graduate student to speak with [Professor 1] and [Professor 2] about inappropriate

behavior of a male professor on March 27, 2013. Doc. No. 156-1 at 22-25; Doc. No. 157-1 at ¶¶

152.

First, the alleged retaliatory decision here is Theidon's denial of tenure, a decision made

by President Faust after receiving input from the *ad hoc* committee. Theidon has submitted no

evidence that President Faust knew of the above mentioned protected activities, nor has she

submitted evidence supporting a reasonable inference that Faust knew of the activities. See Doc.

Nos. 156-1; 157-1. Likewise, she has set forth no evidence supporting an inference of retaliatory

motive on the part of President Faust. See Doc. Nos. 156-1; 157-1. There is no evidence

whatsoever that the *ad hoc* committee considered or discussed Theidon's protected activities.

Most of the participants had no knowledge whatsoever of Theidon's protected activities. As to

those with knowledge, Theidon presents no basis to infer retaliatory animus or consideration.

Theidon makes a separate argument as to [Professor 1], which is discussed below.

Second, Theidon argues the temporal proximity between her protected activities and the

adverse employment action gives rise to an inference of retaliatory motive. Doc. No. 156-1 at 20-

22. Notwithstanding Theidon's contrary assertion, temporal proximity is not a basis to infer

retaliatory motive here. See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004)

("[T]he cases that accept mere temporal proximity between an employer's knowledge of

protected activity and an adverse employment action as sufficient evidence of causality to

establish a prima facie case uniformly hold that the temporal proximity must be very close.");

Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 274 (2001) (noting that courts have found 3- and

4-month periods insufficient and finding "[a]ction taken . . . 20 months later suggests, by itself,

no causality at all."); Mariani-Colon v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216,

224 (1st Cir. 2007) (finding period of weeks "between appellant's complaints of discrimination

and his termination does not show that the government's justifications for firing appellant are pretextual."). Theidon was denied tenure in May of 2013. Supra at 22. Theidon's alleged protected activities occurred over two years, over seven months, three months, and two months before the adverse decision.[30] On its own, the temporal proximity between these activities and President Faust's decision (or the *ad hoc* committee discussion) "fails to raise an 'inference of retaliatory motive.'" Mariani-Colon, 511 F.3d at 224. Furthermore, "if there was temporal proximity and therefore an inference could be drawn, there must be proof that the decisionmaker knew of Plaintiff's protected activity." Canales v. Potter, 614 F. Supp. 2d 213, 220 (D.P.R. 2009), aff'd sub nom. Canales v. Donahoe, 403 F. App'x 529 (1st Cir. 2010). Theidon has set forth no such proof as to the close in time events. Supra at 34-35.

Third, Theidon again relies upon the "cat's paw" doctrine, arguing Faust was a mere conduit" to "give effect to the recommender's . . . retaliatory animus." Doc. No. 156-1 at 13 n.6. Theidon identifies several people involved in the tenure process who, unlike President Faust, did know of the actions she identifies above. Singer, [Professor 2], Marsden, Hammonds, Kruegler, and Kosslyn each knew of one or more of Theidon's alleged protected activities. Doc No. 157-1 at ¶¶ 214-19, 223, 225-28. Nothing in the facts presented suggest that Singer, [Professor 2], Marsden, Hammonds, Kruegler, or Kosslyn in any way possessed a retaliatory motive. See Mariani-Colon, 511 F.3d at 224 (citations omitted) ("To defeat summary judgment, a plaintiff must make a colorable showing that an adverse action was taken for the purpose of retaliating

---

[30] The four alleged activities are (1) Theidon's complaints about disparate treatment of women in June, August, and December of 2010 (all over two years before her denial of tenure); (2) her grant of permission for a student to leaflet following her class in October of 2012 (over seven months before her denial of tenure); (3) her public comments in the Harvard Crimson on March 7, 2013 (three months before her denial of tenure); and (4) her advising of a former graduate student who complained about inappropriate behavior of a male professor on March 27, 2013 (two months prior before her denial of tenure).

against [her].”). Mere knowledge of protective activities is insufficient to infer retaliatory

motive absent other evidence or sufficient temporal proximity. Id.

Theidon additionally identifies [Professor 1] as “tanking her candidacy” for tenure.

Doc. No. 156-1 at 2. She presents two theories as to his retaliatory motive. First, she claims

that [Professor 1] “shifted his public support” of Theidon following her comments in the

Crimson and/or her involvement in the graduate student complaint, and that the temporal

proximity between the activities and shift in [Professor 1]’s position gives rise to an inference

of retaliation. Id. at 16, 22-23

Theidon’s argument fails. [Professor 1]’s “shift” occurred in February 2012 *before* the

alleged protected activities, which occurred in March 2012. In October of 2012, before [Professor

1] had closely read Theidon’s two books, he generally spoke positively about the growth between

the two projects (“[T]he later work tak[es] on new problems and issues not addressed in the

former . . .”). Def. Ex. No. 29 at HVRD0096028. Then, in February of 2013, after having read

both books (and perhaps having considered external reviewer [External Letter Writer 1]’s

supplemental letter), [Professor 1] stated that the “two books . . . substantially represent work on

the same project” and noted that “[T]he overwhelming majority of anecdotes . . . included in [the

second book] [are] present in the earlier [book].” Def. Ex. No. 52 at HVRD0002029-37. He

reiterated this concern in his confidential letter, which he submitted on March 10 of 2013: “I have

read and/or skimmed all of the texts of both *Entre Prójimos* and *Intimate Enemies*. As we state *in

the case statement*, these are two works that deal in all respects that I can discern with the same

project.” Doc. No. 157-1 at ¶ 77 (emphasis added). The letter goes further than the February

email and was decidedly mixed as to Theidon’s tenure application.

Theidon commented on the Crimson article on March 7, 2013 (after [Professor 1]’s

February email but before his confidential March 10 letter). Id. at ¶ 143. She directed a graduate

38

Student to go to [Professor 1] about her complaints of inappropriate behavior by a professor on March 27, 2013 (after both [Professor 1]'s email and his confidential March 10 letter). Doc. No. 157-1 at ¶ 114. [Professor 1]'s negative February email cannot be retaliation for Theidon's activities, which had not yet taken place. Likewise, [Professor 1]'s March 10 confidential letter, which reiterates much of the content in the February email, cannot be retaliation for Theidon's support of a graduate student on March 27.

This leaves only a question whether [Professor 1]'s confidential March 10 letter is retaliation for Theidon's March 7 online posting. First, there is no evidence [Professor 1] was aware of the comments at the time. He expressly denied both reading the Crimson article or Theidon's comments. Doc. No. 174 at 3. There is no basis to draw a reasonable inference that he was aware of the comments. Theidon's comments appeared in the online comments section of Harvard's undergraduate student paper. Supra at 15-16. The Court does not draw the inference that a Harvard professor reads or has knowledge about every article in the online version of Harvard's undergraduate student paper by virtue of being a professor at Harvard—let alone the inference that he reads the comments to those articles. Theidon has identified only Hammonds, who was at the time that the article appeared President of the Undergraduate College, as having knowledge of the comments to the article in question. See Doc. No. 157-1 at ¶ 164. Hammonds herself did not read the comments; her chief of staff read them. Id. Even with her specific responsibilities for the lives of the undergraduates, Hammond testified she does not read comments to articles, but relies upon her staff to review the comments and bring to her attention any worthy of her consideration. Pl. Ex. No. 58 at 178-180. The Court does not infer from the fact that the President of the Undergraduate College was aware of the comments, which were flagged for her by her chief of staff, that [Professor 1], a Professor of Anthropology would have read or even been aware of the comments. Theidon also points to [Professor 1]'s testimony that he was

aware that Theidon "was writing letters strongly in support of students" as evidence that he was aware of her comments in the Crimson and/or her oppositional activity generally, Doc. No. 157-1 at ¶ 162, but this general statement does not support the inference that [Professor 1] read Theidon's Crimson comments at all—let alone before his March 10 letter. In any event, as discussed above, the negative or ambivalent commentary [Professor 1] provided in his letter and later in his testimony expressed the same type of concerns independently raised by others in the process. Supra at 31.

Finally, Theidon points to her positive case statement, which was composed by [Professor 2] and edited, reviewed, and signed onto by the members of Theidon's tenure review committee (including [Professor 1]) after [Professor 1]'s February email, as indicating [Professor 1]'s support of Theidon after the February email. However, [Professor 1] testified that he viewed the case statement as "a general departmental statement" which he signed onto to signal his support "of the statement as the case statement that came from the committee." Doc. No. 157-1 at ¶ 57. [Professor 2] confirmed this view of the case statement. Id. ("[W]here the department voted to proceed with the case, my job was . . . to be an advocate for the case."); Id. at ¶ 75 ("[T]he case report was a record of the views of the committee and the department as a whole, which did not always line up perfectly with my own."). As already noted, signing onto the summary and then writing a negative confidential letter are byproducts of the process established by Harvard and, in this very case, mirrored actions taken by [Professor 3]. Supra at 32. Therefore, the positive case statement and negative confidential letter do not support the cat's paw theory or retaliatory animus.

Theidon additionally argues that a reasonable juror might infer retaliatory motive because the graduate student who Theidon supported complained about the conduct of a professor who was [Professor 1]'s friend and because [Professor 1] engaged in behavior similar in kind to that which Theidon opposed. Doc. No. 156-1 at 4. Theidon has failed to submit evidence sufficient to

infer [Professor 1] engaged in this alleged conduct (e.g. having an affair with a student). Doc. No. 174 at 3.[31] Theidon sets forth no facts supporting an inference that Theidon was aware of [Professor 1]'s inappropriate behavior, that [Professor 1] knew that she was aware of it, or that [Professor 1] was concerned about the alleged conduct. On this record, the Court finds insufficient evidence for a factfinder to infer retaliatory animus, as required for Theidon to prevail on her retaliation claim. See Colburn  v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 335 (1st Cir. 2005) (requiring a showing of "retaliatory animus on the part of the employer.").

Theidon has also brought a state law retaliation claim under Mass. Gen. Laws ch. 151B (Count IV). This claim fails for the same reasons that her Title IX claim fails. See Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005) (explaining that the "gears of either statute" are engaged in the same way). Here, as explained above, Theidon has failed to set forth sufficient evidence to support an inference of retaliatory animus. Accordingly, summary judgment is appropriate for Counts I and IV.

## VI. CONCLUSION

---

31 In her opposition to Harvard's motion for summary judgment, Theidon argues that [Professor 1] "was confronted with the likelihood of needing to end an affair with a student." She cites paragraphs 152 to 159 of the statement of material facts. Her citation does not support her assertion, see  Doc. No. 157-1 at ¶¶152-159 (no mention of [Professor 1]'s alleged affair), nor do the subsequent supplemental materials provided by Theidon. See Doc. No. 175-1 at 24 ([Professor 1] explaining, "She was not a student."); see generally id. (no mention of any confrontation about [Professor 1]'s need to end an affair.").

For the foregoing reasons, Harvard's Motion for Summary Judgment (Doc. No. 151) is ALLOWED as to all counts, and the case is DISMISSED. This order is SEALED until March 7, 2018 at which point it will be UNSEALED unless a party files a motion showing good cause to redact a portion of this order.

SO ORDERED.

         /s/ Leo T. Sorokin
          Leo T. Sorokin
          United States District Judge