# United States Court of Appeals
## For the First Circuit

─────────────

No. 18-1279

KIMBERLY THEIDON,

Plaintiff, Appellant,

v.

HARVARD UNIVERSITY;
PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

Defendants, Appellees.

─────────────

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

─────────────

Before

Torruella, Lynch, and Thompson,
Circuit Judges.

─────────────

Lauren A. Khouri, with whom Linda M. Correia, Correia & Puth,
PLLC, Philip J. Gordon, Elizabeth A. Rodgers, and Gordon Law Group,
LLP were on brief, for appellant.
Martin F. Murphy, with whom Michael P. Boudett, Samuel C.
Bauer, and Foley Hoag LLP were on brief, for appellees.

January 31, 2020
[REDACTED OPINION]*

---

\* The full version of this opinion was filed on January 22, 2020, and remains on file, under seal, in the Clerk's Office.

**THOMPSON**, **Circuit Judge**.

## OVERVIEW

We consider here whether Harvard University and the President and Fellows of Harvard College (collectively, "Harvard") denied Kimberly Theidon a tenured position within Harvard's Anthropology Department on the basis of sex discrimination and retaliation for engaging in protected conduct in violation of federal and state antidiscrimination laws, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2; Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681; and Mass. Gen. Laws ch. 151B, § 4. The district court denied Theidon's claims on summary judgment and declined Theidon's invitation to alter or amend that ruling under Fed. R. Civ. P. 59(e). Seeing no reversible error, we affirm.

## GETTING OUR FACTUAL BEARINGS

The undisputed material facts of this case are recounted here in the light most favorable to Theidon, the non-moving party, consistent with our mandate when reviewing an order granting summary judgment.[1]   Given the district court's impressively

---

[1] At the summary judgment phase below, Theidon objected to several of Harvard's proffered statements of material fact as "subjective" and "self-serving." Because Theidon did not otherwise challenge the accuracy or admissibility of the statements at issue, we (like the district court) consider these facts undisputed unless otherwise noted herein.

- 3 -

detailed recitation of the facts, we need not repeat the whole story again here; rather, we focus on those facts germane to Theidon's claims and our analysis of them (which are nonetheless extensive, but important to detail in order to get a big-picture understanding of just what happened, so we beg the reader's patience). Also, given the numerous cast of characters and the roles they play in this narrative, we will periodically drop a reminder of who's who.

Theidon is an anthropologist and scholar of Latin American studies who has conducted award-winning anthropological research on violence, gender, and post-conflict reconciliation in Latin America. Since 2015, Theidon has served as the Henry J. Leir Professor of International Humanitarian Studies at the Fletcher School of International Affairs at Tufts University. The matter before us, however, concerns Theidon's unsuccessful ten-year pursuit of tenure at Harvard, a private academic institution just two miles up the road from Tufts, in Cambridge, Massachusetts.

### The Early Years at Harvard

Theidon received her undergraduate degree in Latin American Studies from the University of California, Santa Cruz in 1991. She went on to receive three graduate-level degrees from the University of California, Berkeley, including a Ph.D. in Medical Anthropology in 2002. In 2004, Harvard hired Theidon as

- 4 -

an Assistant Professor within the Anthropology Department of the Faculty of Arts and Sciences.[2]  That same year, the Instituto de Estudios Peruanos, a prestigious Peruvian academic press, published Theidon's first book, <u>Entre prójimos:  el conflicto armado interno y la política de la reconciliación en el Perú</u> ("<u>Entre prójimos</u>"), a Spanish-language text examining Theidon's research and fieldwork on reconciliation following violent internal conflict in Peru's Ayacucho region.  <u>Entre prójimos</u> attracted considerable critical acclaim, winning the Premio Iberoamericano Book Award Honorable Mention from the Latin American Studies Association for outstanding book in Spanish or Portuguese in the social sciences.  It also served as the inspiration for the 2010 Oscar-nominated film "The Milk of Sorrow."

By June 2008, Harvard had promoted Theidon to Associate Professor with "unanimously positive" support from leading scholars in the fields of social anthropology and Latin American studies.  In a letter confirming Theidon's promotion, then Acting Chair of the Anthropology Department, Mary Steedly, praised

---

[2] Harvard's Anthropology Department has two wings:  Social Anthropology and Archaeology.  Theidon joined the former and, later, came up for tenure within the Social Anthropology wing of the Department.  For future reference:  when we refer to Harvard's Anthropology Department herein, we mean the Department as a whole (including both the Social Anthropology and Archaeology wings) unless otherwise noted.

- 5 -

Theidon for "outstanding" performance in many areas of evaluation, including ability to secure external funding for research projects, teaching and advising, and Theidon's exemplary service to Harvard.  In addition to the accolades, Steedly also penned the following "specific recommendations" to strengthen Theidon's case for tenure down the road:  (1) publish Intimate Enemies, the draft manuscript that would eventually become Theidon's second book concerning her research and fieldwork on violence and reconciliation in Peru, in a timely manner so that it can be "reviewed in major journals in the fields of socio-cultural anthropology and Latin American studies"; (2) publish "articles in a set of journals that are recognized as the top outlets for social anthropology research"; and (3) have a "second project substantially underway, not only in terms of a book manuscript but also significant articles published or in press."[3]  Steedly also cautioned Theidon against stretching herself too thin by focusing on research projects outside the field of anthropology that might distract from the production of written work product that could be

---

[3] In recommending that Theidon have a second research project "substantially underway," Steedly encouraged Theidon to push ahead with her new drug-related research project, titled "Coca and Conflict in Peru," in anticipation of publishing more work prior to her tenure review.  As discussed later, Theidon did not come up for tenure with a new research project substantially underway (at least from Harvard's perspective) in terms of a book manuscript or significant articles published or in press.

submitted for publication.[4]   Theidon understood that the letter
and enclosed recommendations provided a "roadmap" to tenure.

Six years after she began at Harvard, on August 25, 2010,
the Dean of Harvard's Faculty of Arts and Sciences, Michael D.
Smith, notified Theidon that she was being appointed to the
position of "John L. Loeb Associate Professor of the Social
Sciences," "one of a small number of endowed positions for
[Harvard's] most distinguished tenure-track faculty."   Dean Smith
commended Theidon on an "honor richly deserved," one which
"recognizes outstanding achievement in teaching, research, and
departmental citizenship."

### Theidon Criticizes the Anthropology Department

Relevant to Theidon's claims, less than a week after
being elevated to John L. Loeb Associate Professor, Theidon met
with Judith Singer, Senior Vice Provost for Faculty Development
and Diversity at Harvard, to express concerns about gender
disparities in the Anthropology Department.[5]   According to Singer's

---

[4] Several months after her promotion, in an email dated
November 24, 2008, Theidon similarly acknowledged that she needed
to shift her focus to publishing in peer-reviewed anthropological
journals to increase her chances of receiving tenure.   In the
academic arena, the alliterative aphorism associated with the
pressure to publish academic work is known as "publish or perish."

[5] For those wondering how a junior faculty member found
herself in a meeting with Harvard's Senior Vice Provost for Faculty
Development and Diversity, here's the short of it.   In the weeks
prior to Theidon's meeting with Singer, Theidon had reached out to

handwritten notes from the meeting and an email recap she sent two years later (more on the email in a few), Theidon complained that women were given the "lion's share of the undergrad teaching load," and that there was only one senior, tenured female professor within the Anthropology Department, at the time, Mary Steedly, who had been counseling Theidon in ways that were "totally inappropriate," including by suggesting Theidon downplay her intelligence and warning that Theidon would be "evaluated by a higher standard." On at least one occasion early on in Theidon's career, Steedly told Theidon she needed to be a "dutiful daughter" to succeed in the Department.  A "dutiful daughter," according to Steedly, is a woman who "doesn't complain about the extra workload" and "expectations placed on female faculty members that are not placed on male faculty members."

On August 30, 2010, Singer reached out to Marten Liander, Associate Secretary in Harvard's Office of the Governing Boards, to find a time to discuss Theidon's concerns.  At the time, Liander was tasked with organizing the upcoming Visiting Committee from Harvard's Board of Governors ("Visiting Committee").  The Visiting

---

senior faculty within the Anthropology Department regarding her compensation, future at Harvard, and the way a female senior faculty member, Steedly (who Theidon described in emails as a "Gender Viper"), had been advising her.  Theidon's concerns were passed on to the Dean of Social Science at the time, who, in turn, connected Theidon with Singer.

- 8 -

Committee convened in November 2010 to evaluate diversity at Harvard, including within the Anthropology Department. The Visiting Committee released a report on March 15, 2011, concluding (in relevant part) that the Anthropology Department lacked diversity at the tenured level in terms of gender and ethnicity and, as a result, Harvard needed to pursue stronger efforts to recruit and retain diverse tenured faculty.

Singer's notes from the 2010 meeting surfaced again in September 2012, when Theidon's tenure review process was ongoing. This time, Singer emailed her notes and a recap of the meeting to Dean of Social Science Peter Marsden and Assistant Dean of Social Science Christopher Kruegler, who had asked Singer to provide background information about "issues between [Theidon] and her department" so they could be as "heads-up" as possible while Theidon's tenure review was underway.[6] In the body of her email, Singer described the then extant Anthropology Department as "dysfunctional" and questioned the mentoring Theidon had received, including by Steedly.

### The Road to Tenure

Before turning to the tenure case at issue here, we take a detour to discuss the tenure review process at Harvard more

---

[6] The record does not indicate how (or if) Singer's notes were used during Theidon's tenure review process going forward.

- 9 -

generally.  As with most institutions of higher learning, tenure appointments at Harvard are lifelong.  Harvard views tenure as a privilege reserved for "scholars of the first order of eminence who have demonstrated excellence in teaching and research and who have the capacity to make significant and lasting contributions to the department(s) that proposes the appointment."  The tenure review process is rigorous to say the least.  Here are the steps:

(1)  Shortly before or during the penultimate year of a tenure candidate's appointment as an associate professor, the candidate is instructed to submit a dossier to her academic department for inclusion in the candidate's tenure file, including a curriculum vitae ("CV"), copies of all publications (including any forthcoming publications) or other scholarly materials, teaching and advising materials (i.e., a list of student theses supervised by the candidate, graduate students for whom the candidate had primary responsibility, representative course syllabi, and any evidence of teaching effectiveness), a teaching statement, and a research statement.

(2)  A committee composed of tenured faculty within the candidate's academic department reviews the tenure file and determines whether to proceed to the next step.

- 10 -

(3) The relevant department chair solicits twelve to fifteen external letters from external scholars who are charged with assessing the candidate's scholarly achievements as compared to her contemporaries in the field.[7]

(4) The review committee prepares a draft case statement, which is basically a list of the candidate's pros and cons that is shared with tenured members of the department who, in turn, vote on whether to recommend the candidate's promotion to tenured professor.

(5) Assuming a favorable vote from the candidate's department, the next step is for tenured faculty members to write confidential letters to the Dean of the Faculty of Arts and Sciences for inclusion in the candidate's tenure file.

(6) The chair and the review committee finalize the candidate's case statement and add it to the tenure file.

(7) The Faculty of Arts and Sciences Committee on Appointments and Promotions reviews the tenure file and proposes next steps to the Dean of the Faculty of Arts and Sciences, including submitting the case to Harvard's President for a

---

[7] To assist with the external scholars' evaluations, Harvard sends the scholars a copy of the candidate's CV, a "sampling" of the candidate's work, the candidate's research and teaching statements, significant reviews of the candidate's work, and a link to the candidate's website.

final decision or (as is relevant here) the optional step
of recommending further review by an <u>ad hoc</u> committee.[8]

(8) As was the case for Theidon, an <u>ad hoc</u> committee of external
scholars and Harvard professors reviews the case and makes
a recommendation regarding whether the candidate should
receive tenure.

(9) Finally, the <u>ad hoc</u> committee's recommendation (along with
the candidate's tenure file) is forwarded to and reviewed
by Harvard's President, who then renders a final decision
on the candidate's tenure application.

With the process delineated, we turn back to the
controversy at hand.  Theidon became eligible for tenure the summer
after her seventh year at Harvard, but in March 2011 Theidon asked
Harvard to postpone her tenure review process for a year.  Theidon
explained to her superiors that if given such an extension she
could "come up for tenure review with:  two published books [i.e.,
her Peru-related research] . . . and a complete draft of [her]
third book, <u>Pasts Imperfect:  Working with Former Combatants in</u>

---

[8] The <u>ad hoc</u> committee will typically consist of "three active
professors from outside Harvard, two active professors at Harvard
(who are not from the department making the recommendation), the
President or Provost, the Dean of the Faculty, the Senior Vice
Provost for Faculty Development and Diversity, and the divisional
dean responsible for the case."  The <u>ad hoc</u> committee's role is
advisory, as the final decision regarding a candidate's tenure is
made by Harvard's President.

Colombia."  Dean Marsden (Dean of Social Science) granted Theidon's
request.  She then spent the 2011-2012 academic year as a fellow
at Princeton University, a time away from Harvard's campus she
later described as an opportunity to "get to write . . . [and]
finish a polished draft of [her] third book."  As we later learn,
Theidon never delivered on the promised third book, which would
have covered a new area of research for her.  She nevertheless
returned to Harvard in June 2012 and took her first steps on the
road to tenure.[9]

**Steps 1 and 2:  The Dossier and the Review Committee**

Theidon learned in late June that Harvard had approved
her tenure review committee, which included four tenured
professors from Harvard's Anthropology Department:

- Gary Urton, Anthropology Department Chair

- Mary Steedly, Review Committee Chair (Previous
  Acting Department Chair)

---

[9] Around this same time, and presumably in the ordinary course
of business, on June 4, 2012, Dean Marsden (Dean of Social Science)
emailed Dean Smith (Dean of the Faculty of Arts and Sciences) a
document titled "Departmental outlook and priorities for 2012-13,"
which included an overview of the Anthropology Department's
priorities, including (as is relevant here) the status of upcoming
tenure reviews.  Notably, under the sub-heading "Tenure-track
faculty pipeline," the document states "Theidon prospects mixed."
Other tenure candidate's prospects are described as "weak" and
"just beginning."  The record tells us nothing more about this
document or how it was used relative to Theidon's tenure review.

- Professor 1

- Professor 2

In August 2012, Theidon submitted her dossier to Harvard, which would then compile a tenure file.[10]  Theidon's dossier included her CV, teaching and research statements, ten syllabi from the courses she taught at Harvard, a list of recommended scholars for her external evaluations, a list of her student advisees, and the following of Theidon's publications: Entre prójimos (her first book), a draft manuscript of Theidon's forthcoming second book Intimate Enemies,[11] five published journal articles concerning Theidon's new research on gender, violence, and transitional justice in Colombia, and thirteen of what Theidon described at the time as "miscellaneous articles," which we presume from context concerned her research and fieldwork in Peru.[12]

_____

[10] Harvard's tenure handbook adopts the term "dossier" to describe the set of materials tenure candidates must submit to Harvard at the beginning of their review and the set of materials Harvard disseminates to internal and external evaluators during the review process.  To avoid confusion here, we'll use the term "dossier" only when referring to Theidon's submission, and we'll use the term "tenure file" to account for what Harvard compiled and circulated to Theidon's evaluators.

[11] Intimate Enemies was published in November 2012, a month after Harvard first circulated Theidon's tenure file to external scholars for evaluations.

[12] Harvard's tenure handbook requests that candidates submit all their publications (including forthcoming) and other scholarly materials at this stage in the process.  It is not clear from the record whether the materials Theidon submitted, including her two

- 14 -

Theidon's dossier failed to reflect progress in areas recommended to her by Harvard in the 2008 promotion letter. In particular, Theidon had as yet failed to publish Intimate Enemies in time for its merits to be assessed and reviewed by major anthropology journals before her tenure review process began; the dossier was devoid of articles published in the major anthropology journals that were listed in Harvard's letter; and Theidon did not have a second research project "substantially underway" in terms of producing a draft manuscript or significant articles published or in press concerning that research.

### Step 3:  External Evaluations

Next, the review committee solicited assessments of Theidon's qualifications and recommendations on her tenure case from twenty-five external scholars.[13]  Seventeen of the scholars Harvard contacted agreed to submit letters evaluating Theidon's tenure prospects.  Prior to circulating Theidon's materials to these external scholars, Steedly encouraged Theidon to update her

---

books (one published and one in draft manuscript form), the five Colombia-related articles, and thirteen miscellaneous articles, represented all her published or forthcoming scholarship at the time.

[13] In August 2012, Theidon submitted a list of potential external evaluators when she turned in her dossier.  The review committee requested evaluations from at least some of Theidon's recommended scholars as well as others of their own choosing.

- 15 -

website by adding recent publications since external scholars would likely review it as part of their evaluations.

In October 2012, Harvard sent the external scholars who had agreed to evaluate Theidon a copy of her CV, teaching and research statements, a PDF copy of the draft manuscript for Intimate Enemies, a link to her website (noting that it may include a "current [CV] and papers"), additional guidance regarding the criteria for tenure at Harvard,[14] and a list of four anthropology professors to compare with Theidon.[15]  Even though the tenure dossier Theidon submitted to the review committee included five published articles reflecting her Colombia-related research and thirteen miscellaneous articles concerning Peru, Harvard did not include copies of these materials in the tenure file it distributed to external scholars.[16]  However, Theidon's website did contain

---

[14] Harvard's letter to the external scholars states that the "foremost criteria for both external appointment and promotion to tenure are:  scholarly achievement and impact on the field, potential for future accomplishments, evidence of intellectual leadership and creative accomplishments, teaching and advising effectiveness in a variety of settings with both undergraduate and graduate students, and contributions to the University and broader scholarly communities."

[15] Theidon's comparison list included a professor and an associate professor of anthropology at Rutgers University, as well as professors of anthropology from Duke University and Lehmann College of the City University of New York.

[16] We address Harvard's response to the omission of the articles later.

links to PDFs of three of her published Colombia-related articles,
which several external scholars commented on in their letters, as
well as links to several of Theidon's other articles concerning
her research and fieldwork in Peru.

Theidon received mostly positive feedback from the
sixteen scholars who submitted letters.[17]   External scholars
described Theidon as a "first-rate, brilliant and original
scholar," "whose name came to the top of the list of young scholars
who will soon be shaping the field."  Notwithstanding the encomium,
even the most positive reviews came with commentary on Theidon's
productivity.   Scholars described <u>Intimate Enemies</u>, which was
published after her tenure review started and eight years after
<u>Entre prójimos</u>, as "overdue" and "long-awaited," and one scholar
went so far as to recommend tenure with "hesitancy" because (among
other things) Theidon's record of journal publications was "on the
low side for a tenured appointment" in terms of numbers and range;
the scholar did not see a "pattern of growth" between Theidon's
first and second books, and Theidon had failed to engage the
broader anthropological community in her work.

Another scholar who at first supported tenure, later
retracted her positive letter about Theidon's scholarship and,

---

[17] All but one of the external scholars who agreed to submit
letters did so by Harvard's deadline.

instead, recommended against tenure.  This scholar had initially praised Theidon for Intimate Enemies and enthusiastically supported the case for tenure, noting at the time that she had not read Theidon's first book, Entre prójimos, and thus could not comment on how it "departs from or overlaps with [Intimate Enemies]."  But after eventually reading Entre prójimos, the scholar emailed the Anthropology Department's Chair and tenure review committee member Urton explaining that she would have written a "different" letter had she realized Theidon's first book was "substantially similar in theme and content to Intimate Enemies" given her belief that "the second book of a candidate for full professor should mark a clear departure from previous research projects."  After consulting review committee chair Steedly and Dean Kruegler (Assistant Dean of Social Science), Urton offered the external scholar the opportunity to revise her prior letter and recommendation on Theidon's tenure case.  In a second letter, the external scholar concluded Theidon did not meet the criteria for promotion because "Intimate Enemies and Entre prójimos are substantially the same book" since they cover the same themes, issues, and research.  Despite Urton's directive that the first letter be retracted and the scholar's second, oppositional letter be included in Theidon's tenure file as her case moved forward, that second letter was inadvertently omitted from the file

circulated to evaluators at the next stage in Theidon's tenure review.  The initial positive letter remained.[18]

### Step 4:  Draft Case Statement and Department Vote

With the external scholars' letters collected, members of the review committee began preparing Theidon's case statement -- an important document referenced by evaluators along the lengthy tenure review chain -- setting forth the pros and cons of Theidon's tenure bid.  Steedly was tasked to serve as the case statement's lead drafter, and in that role received, throughout the drafting process, much feedback from the review committee and senior members of Harvard's administration.  The case statement saw several iterations before the final version reached the ultimate round of reviewers and the President.[19]

Early in the drafting process, review committee members offered competing opinions on how best to describe Theidon's scholarship and contributions to the field of anthropology in the case statement.  Her level of productivity and breadth of research

---

[18] On January 7, 2013, Urton asked the Anthropology Department's administrative coordinator to remove the external scholar's first letter from Theidon's review file and replace it with the second letter.  Several hours later, the administrative coordinator confirmed that this would be done "right now" though it appears it never was.

[19] For some reason, versions of the case statement, including drafts we know are from March and April based on the cover emails to which they are attached, are all dated February 2013.

within the field of anthropology surfaced from the start as issues needing to be addressed.  Initiating a back and forth exchange, Urton, in a February 17, 2013 email to Steedly, observed that although Theidon had come up for tenure with two published books, Entre prójimos and Intimate Enemies, those books "pertain to the same research project and substantially to the same body of fieldwork."[20]  Urton, an archaeologist who specializes in pre-Colombian studies, was one of a few professors in the Anthropology Department fluent in Spanish; he was the only member of the review committee to read Theidon's first book (written entirely in Spanish) and her second book in tandem.  In response to Urton's observation, Steedly proposed that the case statement would frame Theidon's Peru-based scholarship in "terms of [research] projects rather than books" and, in so doing, the statement would describe Theidon's Colombia-related research, which had generated the five published articles Theidon submitted as part of her dossier, as her "'true' second research project."  Steedly also reminded Urton

---

[20] This was not the first time Urton expressed the view that Theidon's books expound upon the same body of research relating to post-conflict Peru.  In October 2012, Urton stated in an email to review committee members that Theidon's books "deal with a similar set of concerns and research agendas in relation to performances of violence during Peru's period of terrorism" and thus "the two books appear to be species of a genus (the former in Spanish, the latter in English), with the later work taking on new problems and issues not addressed in the former . . . ."

that Harvard did not require tenure applicants to produce a completed second book; rather, what Harvard valued was a second research project substantially underway.

Then, on February 19, 2013, after Steedly circulated the first draft case statement to the review committee, committee member Professor 2 surfaced another concern: she disagreed with language which suggested Theidon's total body of work essentially excused the need for her to have published in major anthropology journals, as Harvard had recommended in Theidon's 2008 promotion letter. Instead, Professor 2 proposed replacing the draft's "more than ma[d]e up for" language with a sentence stating that Theidon's publications in other journals "help to compensate" for her relative absence from leading anthropology journals. Eventually, reflecting a review committee compromise about its two chief concerns over Theidon's publication history, the February Draft (1) describes the research overlap problem between Theidon's two books as "alleviated" by Theidon's second research project on Colombia; and (2) states that Theidon's publication in human rights journals "compensat[es]" for her failure to meet the specific recommendation of publishing in peer-reviewed major anthropology journals. Pertinent to Theidon's claims, the February Draft concludes by describing Theidon's retention as a "matter of importance" for the Anthropology Department and Harvard as a whole.

- 21 -

The draft case statement was eventually circulated to the Anthropology Department's senior faculty members, who mostly voted in favor of promoting Theidon to tenured professor.[21]

### Step 5:  Confidential Faculty Letters

Next, tenured faculty members of the Anthropology Department submitted confidential letters to the review committee. In all but two of the confidential letters, Theidon received unequivocal support from her colleagues.  One letter, from Professor 2, did express her ongoing concerns over whether Theidon would be a leading figure in the field of anthropology given the similarity between Theidon's books and her failure to publish in top, peer-reviewed journals in the field.  A second letter of import here, from Urton, reiterated his apprehension about the similarity between Theidon's two books and the research underlying them.  Although Urton remained positive on Theidon's prospects, he queried whether she would play a vital role in the intellectual life of the Anthropology Department and recommended referral of Theidon's case for consideration and recommendation by an ad hoc committee (Step 8), the optional step in the review process right

---

[21] One Anthropology Department faculty member abstained from the February 27, 2013 vote on Theidon's case.  He explained in email correspondence shortly thereafter that he had never heard a "more tempered, doubt ridden report" on a tenure candidate and wondered "what was the meaningful result[] of [Theidon's] research."

- 22 -

before Theidon's case was to reach Harvard's President at the time, Drew Gilpin Faust, for a final determination.

### Step 6:  Finalizing the Case Statement

By early March 2013, Steedly was hard at work, incorporating the feedback from Theidon's external evaluations and departmental vote into another iteration of the case statement in preparation for the next step in the tenure process:  review of Theidon's tenure application by the Faculty of Arts and Sciences Committee on Appointments and Promotions ("CAP").  On March 9, 2013, she received an email from Urton spelling out Dean (of Social Science) Marsden's proposed revisions to the February Draft. Although, according to Urton, Dean Marsden generally approved of the case statement draft, he took issue with a couple of its points, which he found misleading.  Germane to Theidon's claims, Steedly's February Draft suggested that the external scholars' expressed reservations about Theidon's scholarly productivity (as described in some of their letters) could have been reduced or eliminated if they had received copies of Theidon's Colombia-related research articles.  The draft said the articles had not been provided to external scholars, in part, because circulating those materials would violate a Faculty of Arts and Sciences rule requiring that the review committee include only a "limited sample"

of a tenure candidate's submitted scholarship in the tenure file.[22]
But, as Dean Marsden pointed out, there was no such rule or
procedure barring the review committee from sending Theidon's
Colombia-related articles, in particular, to external reviewers
and the failure to do so was in his words a "major mistake."
Therefore, he proposed edits to Theidon's case statement that
deleted references to the mischaracterization of Harvard's rules
and eliminated language speculating about the potential impact of
the Colombia materials on Theidon's external evaluations given
that (as mentioned before) some of these materials were clearly
available on Theidon's website, and many external scholars did
factor Theidon's Colombia-related research and articles into their
evaluations.[23]    Dean Marsden, according to Urton's email, also
proposed that "substantive comments on and evaluations" of the

---

[22] Later, in an email to Urton from March 12, 2013, Steedly
explained that the draft's mischaracterization of Harvard's policy
(and, by extension, the resulting omission of other articles from
the external review tenure file) was the result of a
"miscommunication."  There appears to be nothing else in the record
shedding light on how the miscommunication occurred.  Harvard's
tenure review handbook states that a "sampling" (as opposed to a
"limited sample") of a candidate's materials should be circulated
to external reviewers and does not otherwise include a document
quota or page count necessary to satisfy (or exceed) the "sampling"
requirement.

[23] The district court found that just under half of the
external scholars mentioned Theidon's Colombia-related articles.
We count over ten (out of sixteen) external scholars who expressly
referenced and/or demonstrated familiarity with Theidon's
Colombia-related research and publications.

Colombia-related articles and research be included in Theidon's tenure file.  Steedly's March Draft circulated to CAP on March 12, 2013 reflected Dean Marsden's recommended edits, and the tenure file CAP received included hard copies of Theidon's Colombia-related articles and other articles concerning her fieldwork in Peru.[24]

**Step 7:  CAP Recommendation and Preparation for the <u>Ad Hoc</u>**

After evaluating Theidon's case statement, confidential faculty letters, letters from the external scholars, and other documents in her tenure file, CAP (like Urton) recommended that Theidon's tenure bid proceed to <u>ad hoc</u> review.  With this recommendation adopted came additional and final proposed tweaks to the case statement by the review committee.  The April Draft, incorporating CAP's suggestions, included more information on how Theidon's tenure would support the work of and vision for the Anthropology Department, a section explaining how Theidon ranked among other scholars in her field, and other minor edits.  Perhaps most importantly here (at least for purposes of Theidon's claims), the April Draft included stronger language in support of tenure, ending by describing Theidon's retention as a "matter of necessity

---

[24] As we note later, the tenure file Theidon's <u>ad hoc</u> committee received at Step 8 in the review process also included copies of the Colombia-related articles and articles concerning her fieldwork in Peru.

not just for the Department of Anthropology but for the University as a whole."  On April 22, 2013, Urton sent the April Draft to the administrative coordinator for Theidon's tenure review, noting "[h]ere is the final case report . . . [t]his can now be sent to [Dean Smith, Dean of Harvard's Faculty of Arts and Sciences]" for review and sign-off before circulation to the ad hoc committee and Harvard's President in accordance with the tenure handbook.[25]  For reasons unknown, however, the April Draft, was not part of the tenure file sent to either the ad hoc committee or President Faust. Instead, everyone received the March Draft, which described Theidon's retention as a "matter of importance" rather than a "matter of necessity."

### Step 8:  The Ad Hoc Committee Convenes

Theidon's tenure case eventually got handed over to an ad hoc committee comprised of three social and/or medical anthropology professors from outside universities:  External Ad Hoc Member 1 from University A, External Ad Hoc Member 2 from University B, and External Ad Hoc Member 3 from University C. Harvard also invited the participation of two Harvard professors from other departments:  Internal Ad Hoc Member 1 and Internal Ad

---

[25] Harvard's tenure handbook states that the Faculty of Arts and Sciences Dean, in this case Dean Smith, forwards the tenure file, including the final case statement, to the ad hoc committee and President Faust.

Hoc Member 2.   Provost Alan Garber, Harvard's chief academic officer, presided over the ad hoc committee and Singer (Senior Vice Provost for Faculty Development and Diversity), Dean Marsden (Dean of Social Science), and Dean Smith (Dean of the Faculty of Arts and Sciences) attended the committee meeting as ex officio members.

The ad hoc committee assembled on May 23, 2013.   In advance of the meeting, each committee member had received "a copy of Intimate Enemies, the selected publications from [Theidon's] dossier (including articles on Colombia), . . . research and teaching statements, and internal and external letters," as well as the review committee's case statement (albeit not the final draft).   This is how the meeting progressed.   The committee first heard testimony from four departmental witnesses:   Urton kicked things off followed by Steedly, Professor 2, and lastly Professor 3, the latter being a member of the Anthropology Department who submitted a positive internal letter in support of Theidon. Surprised by the unenthusiastic tenor of Urton's opening comments, Singer, who observes forty to fifty tenure decisions per year and "rarely take[s] notes during [an ad hoc] meeting -- and certainly not during the testimony," felt compelled to take notes this time

around.[26]   In them, Singer described Urton's testimony as
"ambivalent."  Later, in an email to President Faust, following
the ad hoc committee meeting, Singer explained that Urton "self-
present[ed] much more negatively [to the ad hoc committee] than
his [departmental] letter (by his own admission)."  Like Urton,
Professor 2, according to Singer's notes, also expressed
reservations regarding Theidon's case.  Professor 2's comments
were consistent with her departmental letter, including concerns
that Theidon "[d]oesn't publish in general anthro[pology] journals
despite being told to do so," was "not engaging w[ith]
anthro[pology] or even med[ical] anthro[pology]," and her "[n]ew
projects are more of the same."  By contrast, in describing both
Steedly's and Professor 3's testimony about Theidon's tenure
prospects, Singer wrote "strong case" and "enthusiastic,"
respectively.

After the oral presentations concluded, the ad hoc
committee privately discussed Theidon's tenure case.  Per Singer's
notes and email recap, when asked if Theidon was a "rising star"

---

[26] Singer's notes appear to be the only contemporaneous
account of the ad hoc committee proceeding in the record given
that there was not an official notetaker and, according to Singer,
notes taken by other members of the committee were shredded per
custom.  To the extent other ad hoc committee members or
participants took notes, Singer's notes appear to be the only ones
that survived.

in the field of anthropology, the three external anthropologists on the committee said "no." The committee ultimately recommended Theidon's tenure application be denied. Provost Garber shared the <u>ad hoc</u> committee's vote with President Faust.

### Step 9: Harvard's President Denies Theidon Tenure

On May 24, 2013, President Faust emailed Provost Garber "a bit bewildered" about the disparity between Theidon's tenure file and the <u>ad hoc</u> committee's recommendation, asking "[w]hat is going on here?" Provost Garber explained, in part, that although Theidon's book, <u>Intimate Enemies</u>, was "wonderful," there were questions about its basis in anthropological theory and Theidon's overall productivity. He concluded that Theidon "sounds like a great person in many ways but not an anthropologist who would make a mark on the field." After her conversation with Provost Garber, President Faust reached out to Singer about the adverse recommendation. Singer noted that the "substantive negatives" of Theidon's application included: (1) concerns that <u>Intimate Enemies</u> "is certainly not a completely second book" from <u>Entre prójimos</u>; (2) although Steedly and Professor 3 argued that <u>Intimate Enemies</u> made a contribution to anthropology, the external <u>ad hoc</u> committee members wondered whether "the book would be setting the agenda in the field"; (3) there were "serious concerns about [Theidon] not publishing in major anthropology journals,"

- 29 -

especially given that her Peru-based books comprised only one research project; (4) the committee worried that Theidon's Colombia-related research was "essentially more of the same"; and (5) Theidon was not "seen as a rising star in the anthro[pology] community writ large, the Latin American anthro[pology] community, or the medical anthro[pology] community." Singer concluded that she "so wanted this to go through," but that after the ad hoc committee discussion, she supported the decision to recommend against tenure. After her discussions with Singer and Provost Garber, President Faust accepted the ad hoc committee's recommendation and denied Theidon tenure. When asked to state her reasoning, President Faust explained in deposition testimony: "I determined that Kimberly Theidon was not a scholar of anthropology of the first rank; that her accomplishments included a book that was not seen as making an advance in the field of anthropology; and that there was not evidence that she would be a leading scholar of anthropology of the sort that we would wish to have at Harvard for the future." President Faust opined further that Theidon's scholarship did not result in major contributions to discourse occurring within the field of anthropology, she was not likely to advance the field given the level and quality of her work, and her

productivity was lacking as evidenced by her two published books, which were essentially "one project."[27]

**Theidon's Response to Alleged Sexual Misconduct at Harvard**

Additionally relevant to her retaliation claims, Theidon says that, preceding and simultaneous to her tenure review, she observed and opposed multiple times a toxic culture of gender discrimination and sexual misconduct on Harvard's campus. We've already discussed Theidon's complaints about the lack of gender diversity within the Anthropology Department and Steedly's invocation of the dumb-down and "dutiful daughter" guide to success as a female faculty member. We consider now the undisputed material facts concerning Theidon's involvement in the debate around and complaints regarding sexual misconduct on Harvard's campus.

Theidon was a vocal supporter of efforts to improve Harvard's response to sexual misconduct allegations. In Fall 2012 and Spring 2013, Theidon presented at conferences and on panels before Harvard faculty and students regarding comparative studies

---

[27] On May 29, 2013, after President Faust denied Theidon tenure, Urton shared the decision with tenured members of the Anthropology Department. He explained in a follow-up email that, if any faculty members wanted to protest the decision, he would "support [their] right to do that" and would "join [them] in such action." There is no indication in the record whether any such protest occurred.

of gender and violence.  After her panel in Spring 2013, she responded to questions about sexual assault on Harvard's campus. Theidon regularly tweeted and blogged about sexual assault, including on Harvard's campus.  And at the conclusion of one particular class period, she permitted a student to distribute leaflets on sexual assault and make verbal announcements on behalf of the group "Our Harvard Can Do Better."  Theidon has acknowledged, however, that she did not receive any criticism from any source at Harvard in response to the aforementioned conduct.

On March 7, 2013, Harvard's student paper, the <u>Harvard Crimson</u> (the "<u>Crimson</u>"), published an article titled "Sexual Assault at Harvard."  After internet trolls posted incendiary comments in response to the article on the <u>Crimson</u>'s online platform, Theidon jumped to the defense of survivors of sexual assault and those working to address the issues highlighted in the article.  Of note here, Theidon posted the following comment online:  "I want to lend a voice of support for the many people -- men, women and other genders -- who work with great commitment on the Harvard campus to insure that everyone receives equal, respectful and dignified treatment."  Although Theidon made these comments while her tenure review was ongoing, there is no evidence in the record stating that the members of Theidon's <u>ad hoc</u> committee or President Faust were aware of them.

- 32 -

On March 27, 2013, Theidon spoke with a former graduate student who accused a professor within the Anthropology Department of inappropriate behavior. Theidon directed this individual to Urton and Steedly -- the formal channels for reporting misconduct. During a meeting with Urton, on April 26, 2013, the former graduate student explained that Theidon had suggested she reach out to Urton. At the meeting, Urton told the graduate student not to involve Theidon any further, stating "I can take care of this" and that Theidon had "enough on her plate" with her tenure review. Around the same time, Theidon's tenure application was referred to the ad hoc committee for review, but there is no indication the ad hoc committee or President Faust were aware of Theidon's conversation with the graduate student.

### Aftermath

Theidon filed an internal grievance shortly after being denied tenure in 2013. On May 23, 2014, Dean Smith denied the same based on the findings of a newly-assembled, ad hoc grievance panel. Later that year, Theidon left Harvard to join Tufts University (where she remains) as an Associate Professor of Human Security in the Fletcher School of International Affairs.

In 2014, Theidon filed a complaint against Harvard with the Massachusetts Commission Against Discrimination ("MCAD"), alleging that she was denied tenure because of her gender and in

- 33 -

retaliation for her advocacy relating to sexual misconduct on campus. MCAD denied her grievance. Having exhausted her administrative options, Theidon filed this civil suit against Harvard on March 12, 2015.

With discovery complete and all dispositive motions teed up for resolution, the district court dismissed Theidon's claims on summary judgment on February 28, 2018. One day prior to the district court's order, The Chronicle of Higher Education ("The Chronicle") published an article, detailing sexual misconduct allegations against Jorge Domínguez. Domínguez was a prominent Harvard professor of Latin American studies in the Government Department, who gave Theidon career advice during her time at Harvard, but had no vote or say in her tenure bid. After the story broke, multiple women came forward accusing Domínguez of sexual assault.[28] Theidon, in turn, filed a Rule 59(e) motion to alter or amend the district court's summary judgment order and to reopen discovery on a limited basis in light of The Chronicle's watershed investigation into Domínguez's misconduct. Theidon argued that Domínguez, her former mentor, played a role in her tenure denial as retaliation for Theidon's public and private encouragement of survivors of sexual harassment and violence, which purportedly

---

[28] Theidon lodges no personal allegations of sexual misconduct against Domínguez.

- 34 -

threatened Domínguez's position as a respected administrator and
scholar.  On April 2, 2018, the district court denied Theidon's
motion, concluding there was no new evidence connecting Domínguez
to Theidon's denial of tenure and allegations of retaliation.

## OUR TAKE

That brings us to the present, with Theidon appealing
the district court's grant of summary judgment on all claims and
its denial of Theidon's Rule 59(e) motion filed in the aftermath
of The Chronicle's revelations regarding Domínguez.

## The Standard of Review

Our review of the grant of summary judgment is de novo.
Johnson v. Univ. of P.R., 714 F.3d 48, 52 (1st Cir. 2013).  Summary
judgment is warranted if the record, construed in the light most
flattering to the nonmovant, presents "no genuine dispute as to
any material fact and the moving party is entitled to judgment as
a matter of law."  Id.  When a plaintiff opposes summary judgment,
she bears "the burden of producing specific facts sufficient to
deflect the swing of the summary judgment scythe."  Mulvihill v.
Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003). For this
purpose, she cannot rely on "conclusory allegations, improbable
inferences, acrimonious invective, or rank speculation."  Ahern v.
Shinseki, 629 F.3d 49, 54 (1st Cir. 2010).

By contrast to the summary judgment standard, "we review a district court's ruling on a Rule 59(e) motion for abuse of discretion." Franchina v. City of Providence, 881 F.3d 32, 56 (1st Cir. 2018). "In doing so, we keep in mind that '[s]uch a motion must either establish a clear error of law or point to newly discovered evidence of sufficient consequence to make a difference.'" Id. (alteration in original) (quoting Guadalupe-Báez v. Pesquera, 819 F.3d 509, 518 (1st Cir. 2016)).

## Analysis

In a capsule, Theidon brings federal and state law antidiscrimination claims against Harvard. She alleges that Harvard denied her application for tenure because of sex discrimination in violation of Title VII and Mass. Gen. Laws ch. 151B, § 4 (Counts II and III, respectively) and/or as retaliation for her purported advocacy on Harvard's campus in violation of Title IX and Mass. Gen. Laws ch. 151B, § 4 (Counts I and IV, respectively). Although there is substantial overlap between our analysis of these claims, we avoid confusion by taking them in turn (starting with discrimination). We conclude with a few words on the district court's denial of Theidon's Rule 59(e) motion.

## Sex Discrimination

Before jumping into the fray, a brief primer on Title VII, the federal statue underlying Theidon's claims of

- 36 -

discrimination, might prove helpful. Title VII forbids employers like Harvard from failing or refusing to hire, discharging, or otherwise discriminating against any individual "with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1). We have consistently recognized that where, as here, one alleges discrimination because of sex, there is seldom "'smoking gun' evidence to prove their employers' discriminatory motivations." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 88 (1st Cir. 2018) (quoting Vélez v. Thermo King de P.R., Inc., 585 F.3d 441, 446 (1st Cir. 2009)). But for plaintiffs like Theidon, who have not proffered direct evidence of discrimination, we invoke the three-step burden-shifting scheme outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to assess whether we can infer discrimination from the undisputed material facts.

Under the McDonnell Douglas framework employed by this court in assessing adverse tenure decisions, Theidon at step one can make out a prima facie case of discrimination by showing: (1) she is a member of a protected class; (2) "she was a candidate for tenure and was qualified under [Harvard's] standards, practices or customs"; (3) "despite her qualifications she was rejected"; and (4) "tenure positions in the Department of [Anthropology] at

[Harvard] were open at the time [she] was denied tenure, in the sense that others were granted tenure in the department during a period relatively near to the time [Theidon] was denied tenure." Fields v. Clark Univ., 966 F.2d 49, 53 (1st Cir. 1992). At step two in the analysis, "the burden of production -- but not the burden of persuasion -- shifts to [Harvard], who must articulate a legitimate, non-discriminatory reason" for denying Theidon tenure. Johnson, 714 F.3d at 53-54 (quoting Lockridge v. Univ. of Me. Sys., 597 F.3d 464, 470 (1st Cir. 2010)). If Harvard provides such a reason, "the McDonnell Douglas framework 'disappears' and the sole remaining issue is 'discrimination vel non.'" Ray v. Ropes & Gray LLP, 799 F.3d 99, 113 (1st Cir. 2015) (quoting Cham v. Station Operators, Inc., 685 F.3d 87, 93 (1st Cir. 2012)). At step three, to avoid summary judgment, Theidon must "show by a preponderance of the evidence that [Harvard's] proffered reason is pretextual and that the actual reason for the adverse employment action is discriminatory."[29] Johnson, 714 F.3d at 54.

---

[29] Pretext and discriminatory animus are often lumped together in Title VII analysis, but the plaintiff's burden at this stage comprises two separate tasks. See Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 430 n.5 (1st Cir. 2000). "The plaintiff must present sufficient evidence to show both that 'the employer's articulated reason for [the adverse employment decision] is a pretext' and that 'the true reason is discriminatory.'" Id. (quoting Thomas v. Eastman Kodak Co., 183 F.3d 38, 56 (1st Cir. 1999)). However, "[e]vidence that makes out a prima facie case together with evidence of pretext can suffice to defeat summary judgment 'provided that the evidence is adequate to enable a

We proceed with caution and restraint when considering summary judgment motions where, as here, issues of motive and intent must be resolved. See Oliver v. Digital Equip. Corp., 846 F.2d 103, 109 (1st Cir. 1988) (emphasizing the importance of judicial caution and restraint in reviewing employment discrimination claims but nonetheless affirming district court's dismissal of such claims on summary judgment as warranted). "Nevertheless, '[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1121 (1st Cir. 1995) (alteration in original) (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

Transitioning from the general to the specific, we apply McDonnell Douglas to the case at hand. With respect to step one,

---

rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action.'" Id. (quoting Rodríguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 22 n.5 (1st Cir. 1999)); see Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000). Accordingly, the ultimate question is whether, "viewing the 'aggregate package of proof offered by the plaintiff' and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine issue of fact as to whether the termination of the plaintiff's employment was motivated by . . . discrimination" at issue. Domínguez-Cruz, 202 F.3d at 431 (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824-25 (1st. Cir. 1991)).

- 39 -

the prima facie case, there is no dispute that Theidon is a member of a protected class (i.e., women) who was denied tenure when such positions were available in the Anthropology Department. Theidon, therefore, needed only show that she was qualified for tenure which we favorably assume she did, thereby shifting the burden of production to Harvard to articulate a legitimate, nondiscriminatory reason for denying her tenure. To satisfy its step two burden, Harvard relies upon the testimony of final tenure decisionmaker, President Faust, who considered the recommendation of the ad hoc committee and reviewed Theidon's tenure file, and concluded (among other things) that due to Theidon's failure to make major contributions to the field of anthropology and her lack of publication productivity she did not meet Harvard's standard for promotion to full professor with tenure. Harvard having articulated a legitimate, nondiscriminatory reason for denying Theidon tenure, the pendulum swings back to Theidon to prove Harvard's stated reason for denying her tenure is pretext covering its discriminatory animus toward her. For purposes of our analysis, we focus our attention on step three, the pretext inquiry, as we find it dispositive of Theidon's sex discrimination claim.

At the third and final phase of the McDonnell Douglas burden-shifting analysis we ask: whether, after assessing all of

the evidence on the record in the light most favorable to Theidon,
she has raised a genuine issue of material fact as to whether
Harvard's stated reason for denying her tenure -- that Theidon did
not meet Harvard's standard -- was merely pretext for
discrimination.  To meet this burden, Theidon "must offer 'some
minimally sufficient evidence, direct or indirect, both of pretext
and of [Harvard's] discriminatory animus.'"  Pearson v. Mass. Bay
Transp. Auth., 723 F.3d 36, 40 (1st Cir. 2013) (emphasis in
original) (quoting Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696
F.3d 128, 140 (1st Cir. 2012)); see García v. Bristol-Myers Squibb
Co., 535 F.3d 23, 31 (1st Cir. 2008).  "[M]ere questions regarding
the employer's business judgment are insufficient to raise a
triable issue as to pretext."  Pearson, 723 F.3d at 40 (alteration
in original) (quoting Acevedo-Parrilla, 696 F.3d at 140)
(affirming grant of summary judgment where employer's "merely
questionable behavior" did not constitute minimally sufficient
evidence of pretext for discrimination).  By contrast, "[p]retext
can be shown by such weaknesses, implausibilities,
inconsistencies, incoherencies, or contradictions in the
employer's proffered legitimate reasons for its action that a
reasonable factfinder could rationally find them unworthy of
credence and hence infer that the employer did not act for the
asserted non-discriminatory reasons."  Adamson v. Walgreens Co.,

- 41 -

750 F.3d 73, 79 (1st Cir. 2014) (quoting Gómez–González v. Rural
Opportunities Inc., 626 F.3d 654, 662–63 (1st Cir. 2010)). "[I]n
assessing pretext, a court's focus must be on the perception of
the decisionmaker, that is, whether the employer believed its
stated reason to be credible." Vélez, 585 F.3d at 452 (quoting
Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 246 (1st Cir. 2006)).
"We understand that it is not enough for a plaintiff merely to
impugn the veracity of the employer's justification; [s]he must
elucidate specific facts which would enable a jury to find that
the reason given is not only a sham, but a sham intended to cover
up the employer's real and unlawful motive of discrimination."
Id. (cleaned up).

Below and on appeal, Theidon first points to four
perceived irregularities in her tenure review process in
attempting to meet her burden of showing Harvard's stated reason
was merely pretext for discrimination. From the district court's
vantage, the irregularities Theidon claimed, to the extent they
were supported by the record, were insufficient to create a genuine
issue of material fact as to whether Harvard's decision to deny
Theidon tenure served as pretext for discrimination. Mindful of
her protestation that the district court erred (badly) by drawing
inferences in Harvard's favor, we tackle each of Theidon's claims
of irregularity in turn.

## A. Procedural Irregularities

### 1. The Publication Sample Sent to External Evaluators

As Theidon tells it, Harvard deviated from standard procedure and sabotaged her tenure prospects by failing to send out a sampling of her publications to external scholars tasked with evaluating her contributions to the field of anthropology at Step 3 of her tenure review process.  Theidon complains, in particular, that external scholars should have received PDF copies of at least some of the published articles she submitted to Harvard as part of her dossier, including five Colombia-related journal articles and thirteen articles concerning her Peru-based research. In her view, the omission of journal articles from her external review tenure file, coupled with Harvard's deletion of this self-described mistake from future draft case statements, is probative of pretext.  However, we believe no reasonable jury viewing the record as a whole could conclude that Harvard's conduct during Theidon's external evaluation process evinces pretext for discrimination.  Before explaining why, we provide a quick reminder of Harvard's standard procedure at the external evaluation phase of the tenure review process.

As spelled out in Harvard's handbook, the purpose of external review is to aid the various tenure review bodies at Harvard in evaluating a candidate's scholarly footprint as

compared to other scholars in their field. The handbook goes on
to explain that external scholars' views on a candidate's
"scholarly impact" and "future trajectory" help internal
stakeholders at Harvard determine whether a candidate's work has
met the standard for tenure. To assist with this process, Harvard
sends external scholars a comparison list of academics in the
relevant field or subfield as well as a copy of the candidate's
CV, "a sampling of [the candidate's] work" from the publications
and other materials submitted by the candidate as part of their
tenure dossier, research and teaching statements, significant
reviews of the candidate's work, and a link to the candidate's
website. The handbook establishes neither a floor nor ceiling for
the sampling of publications from a candidate's dossier that must
be circulated as part of the candidate's tenure file. Here,
external scholars received the draft manuscript for <u>Intimate
Enemies</u>, Theidon's then-forthcoming four-hundred-page book based
on her research and fieldwork in Peru; her website's URL, which
included links to some of her other scholarship, including three
journal articles concerning Theidon's Colombia-related research
and other articles concerning Peru;[30] and Theidon's research and

---

[30] Steedly advised Theidon to update her website before the
external evaluation process, explaining that scholars may check
out her website as part of their review. Yet, when external
scholars received the link to Theidon's website, it did not include
two of the Colombia-related articles she submitted to Harvard as

teaching statements and CV, which describe Theidon's Colombia-related and Peru-related research.

That said, on appeal, even Harvard appears to recognize a snafu in its circulation of Theidon's external review tenure file. Harvard acknowledges that the review committee erred when it failed to send external reviewers Theidon's Colombia-related articles and stated in an early draft of Theidon's case statement that a Faculty of Arts and Sciences rule prevented the circulation of these materials.[31] Upon review of the draft case statement at issue, Dean Marsden pointed out that Harvard's standard tenure procedures did not prohibit the review committee from sending external scholars Theidon's articles and suggested revisions to the case statement in line with this correction. In response, Steedly deleted the mischaracterization of Harvard's procedures from the case statement, and later explained via email to Urton that the error was the result of a miscommunication. At subsequent steps in Theidon's tenure review, Harvard circulated PDF copies of

_____

part of her dossier. Theidon offers no reason for her failure to heed Steedly's counseling on this occasion.

[31] The inaccuracy in the draft case statement at issue follows: "[I]t should be noted that the concerns [external scholars] raised, which mostly had to do with [Theidon's] publication record, were in part the result of the FAS requirement that we provide only a limited sample of the materials included in Theidon's dossier."

the Colombia-related articles and other scholarship as part of
Theidon's tenure file.

Evidence that Harvard "deviated from its standard
procedure or policies in taking an adverse employment action
against [Theidon] may be relevant to the pretext inquiry."
Rodríguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40, 50 (1st Cir.
2019) (citing Acevedo-Parrilla, 696 F.3d at 142-43). "The
rationale is that if an employer has a policy or procedure that
governs a specific situation but fails to adhere to the same in
taking an adverse employment action . . . , then it might be
inferred that the reason articulated for taking the adverse
employment action against the employee was not true." Id. Here,
by contrast, Theidon has not pointed us to any evidence in the
record from which a reasonable jury might infer that Harvard's
external evaluation process was "cloaked" in sex-based animus.
Id. at 48. First, even if it was, as described in the email
outlining Dean Marsden's concerns with the draft case statement,
a "major mistake" not to circulate PDF copies of Theidon's
Colombia-related articles to external reviewers, in this instance,
we fail to see how Harvard's erroneous omission of those
publications renders pretextual Harvard's stated reason for
denying Theidon tenure. At best, Theidon has identified an
administrative error, but not one from which a reasonable jury

- 46 -

could glean a perceivable or demonstrable motivation that aligns
with Theidon's theory of the case.  See Rodríguez-Cardi, 936 F.3d
at 48-49 (stating that "when faced with employment decisions that
lack a clear discriminatory motive, '[c]ourts may not sit as super
personnel departments, assessing the merits -- or even the
rationality -- of employers' nondiscriminatory business
decisions'" (alteration in original) (quoting Mesnick, 950 F.2d at
825)).  We accept that Harvard's omission may have been less than
ideal (at least from Theidon's perspective).  "But a bare showing
of administrative error, without more, does not make out a case of
either pretext or discriminat[ion] . . . ."  Miceli v. JetBlue
Airways Corp., 914 F.3d 73, 84 (1st Cir. 2019).  This is because
"the anti-discrimination laws do not insure against inaccuracy or
flawed business judgment on the employer's part; rather, they are
designed to protect against, and to prevent, actions spurred by
some discriminatory animus."  Kouvchinov v. Parametric Tech.
Corp., 537 F.3d 62, 67 (1st Cir. 2008); see Rivas Rosado v. Radio
Shack, Inc., 312 F.3d 532, 535 (1st Cir. 2002) ("Title VII . . .
does not ensure against inaccuracy by an employer, only against
gender-based discrimination.").  Second, Theidon's theory that
Harvard attempted to "cover-up" its alleged sabotage finds no
support in the record.  In emails contemporaneous to the review
committee's edits to the case statement, Dean Marsden offered a

reasonable explanation for the request that Steedly remove reference to the rule:  it was inaccurate and (most importantly) much of Theidon's Colombia-related research was in fact available to external scholars via Theidon's website and described in other circulated materials, including her CV and research and teaching statements.  The review committee's conduct during the external review process, including the circulation of other documents that discussed the omitted scholarship and correction of the draft case statement, is devoid of the inexplicable and troubling inconsistencies that give rise to a reasonable inference of pretext.  See Harrington v. Aggregate Indus. Ne. Region, Inc., 668 F.3d 25, 33-34 (1st Cir. 2012) (finding evidence of pretext in a "close case" where employer violated company procedure on at least three occasions in the effort to force an employee to take what it described as a "random" drug test and where other evidence suggested the test was not actually random and, instead, the employee at issue had been targeted); Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21, 29 (1st Cir. 1998) (finding "thin" evidence of pretext in age discrimination case where employer failed to follow layoff procedure giving deference to seniority and, instead, "simply fill[ed] in names of persons to be laid off" based on a list compiled a year prior with a different set of criteria).

Moreover, "the totality of the circumstances, rather than proving [Theidon's] pretextual argument, instead show a lack of foundation for [Theidon's] claim." Rodríguez-Cardi, 936 F.3d at 51. Theidon's suggestion that we infer pretext from the review committee's behavior at the external evaluation juncture is especially dubious since there is no indication that this perceived procedural irregularity was relevant to or had any bearing on Harvard's evaluation of her tenure prospects. The materials circulated by Theidon's tenure review committee (e.g., link to Theidon's website, research and teaching statements, and CV) provided significant information about her Colombia-related research to allow the external scholars (who, let us not forget, nearly unanimously recommended Theidon be given tenure) to provide their take on it. After reviewing these materials, over half of Theidon's external evaluators submitted letters expressly mentioning her other scholarship. One such external letter includes a lengthy discussion of Pasts Imperfect, one of the Colombia-related publications that Theidon complains was neither in the materials Harvard sent to external scholars nor linked to Theidon's website. The record also establishes (and we consider as part of our "totality of the circumstances" approach) that after the external scholar review process Harvard holistically evaluated Theidon based on her full body of work, including in tenured

faculty letters from the Anthropology Department, in multiple iterations of the case statement, during the CAP evaluation, in the ad hoc committee review, and before final decisionmaker, President Faust.  In sum, viewing the record as a whole, no reasonable jury could infer pretext and discriminatory animus from Harvard's fumbling during the external evaluation process.

Theidon also contends that Harvard treated her differently than the Anthropology Department's male candidates up for tenure.  With respect to her "sampling-gate" theory, Theidon argues only that Harvard sent external evaluators a more robust selection of her comparators' work, purportedly sending a "full set of materials" to evaluators for a male candidate in 2011 and circulating a "zip link with multiple publications" for a male candidate in 2013.  Theidon points to nothing in the record that helps us compare the file Harvard sent her external reviewers to the "sampling" of publications Harvard circulated on behalf of male comparators.  We do not have before us, for example, the list of publications comparators compiled for their dossiers.[32]  But

---

[32] The record includes what purports to be tenure files for Theidon's three male comparators.  Each file includes a document titled either "selected recent publications to be circulated to reviewers," "list of included publications," or "publications list."  The candidates' tenure dossiers, i.e., the materials they submitted to Harvard, are not in their files nor do they exist elsewhere in the record.

even if Theidon could show she was treated differently, she has not overcome the additional hurdle of establishing situational similarity with any such comparators.    There are relevant differences between Theidon and her male comparators that cannot be ignored simply because they were all up for tenure at some point in one of two wings forming Harvard's Anthropology Department. See García, 535 F.3d at 31 (explaining that "a plaintiff must show 'that others similarly situated to [her] in all relevant respects were treated differently by the employer'" (alteration in original) (quoting Kosereis v. Rhode Island, 331 F.3d 207, 214 (1st Cir. 2003)).    For instance, Theidon's subfields at Harvard included social and medical anthropology whereas the male comparators she points to came up for tenure with subfields in visual and sensory anthropology as well as archaeology.    Although "comparison cases 'need not be perfect replicas,' . . . they must 'closely resemble one another in respect to relevant facts and circumstances.'"    Id. (quoting Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20-21 (1st Cir. 1999)); see id. at 32 (affirming denial of sex discrimination claims where (among other things) male comparators had different job responsibilities and titles within the same department).    In academia, the differences between subfields matter.    Harvard's tenure handbook indicates that the quality and quantity of publications necessary to achieve tenure

- 51 -

vary by division, department, and even subfield. Accordingly, a representative sampling of materials circulated to reviewers evaluating a visual and sensory anthropologist, for example, will necessarily be different than a sampling of materials circulated on behalf of a medical and social anthropologist. The same thing goes for candidates seeking tenure in the archaeology subfield, which is described as its own separate "wing" within Harvard's Anthropology Department. At bottom, it is Theidon's burden to connect the dots between her candidacy for tenure and that of her male comparators, including at the external evaluation phase. Contrary to Theidon's contention, the record simply does not provide a basis from which a reasonable jury could conclude that the three male comparators she identifies were in fact similarly situated to her (despite differences in the various subfields).

**2.  The Battle of the Draft Case Statements**

Theidon's next irregularity gripe is that Harvard deviated from procedure by circulating the penultimate draft of her tenure case statement (as opposed to a later, slightly revised draft) to the ad hoc committee and President Faust. Recall that, despite Urton's email to a Harvard administrative coordinator attaching the final, April Draft, the March Draft was sent to evaluators and President Faust instead. In Theidon's view, the key difference warranting our consideration is this: the

circulated draft described Theidon's retention as a "matter of importance" and the final draft that never saw the light of day described Theidon's retention as a "matter of necessity." As an initial matter, Theidon has not identified here a procedure from which Harvard has deviated (though it stands to reason that the review committee's final report would best reflect its most considered recommendation). And assuming arguendo that Harvard's circulation of the penultimate draft was not an inadvertent, clerical error, we nevertheless struggle to understand how the circulation of the notably praiseworthy, even if slightly less laudable earlier draft recommending tenure, adds heft to Theidon's claim of sex discrimination. This is especially the case given our review of the notes from the ad hoc committee's deliberation, which suggest the recommendation to deny tenure had little to do with the case statement's conclusionary verbiage and a whole lot to do with the external committee members' professional determination that Theidon had not made a substantial contribution to her field either in terms of publications in leading journals or progress on a second major research project. As such, Theidon's "failure to circulate" theory would not lead a reasonable jury to

conclude Harvard's stated reason for denying her tenure was pretextual.

### 3. Theidon's Complaints about the Anthropology Department

Theidon also argues that Harvard improperly inserted her complaints about sex discrimination into the tenure review process. We mentioned earlier that in 2010 Theidon complained to Singer about the lack of gender diversity among tenured faculty within the Anthropology Department and certain comments suggesting (among other things) that Theidon needed to be a "dutiful daughter" to succeed there. Singer shared her notes from the meeting with Kruegler and Dean Marsden, who participated at various stages in Theidon's tenure review. It is not immediately apparent whether reference to this alleged deviation is meant to support Theidon's burden of proof as to her discrimination claims or retaliation claims. This argument is nonetheless meritless since there is no evidence that the voting members of the ad hoc committee were aware of Theidon's complaints prior to recommending the denial of tenure.[33] Nor is there suggestion from Singer's notes outlining the ad hoc committee's deliberation that Theidon's complaints (known by two persons in attendance at the meeting, i.e., Singer

---

[33] The record contains this excerpt from a voting ad hoc member's deposition testimony: "This was a completely scholarly based discussion."

- 54 -

and Dean Marsden, and not mentioned in any circulated tenure file) were weighed against her case. In a long email that Singer admits provided "much more detail" than warranted, Singer summarized the ad hoc committee's reasoning for President Faust. Absent from this email (and, more generally, from the record concerning the ad hoc committee's deliberation) is any mention of Theidon's complaints about gender disparities or sex discrimination.[34] And Theidon has not pointed to anything in the record that would suggest President Faust was aware of Theidon's complaints and, even if aware, she points to nothing suggesting President Faust factored this knowledge into her final deliberation. Although this court is required to make all reasonable inferences in Theidon's favor from evidence which could be viewed as supporting pretext, we cannot accept "conclusory allegations, improbable inferences, and unsupported speculation." Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003) (quoting Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000)).

---

[34] Theidon never explains why, in her opinion, Harvard's internal communications among University leaders, including the Senior Vice Provost for Faculty Development and Diversity, regarding her complaints of bias would have been inappropriate merely because they came up again during her tenure review.

- 55 -

### 4. The "Two-Book" Standard

Theidon's final claim of procedural irregularity is that Harvard implemented a stricter publication requirement during her tenure review than was required by the tenure procedures or imposed upon male comparators who received tenure in the Anthropology Department in 2011, 2012, and 2014. Specifically, Theidon contends Harvard erroneously led the ad hoc committee to believe candidates needed a second published book for tenure at Harvard (despite the fact there was no such requirement at Harvard) and thus the committee recommended to President Faust that Theidon be denied tenure because they believed her two books were too similar to be considered separate texts. For support, Theidon cites to the deposition testimony of one ad hoc committee member who explained that anthropology scholars at her university must have a second book and a second research project to receive tenure, suggesting, as Theidon tells it, that the committee member superimposed her university's standards onto Theidon. As a result, the committee, according to Theidon, erroneously subjected her to a more stringent

publication standard than Harvard actually requires and Harvard did nothing to stop it.[35]

Harvard, on the other hand, argues that it never prompted the ad hoc committee to impose a two-book standard and the committee never did so; rather, it concluded Theidon lacked substantial progress on a second research project in her field, as was recommended in the 2008 promotion letter. According to Harvard, the ad hoc committee determined Theidon's two books comprised only "one project" and, after evaluating the Colombia-related articles, decided they too did not represent substantial progress on a second research project. As such, Theidon simply fell short of meeting its overall quality criteria to merit tenure.

In her challenge, Theidon can point to no instance of Harvard espousing a two-book policy in any communications with the committee or during the ad hoc committee's deliberation. At best, Theidon's argument is that Harvard should have corrected any external ad hoc member's possible misconception of Harvard's policy. But even assuming any one ad hoc committee member mistakenly harbored such a belief that Harvard was aware of but

---

[35] To be clear, the deposition testimony Theidon primarily relies upon does not suggest the ad hoc committee collectively discussed or imposed a two-book quota during its consideration of Theidon's case. Before the scholar being deposed could explain what the ad hoc committee cared about as she attempted to do, Theidon's counsel cut her off.

failed to clarify (though the record does not support such an inference here), Theidon's scholarly productivity was only one of many factors that informed the ad hoc committee's recommendation. Crucially and unrebutted by Theidon, the three external scholars and two Harvard professors on the committee also raised "serious concern" about Theidon's failure to publish in major anthropology journals and about the quality of the various human rights journals in which Theidon's work was published instead; they expressed doubts as to Theidon's sustained contribution to the field of anthropology based on their review of Intimate Enemies; and they believed Theidon was unlikely to grow as a scholar given their criticism that her Colombia-related research and new research on Peru constituted "more of the same."

At the end of the tenure review process, President Faust, the final decisionmaker, considered the ad hoc committee's recommendation, reviewed Theidon's file, and concluded she was not a leading contributor to the advancement of the field and her work, including (as President Faust described it) "two books that were . . . essentially one project," which had not made a major contribution to the discourse of the field. Although reasonable people could differ, and did differ, on the quality and quantity of Theidon's academic work and on whether Theidon was deserving or not of tenure, unless the evidence is sufficient to support a

finding that a decisionmaker's doubts about the "scholarly merits of [a] [tenure] candidate's academic work . . . are influenced by forbidden considerations such as sex or race, universities are free to establish departmental priorities, to set their own required levels of academic potential and achievements and to act upon the good faith judgments of their departmental faculties or reviewing authorities." Villanueva v. Wellesley Coll., 930 F.2d 124, 131 (1st Cir. 1991) (quoting Zahorik v. Cornell Univ., 729 F.2d 85, 94 (2d Cir. 1984)). And where, as here, absent such evidence pointing to pretext and discriminatory animus, Theidon has failed to create a genuine issue of material fact necessary to succeed on her claim.[36]

---

[36] Since the facts do not support Theidon's complaints about being subjected to a two-book standard, we need not spill excess ink on her argument that male comparators received tenure with less than two books. For the sake of completeness, however, we provide the following abbreviated sketch of her comparators' publication records at the time they were up for tenure based on tenure case statements Harvard produced for each:

1. (archaeologist one):  one published book and a second book in "preparation" that captures research not covered in the prior book, and numerous peer-reviewed journal articles;

2. (archaeologist two):  three major research projects and author or co-author of nearly thirty articles in peer-reviewed journals; and

3. (visual and sensory anthropologist):  a co-authored book, two full-length feature films on distinct subject matter described as the "equivalent of major books," shorter video pieces and photography, and described as

## **B. The Hail Mary Evidence**

But we're not done.  Aside from the purported procedural irregularities Theidon claims tainted her review process, Theidon also points to the Anthropology Department's alleged discriminatory work environment as evidence she contends would permit a reasonable jury to infer pretext and discriminatory animus.  Here, Theidon argues that Steedly's fascination with the "dutiful daughter" method of advancement and Steedly's other unsolicited strategies for success, coupled with the Anthropology Department's "lack-of-diversity" criticism leveled by Singer and the Visiting Committee, provide circumstantial evidence of discrimination.  We address these in turn.

First, Steedly's remarks, made years before Theidon's tenure decision, are insufficient to satisfy Theidon's burden of proof on the pretext and animus prong of the McDonnell Douglas burden-shifting analysis.  See Ray, 799 F.3d at 116 (explaining the "probative value" of stray discriminatory remarks is "circumscribed if they were made in a situation temporally remote

---

having an "anomalous CV in that his major accomplishments are films rather than books."

At a minimum, Theidon's comparators seem to have received the memo that more than one research project is necessary for tenure at Harvard.  Regardless, as previously mentioned, Theidon has not set forth any facts establishing that she and her comparators were similarly situated during Harvard's tenure review processes.

from the date of the employment decision in question, or if they . . . were made by nondecisionmakers" (quoting Bonefont-Igaravidez v. Int'l Shipping Corp., 659 F.3d 120, 125 (1st Cir. 2011))).  And notwithstanding Steedly's early on ill-advised mentoring advice to Theidon, she proved to be a zealous advocate for Theidon's tenure case throughout the process of drafting multiple iterations of the case statement (diligently correcting the case statement's mistakes and holes early on), in her confidential faculty letter, and during testimony before the ad hoc committee.  Theidon does not argue to the contrary.  Such unwavering support for Theidon's case further diminishes the significance (if any) of the "dutiful daughter" trope (and other remarks) to Theidon's allegations of pretext and discrimination during her tenure review.[37]  Second, Singer's observations, after meeting Theidon in 2010, that the Anthropology Department was "dysfunctional" and the Visiting Committee's recommendations for increasing gender and racial diversity among tenured professors within the Department are too general to constitute circumstantial evidence of discriminatory animus against Theidon in particular.[38]

---

[37] Theidon does not allege anyone on the ad hoc committee was aware of or agreed with Steedly's "dutiful daughter" theory of advancement.

[38] Theidon also urges us to consider Urton's reservations about her tenure case as evidence supporting both her discrimination and retaliation claims.  But in her analysis of

Even if this evidence, together with the perceived
procedural irregularities dispensed with earlier, "raise doubts
about the wisdom of [Harvard's] tenure decisions[,] . . . '[m]erely
casting doubt on the employer's articulated reason does not suffice
to meet [Theidon's] burden of demonstrating discriminatory
intent.'" Villanueva, 930 F.2d at 131 (quoting Menard v. First
Sec. Servs. Corp., 848 F.2d 281, 287 (1st Cir. 1988)).  In sum,
the undisputed material facts do not support Theidon's claims of
sex discrimination under Title VII.

### State Law Discrimination

As for Theidon's state law discrimination claim under
151B, similarly it, too, fails.  "Massachusetts law also makes use
of the McDonnell Douglas burden-shifting framework."  Ray, 799
F.3d at 113 n.8.  However, because "Massachusetts is a pretext
only jurisdiction," a plaintiff "need only present evidence from
which a reasonable jury could infer that 'the [employer's] facially

---

Urton's conduct and how it ties into her theory of the case,
Theidon actually argues that Urton injected negative feedback into
her tenure review and influenced the outcome against her as
retaliation for her protected activity.  Indeed, each reference to
Urton in her analysis is normally preceded or followed by mention
of Theidon's protected activity and/or Urton's retaliatory animus.
Nevertheless, we have considered the totality of Theidon's
circumstantial evidence, including Urton's role in the tenure
review process, in concluding Theidon has not demonstrated her
burden of proof as to discrimination.  We will address Theidon's
specific argument that Urton harbored retaliatory animus next.

proper reasons given for its action against [her] were not the real reasons for that action'" to survive summary judgment.[39] Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 33 (Mass. 2016) (quoting Wheelock Coll. v. Mass. Comm'n Against Discrimination, 355 N.E.2d 309, 315 (Mass. 1976)).  For the reasons already explained, Theidon's proffered evidence of pretext cannot satisfy her burden.

### Retaliation

We again look to McDonnell Douglas to assess Theidon's retaliation claims under Title IX.  See Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 67 (1st Cir. 2002) ("[T]he jurisprudence of Title VII supplies an applicable legal framework [for Title IX claims].").  To establish a prima facie case of retaliation, Theidon must prove:  "(1) she engaged in protected conduct; (2) she was subjected to an adverse employment action; and (3) the adverse employment action is causally linked to the protected conduct."  Rivera-Rivera, 898 F.3d at 94.  With respect to causation, Theidon must show that Harvard's "desire to retaliate was the but-for cause of the challenged employment action." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 339 (2013).

---

[39] In other words, Massachusetts law differs from federal law in that plaintiffs do not need to establish both discriminatory animus and pretext; they just need to show pretext.  See Bulwer, 46 N.E.3d at 33.

To begin, Theidon identifies two instances of protected activity on appeal that purportedly caused Harvard to retaliate against her by denying her tenure. First, on March 7, 2013, Theidon commented on the online version of an article in the Crimson, Harvard's student paper, that criticized Harvard's response to complaints of sexual assault and misconduct on campus. Second, on March 27, 2013, she advised a former graduate student to speak with Urton and Steedly about inappropriate behavior of a male professor.[40] The district court did not opine on whether these instances rise to the level of protected activity and, despite Harvard's urging, we'll sidestep the fray on that issue for now as well.

Since there's no dispute that Theidon suffered an adverse employment decision under prong two of the prima facie

---

[40] Before the district court, Theidon identified at least two other protected activities, including her complaints to Singer from 2010 and the fact that she allowed students to distribute leaflets following her class in October 2012. Theidon does not press this conduct in earnest in connection with her retaliation claim on appeal. And, even if she did, the arguments in support would fail given that the underlying activities were "far too temporally remote from the challenged actions to support an inference of causality." Abril-Rivera v. Johnson, 806 F.3d 599, 609 (1st Cir. 2015) (declining to consider as protected activity conduct that occurred over a year after the adverse employment decision at issue); see Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004) (noting that periods of three or four months have been held insufficient to establish the necessary causal connection).

analysis, we instead focus our energy on causation.  The district court did not find sufficient evidence that retaliation played a substantial or a motivating factor in Harvard's denial of tenure.  In so doing, the district court acknowledged that six years ago, the Supreme Court in Nassar held that "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."  Nassar, 570 U.S. at 362.  Neither the Supreme Court nor our court has resolved the question of whether Nassar's holding on causation extends to Title IX retaliation claims given the import of Title VII to the adjudication of such claims.  See Frazier, 276 F.3d at 67 (acknowledging the "jurisprudence of Title VII supplies an applicable legal framework [for Title IX claims]").  We need not resolve that issue today because, as the district court concluded below, Theidon has not established a causal link between her protected activity and the denial of tenure under either a "but for" or a "substantial or motivating" factor standard of causation.

As an initial matter, there is no evidence in the record from which a jury could reasonably conclude that the voting members of the ad hoc committee were aware of Theidon's protected activities during their deliberation.  Singer's notes regarding the ad hoc committee's reasoning are devoid of any reference to

- 65 -

Theidon's comments on the _Crimson_ article, advice to a former graduate student who accused a professor of sexual misconduct, or other purported blogging, lecturing, and tweeting activities. Additionally, a voting member of the ad hoc committee stated during her deposition that she had no clue Theidon was speaking out about sexual assault on campus or supporting graduate students in connection with claims of sexual harassment. Nor did anything of the sort come up during their deliberation, according to the voting ad hoc committee member's deposition testimony. Plus, as stated earlier, there is no evidence on the record that President Faust, the individual with final say on Theidon's tenure case, knew of any alleged protected activity and nothing in Theidon's tenure file would have put her on notice of this conduct.[41]

---

[41] Theidon also argues a jury could infer retaliatory animus from a comment Singer purportedly made to Theidon during a meeting between the two regarding her tenure denial on June 10, 2013, i.e., after President Faust rendered her final decision on Theidon's case. According to Theidon's notes from the meeting with Singer, which she transcribed and emailed to a fellow academic from American University, Singer insisted that the ad hoc committee's deliberation was fair and that the committee ultimately concluded Theidon's "unusual career" did not align with the work being done within Harvard's Faculty of Arts and Sciences. Relevant to her retaliation claims, Theidon asserts that Singer described her "activities" as the "sort of activities scholars postpone until they have tenure, and that tenure is designed precisely to protect them for [sic] these sorts of activities." Even assuming favorably to Theidon that this comment about unspecified "activities" implies a causal connection between the protected activities Theidon alleges here and Harvard's tenure decision, this argument still fails. The record concerning the ad hoc committee's deliberation, including Singer's detailed notes and testimony as

In lieu of such evidence, Theidon pounces upon the "cat's paw" theory of liability pursuant to which she argues the retaliatory animus of an employee (in this case Urton) may be imputed to a decisionmaker's (i.e., President Faust's and, by extension, Harvard's) ultimate decision denying Theidon tenure. See Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 68 (1st Cir. 2015) (explaining that "[t]he 'cat's paw theory' is employed when one 'seeks to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision'" (quoting Staub v. Procter Hosp., 562 U.S. 411, 415 (2011)).

Theidon contends that Urton, who served on her tenure review committee and recommended her for tenure along with other senior faculty in the Anthropology Department, provided increasingly negative feedback on Theidon's tenure case in close proximity to her protected activity. For example, Theidon points to Urton's confidential faculty letter, which was submitted after the Anthropology Department vote and which postdated Theidon's

---

to the same, lack any evidence to support an inference of retaliation that Theidon suggests a jury could draw from statements Singer may have made during the meeting at issue. Therefore, Theidon's interpretation of Singer's post-tenure denial commentary (as described here only by Theidon) amounts to, at most, a "conclusory allegation[] . . . or rank speculation" that cannot prevent summary judgment. Ahern, 629 F.3d at 54.

- 67 -

comments on the Crimson article by three days. There, Urton stated
that he "remain[ed] positive" on her case with a few reservations,
including his concern that Entre prójimos and Intimate Enemies
"deal in all respects . . . with the same project" and that
Theidon's "work has not made a significant and meaningful impact
in the general fields of Latin American or Andean anthropological
studies." However, no fact on the record (disputed or otherwise)
indicates that Urton was aware of the Crimson article or Theidon's
comments on the online version of the same. Moreover, any
inferences that can be derived from the temporal proximity of these
events are incapacitated by the fact that Urton's letter merely
echoed concerns added to Theidon's file well before the protected
activity, including views expressed by external reviewers, a
tenured member of the Anthropology Department who abstained from
the departmental vote, Professor 2, and by Urton himself in October
2012 and February 2013, when he criticized Theidon's books for
amounting to "the same research project and substantially to the
same body of field work."

    Theidon's reliance on Urton's presentation before the ad
hoc committee, which occurred over a month after Theidon advised
a former Harvard graduate student who complained about a male
professor, is also unpersuasive. Even if Urton's presentation to
the ad hoc committee was more negative than his confidential

- 68 -

faculty letter and such increased negativity was motivated by retaliatory animus, Urton was not a voting member of the ad hoc committee, which included three tenured professors of anthropology from other institutions and two Harvard professors from other departments.[42]   Nor was Urton the sole presenter at the ad hoc meeting who expressed reservations about Theidon, and there is no indication that he unilaterally and directly shared his views with President Faust or that she gave him any special consideration at any point in the process.[43]   In fact, Theidon points to no instance in the record from her tenure review process where President Faust even mentions Urton (let alone his opinion of Theidon).

Cat's paw liability requires at a minimum that the act motivated by retaliation be the "proximate cause of the ultimate

---

[42] Theidon cherry-picked excerpts from Provost Garber's deposition testimony as evidence that Urton's role as Chair of the Anthropology Department meant that his opinions carried more weight with the voting members of the ad hoc committee.   As an initial matter, Provost Garber described Urton's testimony as "fairly balanced" and positive overall.   To Theidon's point, however, we assume Urton's presentation was taken seriously, but nothing in the record suggests the committee's three medical and social anthropologists, in particular, chose not to rely on their own opinions about Theidon's contributions to their subfields, and, instead, were swayed by Urton, who is an archaeologist by trade.

[43] When asked during a deposition how Urton's presentation before the ad hoc factored into her decision, President Faust stated:   "[I]f he had not become ambivalent, my decision would not have changed.   This was not the determining factor in the nature of the ad hoc."

employment action." <u>Staub</u>, 562 U.S. at 422. Here, by contrast, Urton was one of many voices in a chorus cautioning President Faust against promoting Theidon to tenured faculty.[44] Thus, on this record, it cannot be plausibly inferred that the final decision to deny Theidon tenure was tainted by retaliatory animus. Since Theidon cannot establish (directly or via the cat's paw) a causal link between her protected activity and the adverse employment decision, her Title IX retaliation claim must fail.

### State Law Retaliation

We affirm the district court's grant of summary judgment as to Theidon's state law retaliation claim under 151B for the same reasons. <u>See</u> <u>Verdrager</u> v. <u>Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.</u>, 50 N.E.3d 778, 793 (Mass. 2016) (employing the <u>McDonnell Douglas</u> burden-shifting framework and analysis in evaluating a prima facie case of retaliation under 151B, § 4).

---

[44] We also reject Theidon's argument that Urton's emails to members of the Anthropology Department following Theidon's tenure denial, including his offer to assist any faculty members who wanted to protest President Faust's decision, support an inference of discriminatory purpose or retaliation. Even assuming <u>dubitante</u> that Urton's emails were inconsistent with either his confidential faculty letter or presentation to the <u>ad hoc</u> committee, such emails do not represent the position of a tenure decisionmaker. President Faust, not Urton, had the final say on Theidon's tenure case.

**Rule 59(e)**

With the antidiscrimination claims wrapped up, we now
turn to the district court's denial of Theidon's Rule 59(e) motion
for an altered or amended judgment.  As a reminder, "[a] trial
court's disposition of a Rule 59(e) motion engenders review for
abuse of discretion." Negrón-Almeda v. Santiago, 528 F.3d 15, 25
(1st Cir. 2008).  Motions under Rule 59(e) "must either establish
a clear error of law or point to newly discovered evidence of
sufficient consequence to make a difference." Guadalupe-Báez, 819
F.3d at 518.  We discern no abuse of discretion in the district
court's denial of Theidon's motion.

Here, Theidon contends that sexual misconduct
allegations against her former mentor, Domínguez, constituted new
evidence requiring the reopening of discovery.  Theidon admits
that, prior to publication of the article describing Domínguez's
sexual misconduct over four decades, she was aware of an allegation
against Domínguez from 1983.  Theidon nevertheless suggests that
Domínguez's proclivity for sexual harassment prior to and around
the time of her tenure review (as described in greater detail in
The Chronicle article) may have motivated him to retaliate as
backlash against Theidon's support of work bringing light to sexual
misconduct on Harvard's campus.  Replacing Urton with Domínguez,
however, falls short of breathing new life into Theidon's specter

- 71 -

of a cat's paw theory of retaliation. If anything, with Domínguez at the helm, the causal connection between Theidon's protected activity and the adverse employment decision at issue becomes more tenuous and less tethered to a reasonable inference of retaliation. This is because Domínguez played virtually no role in Theidon's tenure review process. To the contrary, Theidon admits that Domínguez did not want to be involved.

Theidon directs the court to an email pursuant to which Singer reaches out to Domínguez prior to the ad hoc committee's review and asks him to describe Theidon's service on various Harvard committees. Domínguez replies that Theidon was not a "significant contributor," but that she had provided considerable service outside Harvard and was a powerful contributor to teaching about Latin America to undergraduates. Theidon does not challenge the veracity of Domínguez's statements nor has she identified a shred of evidence that Singer shared Domínguez's observations (accurate or not) with anyone. At bottom, Theidon has not identified a single undisputed fact suggesting that Domínguez influenced either the ad hoc committee's recommendation or President Faust's decision-making process.[45] The light shone on

---

[45] Domínguez is connected to one of the external professors who served on Theidon's ad hoc committee. Theidon did not present this fact below (or here) as evidence in support of her claims. And, even if she did, nothing in the record suggests the

Domínguez's deplorable behavior has no bearing on the case before us.  Theidon has not, therefore, "point[ed] to newly discovered evidence of sufficient consequence to make a difference" in her case.  <u>Franchina</u>, 881 F.3d at 56.  Accordingly, we see no reason to disturb the district court's order denying Theidon's Rule 59(e) motion.

## WRAP UP

Having worked our way through the issues, we *affirm* the district court's grant of summary judgment and denial of the Rule 59(e) motion to alter or amend the same.

Each side to bear their own costs.

---

relationship played a role (positive or negative) in her tenure review process.